

1   JOSEPH P. RUSSONIELLO (CABN 44332)
    United States Attorney
2
    BRIAN J. STRETCH (CABN 163973)
3   Chief, Criminal Division

4   MATTHEW A. PARRELLA (NYSBN #2040855)
    JEFFREY D. NEDROW (CSBN #161299)
5   JEFFREY R. FINIGAN (CSBN #168285)
    J. DOUGLAS WILSON (DCBN #412811)
6   Assistant United States Attorneys

7   150 Almaden Boulevard, Suite 900
    San Jose, CA 95113
8   Telephone: (408) 535-5045
    Facsimile: (408) 535-5066
9   Email: jeff.nedrow@usdoj.gov

10
    Attorneys for Plaintiff
11
12                        UNITED STATES DISTRICT COURT

13              NORTHERN DISTRICT OF CALIFORNIA

14                        SAN FRANCISCO DIVISION

15   UNITED STATES OF AMERICA,          )   No. CR 07-0732-SI
                                        )
16          Plaintiff,                  )   **UNITED STATES' OPPOSITION TO**
                                        )   **DEFENDANT'S MOTION IN LIMINE**
17      v.                              )   **TO EXCLUDE EVIDENCE**
                                        )
18   BARRY BONDS,                       )   Date: February 5, 2009
                                        )   Time: 10:30 a.m.
19          Defendant.                  )   Judge: Honorable Susan Illston
                                        )
20
21
22
23
24
25
26
27
28

     U.S. OPP. TO DEFENSE MOTION IN LIMINE
     [CR 07-0732-SI]

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................. 2

II. FACTS ......................................................................... 3

III. ARGUMENT ................................................................... 5

A. PRETRIAL RESOLUTION OF FOUNDATIONAL ISSUES ..................... 5

B. GENERAL PRINCIPLES APPLICABLE TO AUTHENTICATION AND
CHAIN OF CUSTODY ........................................................ 6

C. THE DEFENDANT'S SPECIFIC CLAIMS ...................................... 8

  1. The Blood and Urine Test Results .......................................... 8

    a. The Results Are Admissible Pursuant To Fed. R. Evid. 803(6) As Business
    Records. ................................................................. 8

    b. The Results Are Admissible For The Non-Hearsay Purpose Of
    Proving Materiality .................................................... 17

  2. The Calendars ........................................................... 18

    a. Calendars Reflecting Distribution of Anabolic Steroids To Bonds ........... 18

      i. Foundation and Authentication .................................... 18

      ii. Relevance ...................................................... 21

      iii. Hearsay ....................................................... 22

        A. The Calendars Are Admissible For The Non-Hearsay Purpose of
        Establishing Materiality ....................................... 22

        B. Statements Against Penal Interest–Fed.R.Evid. 804(b)(3) ........... 22

        C. Co-conspirator Statements–Fed.R.Evid. 801(d)(2)(E) ............... 25

        D. Business Records–Fed.R.Evid. 803(6) ........................... 26

        E. The Residual Exception–Fed.R.Evid. 807 ........................ 29

    b. The Calendars Unrelated To Bonds ...................................... 30

  3. Balco's Log Sheets Are Admissible ........................................ 30

    a. Introduction ............................................................ 30

    b. The evidence. ........................................................... 31

    c. The Balco Log Sheets Are Relevant And Not Prejudicial. ................. 31

    d.  The Log Sheets Are Admissible As Non-Hearsay To Prove
        Materiality. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    e.  The Log Sheets Are Admissible Pursuant To Three Hearsay
        Exceptions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

       i.   The Log Sheets Are Business Records Pursuant To Fed. R. Evid.
           803(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

       A.  Anderson's Statements To Valente Are Admissible As Statements Against
           Interest - Fed. R. Evid. 804(b)(3), Pursuant To The Residual Exception -
           Fed. R. Evid. 807, And As Statements Of A Co-conspirator - Fed. R. Evid.
           801(d)(2)(E). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

       B.  The Documents Valente Relied Upon Are Independently
           Admissible As Business Records Pursuant To Fed. R. Evid. 803(6). . . 39

       ii.  The Log Sheets Are Admissible Pursuant To The Residual Exception
          Of Fed. R. Evid. 807. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

       iii. The Log Sheets Are Statements Of A Co-conspirator Pursuant
          To The Exception Of Fed. R. Evid. 801(d)(2)(E). . . . . . . . . . . . . . . . . . . . . . 40

  4.  The Handwritten Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

  5.  Greg Anderson's Tape-Recorded Statements To Steve Hoskins Are
     Admissible. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

    a.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

    b.  The Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

    c.  The Tape-Recorded Statements Are Relevant. . . . . . . . . . . . . . . . . . . . . . . . . . 44

    d.  The Tape-Recorded Statements Are Admissible Under Two
       Hearsay Exceptions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

       i.   The Tape-Recorded Statements Were Against Anderson's
           Interests Pursuant To Fed. R. Evid. 804(b)(3). . . . . . . . . . . . . . . . . . . . . . . 44

       ii.  Anderson's Tape-Recorded Statements Are Admissible
          Pursuant To The Residual Exception Of Fed. R. Evid. 807. . . . . . . . . . . . 46

  6.  Expert and Lay Testimony Pertinent To Steroid Use . . . . . . . . . . . . . . . . . . . . . . . 47

    a.  The government's expert testimony is relevant and reliable. . . . . . . . . . . . . . . 47

    b.  The government's lay witnesses will offer percipient, not opinion, testimony. . 52

IV.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Ballou v. Henri Studios, Inc.*, 656 F.2d 1147 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Bourjaily v. United States*, 483 U.S. 171 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Cooper v. Eagle Memorial Hospital, Inc.*, 270 F.3d 456 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . 7

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . 2, 49

*Gallego v. United States,* 276 F.2d 914 (9th Cir. 1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Hangarter v. Provident Life & Accident Insurance Co.*, 373 F.3d. 998 (9th Cir. 2004) . . . . . . . 49

*In re Napster, Inc.*, 479 F.3d 1078 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 51

*Link v. Mercedes Benz of North America*, 788 F.2d 918 (3d Cir. 1981) . . . . . . . . . . . . . . . . . . . 18

*Mukhtar v. California State University*, 299 F.3d 1053 (9th Cir. 2002); . . . . . . . . . . . . . . . . . . 49

*Ohio v. Roberts*, 448 U.S. 56 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Orr v. Bank of America, NT & SA*, 285 F.3d 764(9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Padilla v. Terhune*, 309 F.3d 614 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 46

*Sana v. Hawaiian Cruises, Ltd.*, 181 F.3d 1041 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Thomas v. Newton International Enterprises*, 42 F.3d 1266 (9th Cir. 1994) . . . . . . . . . . . . . . . 49

*United States v. Alatorre*, 222 F.3d 1098 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 51

*United States v. Arteaga,* 117 F.3d 388 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 33

*United States v. Bachsian,* 4 F.3d 796 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 37

*United States v. Beckman*, 298 F.3d 788 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*United States v. Black*, 767 F.2d 1334 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Blackburn*, 922 F.2d 666 (7th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Blackwood*, 878 F.2d 1200 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Bland*, 961 F. 2d 123 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Boone,* 229 F.3d 1231 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 46

*United States v. Catabran*, 836 F. 2d 453 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Cerone*, 830 F.2d 938 (8th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Childs*, 5 F.3d 1328 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*United States v. Doe*, 805 F. Supp. 1513 (D. Hawaii 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Durham*, 464 F.3d 976 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*United States v. Egge*, 223 F.3d 1128 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Flom*, 558 F.2d 1179 (5th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Foster*, 711 F.2d 871 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States v. Friedman*, 593 F.2d 109 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38

*United States v. Gaudin*, 515 U.S. 506 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States v. Gonzalez-Flores*, 418 F.3d 1093 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Harrington*, 923 F.2d 1371 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Ladd*, 885 F.2d 954 (1st Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Licavoli*, 604 F.2d 613 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Luschen*, 614 F.2d 1164 (8th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Martin*, 984 F.2d 308 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Mata-Ballasteros*, 71 F.3d 754 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. McKenney*, 846 F.2d 528 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Ordonez*, 737 F. 2d 793 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Paguio*, 114 F.3d 928 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Pang*, 362 F.3d 1187 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Perez*, 526 F.3d 543 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*United States v. Perez*, 658 F.2d 654 (9th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Pfeiffer*, 539 F.2d 668 (8th Cir. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*United States v. Ramos-Oseguera*, 120 F.3d 1028 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Reyes*, 798 F.2d 380 (10th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*United States v. Sanchez-Lima*, 161 F.3d 545 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Satterfield*, 572 F.2d 687 (9th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Scholl*, 166 F.3d 964 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Slaughter*, 891 F.2d 691 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Ullrich*, 580 F.2d 765 (5th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*United States v. Valdez-Soto*, 31 F.3d 1467 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Wilson*, 532 F.2d 641 (8th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Williamson v. United States*, 512 U.S. 594 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25

## FEDERAL STATUTES AND RULES

Fed. R. Evid. 102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Fed.R.Evid. 103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Fed. R. Evid. 104(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 19

Fed. R. Evid. 401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Fed. R. Evid. 402 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 32

Fed.R.Evid. 801(d)(2)(E) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 31

Fed. R. Evid. 802 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Fed.R.Evid. 803(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 8, 9, 27, 31, 41

Fed.R.Evid. 804(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23, 44, 45

Fed. R. Evid. 807 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 31, 34

Fed. R. Evid. 901 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Fed.R.Evid. 901(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 18

Fed.R.Evid. 901(b)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 41

## OTHER SOURCES

*Weinstein's Evidence* ¶ 901(a)[01], at 901-16 to 17 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

# I. INTRODUCTION

The United States opposes defendant Barry Bonds's motion in limine. The defendant's January 15, 2009 motion broadly seeks to exclude drug tests, ledgers, doping calendars, and notes maintained by Balco and Greg Anderson in the course of their conspiracy to illegally distribute anabolic steroids and related performance-enhancing drugs to Barry Bonds and others. The defense further moves to exclude a digital recording of the defendant's steroid supplier, Greg Anderson, discussing the administration of steroids to the defendant. The defense also moves to exclude the expert testimony of two witnesses, Dr. Don Catlin and Dr. Larry Bowers, by suggesting that the basis of their testimony cannot meet the threshold for admissibility established under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Finally, the defense moves to exclude observations by percipient witnesses of the defendant's development of physical characteristics consistent with the use of anabolic steroids.

The defendant's arguments are without merit and should be rejected. The defendant's motion mistakenly suggests that the government must rely on novel applications of the law and unique legal arguments to gain admissibility of this evidence. The defense claims are long on rhetoric and notably short on either factual or legal substance. The government's arguments in support of admissibility, as set forth below, are premised upon straightforward, everyday applications of the rules of evidence governing the admissibility of evidence at trial in federal criminal cases. Indeed, many of the items that the defense seeks to exclude are routine business records maintained by Balco and the blood and urine testing labs used by Balco that are plainly admissible, upon the laying of a proper foundation, pursuant to Fed.R.Evid. 803(6). To the extent the government proposes anything other than an everyday application of the rules of evidence, it will likely be forced to do so only because of the anticipated illegal refusal of Greg Anderson, the defendant's former trainer, former steroid supplier, and close friend, to comply with his legal obligation to testify regarding his knowledge of the defendant's steroid use. As detailed below, the significant and particular guarantees of trustworthiness of the challenged items, along with the ample evidence corroborating the assertions contained with them, strongly support their admissibility.

## II. FACTS

On September 3, 2003, as part of its investigation of the illegal steroid distribution activities of Balco Laboratories, the government executed a search warrant at the Balco business premises in Burlingame, California. Federal agents found documents indicating the illegal distribution of anabolic steroids and other performance-enhancing drugs to dozens of athletes in a variety of sports.

Some of the documents seized from Balco indicated that the defendant was using Balco's services to determine whether anabolic steroids were detectable in his blood and urine. Agents found the results of numerous blood tests for the defendant. Agents further found a ledger that reflected a coding system in which the defendant's urine samples were assigned numbers and then referred out for urine testing at Quest Diagnostics, a national drug testing laboratory. The ledger and the drug test results found at Balco that corresponded to the numbers entered under the defendant's name on the ledger indicated that Bonds's urine tested positive for anabolic steroids on three separate occasions in 2000 and 2001. On each occasion, Bonds tested positive for the injectable steroid methenelone. On two of these three occasions, Bonds also tested positive for the injectable steroid nandrolone. Other results showed negative tests for the presence of anabolic steroids but reflected testosterone-to-epitestosterone ratios that strongly indicated the use of anabolic steroids by Bonds. Based upon this information, the government subsequently obtained, pursuant to grand jury subpoena, the records from Quest Diagnostics that confirm the referral of these urine samples from Balco and the testing of the samples pursuant to routine lab protocols at Quest Diagnostics.

At the time of the search, Victor Conte and James Valente, another Balco employee, voluntarily provided statements in which they identified Greg Anderson as a participant in the scheme. Based on these statements and corroborating documents found during the search, agents requested and received a separate search warrant for Anderson's residence. There, agents found handwritten notes, calendars, drug ledgers and financial notes indicating that Bonds and other athletes received and paid for illegal athletic performance-enhancing drugs from Anderson. Anderson voluntarily provided a statement in which he confessed to distributing anabolic

steroids to several of the athletes; but when asked about documents containing references to Bonds, he declined to provide any further statements. The documents from Anderson's residence provide a detailed record of steroid distribution from Anderson to Bonds from 2001 to 2003, with entries referring to injectable steroids ("test. 1cc"), human growth hormone, and other illegal performance-enhancing drugs.

In 2004, the government executed search warrants on Comprehensive Drug Testing, Inc. and Quest Diagnostics for documents and urine samples provided by Bonds and other Balco athletes in connection with Major League Baseball's 2003 drug testing program. Among the items seized were urine samples provided by Bonds and documents associated with those samples.

In approximately early 2003, Steve Hoskins, a former associate of Bonds who is expected to be one of the government's percipient witnesses in this case, recorded an in-person conversation he had with Anderson. Hoskins recorded the conversation on his own initiative; the government had no involvement with the decision to record the conversation or the actual recording of the conversation, and only became aware of the recording when it received a copy of it years after the conversation took place. Among other things, the recording contains Anderson's discussion of injecting Bonds and other statements consistent with the administration of anabolic steroids to Bonds.

The government has notified the defense that it intends to call two expert witnesses, both of whom have been qualified and permitted to testify as experts in prior proceedings before this Court. One of these experts is Dr. Larry Bowers, the medical director for the United States Anti-Doping Agency, who will testify that steroid users develop such symptoms as increased muscle mass, shrunken testicles, acne on the upper back, moodiness, and an erratic sexual drive. The government will introduce testimony from several percipient witnesses close to Bonds who will testify that Bonds exhibited some or all of these symptoms between approximately 1998 and 2003. Dr. Bowers will further testify that the urine and blood test results for Bonds reflect steroid use, and that the steroids involved are usually, though not exclusively, injectable steroids.

Dr. Bowers testified as an expert on steroids and banned performance-enhancing drugs in *United States v. Graham*, CR 06-0725-SI, a case tried before this Court last year.

The government's other expert is Dr. Don Catlin, one of the world's leading drug testing experts and the researcher who discovered "the clear," also known as tetrahydragestrinone or "THG." Dr. Catlin will testify that he tested the urine sample Bonds submitted to Major League Baseball in 2003 and determined that the sample was positive for THG and Clomid, an anti-estrogen drug typically used by steroid users to "jump-start" the replenishment of natural testosterone following its suppression by the use of anabolic steroids. In addition, Dr. Catlin will testify that Bonds's sample is positive for exogenous, that is, foreign, testosterone, itself an anabolic steroid and controlled substance under federal law. Dr. Catlin testified as an expert regarding his testing of urine samples of a defendant in *United States v. Thomas*, CR 06–0803-SI, a case tried before this Court last year.

In November 2008, the defense suggested that the parties seek to resolve some of the issues regarding the admissibility of the evidence in this case through an informal exchange of letters. *See* Exhibits A and B to the defense motion. The government entered into this process with the understanding that the purpose of these letters was a good-faith exchange of positions in the hopes of narrowing pretrial issues. The government received assurances from Bonds's counsel that the purpose of this process was to streamline the litigation, and that the process was not intended to create a basis for an assertion of rights by either party.

## III.     ARGUMENT

### A. PRETRIAL RESOLUTION OF FOUNDATIONAL ISSUES

In general, the government concurs with the defendant's position that the Court can, and should, rule pretrial with respect to the admissibility of the challenged evidence. The policy reasons underlying Fed.R.Evid. 103 and 104 support resolution of evidentiary issues pretrial, if possible, in the interests of an efficient pretrial presentation by both parties. The government accordingly has no procedural objection to proceeding by pretrial motion in limine to resolve these issues. The government notes, however, that the Court may find that certain questions cannot easily be resolved until foundational testimony has been received and considered at trial.

In addition, the government simply does not know whether Greg Anderson will testify. In the event the Court finds that an item may be admissible assuming the government meets certain foundational requirements, the government respectfully requests that the Court simply reserve ruling until those foundational witnesses have testified at trial.

## B. GENERAL PRINCIPLES APPLICABLE TO AUTHENTICATION AND CHAIN OF CUSTODY

The authentication of evidence is "satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed.R.Evid. 901(a). An item is sufficiently authenticated under Rule 901(a) "if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." *United States v. Black*, 767 F.2d 1334, 1342 (9th Cir. 1985) (citing 5 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 901(a)[01], at 901-16 to 17 (1983)). Put another way, if a witness offers testimony from which a reasonable juror could find in favor of authenticity, the trial court may properly admit the evidence to allow the jury to decide what probative force it has. *United States v. Blackwood*, 878 F.2d 1200, 1202 (9th Cir. 1989). "The proponent need not establish a proper foundation through personal knowledge; a proper foundation 'can rest on any manner permitted by Federal Rule of Evidence 901(b) and 902.'" *United States v. Pang*, 362 F.3d 1187, 1193 (9th Cir. 2004) (citing *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 774 (9th Cir. 2002)).

With respect to chain of custody, the prosecution must introduce sufficient proof so that a reasonable juror could find that the offered item is in substantially the same condition as when the item was seized by the government, and may admit the item if there is a reasonable probability the item has not been changed in important respects following the government's seizure. *United States v. Harrington*, 923 F.2d 1371, 1374 (9th Cir. 1991) (citing *Gallego v. United States*, 276 F.2d 914, 917 (9th Cir. 1960)). It is a well-established principle of federal law, as the defense concedes, that "a defect in the chain of custody goes to the weight, not the admissibility, of the evidence introduced." *United States v. Mata-Ballasteros*, 71 F.3d 754, 769 (9th Cir. 1995) (citations omitted).

The defendant cites to three fact-specific cases in his preliminary argument in support of the notion that this Court must apply special standards to admit evidence relating to blood and

U.S. OPP. TO DEFENSE MOTION IN LIMINE
[CR 07-0732-SI]                                          6

urine testing. This premise is wrong. In fact, the same authentication and chain of custody principles apply equally to blood and urine test results as they would to any other item of evidence. For example, in *Cooper v. Eagle Memorial Hospital, Inc.*, 270 F.3d 456, 463 (7th Cir. 2001), the Seventh Circuit found that an uninterrupted chain of custody, even as it pertains to a tissue sample, is not a prerequisite to admissibility. *See also Ballou v. Henri Studios, Inc.*, 656 F.2d 1147, 1155 (5th Cir. 1981) (stating that claims of "alteration, contamination, or adulteration" of blood samples that serve as the basis of blood tests to determine intoxication go to the "weight and not the admissibility of the evidence").

The cases cited by the defense have no bearing on the admissibility questions before the Court in the instant motion. In fact, two of the cases have nothing to do with authentication or chain of custody at all. The Ninth Circuit's concern in *United States v. Martin*, 984 F.2d 308 (9th Cir. 1993), was not admissibility, but the right to confrontation in the context of a supervised release violation. The facts of that case are easily distinguishable from the instant case. First, the defendant's positive drug test results in that case were the *only* evidence of the defendant's guilt in violating the terms of his supervised release. The government's evidence that Bonds lied when he denied knowingly taking steroids, among other false statements, will include a number of exhibits and witnesses above and beyond the test results. Second, the Ninth Circuit found that the defendant in *Martin* was denied an opportunity to refute the evidence: Bonds has had ample opportunity to challenge the test results the government seeks to offer in this case. Third, as discussed in greater detail below, the chain of custody with respect to Bonds's urine samples is completely reliable; once the samples at issue in this case were in the possession of Quest and the UCLA lab, the documentation of those entities establishes that the samples were handled properly.

In *United States v. Perez*, 526 F.3d 543 (9th Cir. 2008), a supervised release case similar to *Martin*, the Court articulated due process concerns about the use of drug test results to violate a defendant's term of supervised release based upon affirmative evidence of dilution of the sample and the lab's history of unreliable testing. Furthermore, the test result, as with *Martin*, was the sole evidence of the defendant's violation of supervised release. These factors led the

Ninth Circuit to state, "[w]e caution that this is an unusual case with unusual facts that should not be taken out of context." *Id.* at 545. The instant case is not like the "unusual case" considered by the Ninth Circuit in *Perez*. Notably, the defense has provided no evidence that the samples did not belong to Bonds or that there were some tangible problems with the testing processes of Quest and the UCLA Lab. Indeed, Bonds himself has admitted submitting numerous blood and urine samples to Balco for testing.

The sole case cited by the defense that contains pertinent case law, *United States v. Ladd*, 885 F.2d 954 (1st Cir. 1995), is easily distinguishable. In *Ladd*, the First Circuit found that the government had simply failed to introduce sufficient evidence to establish that the blood sample tested was the sample at issue in the case after a government lab had transferred the sample to a private lab and a numbering error had occurred. The government did not introduce any evidence to explain the numbering discrepancies. In other words, the government's showing failed to fulfill the basic authentication requirement under Rule 901(a) that the item "was what its proponent claims." Here, there are no factual problems similar to the discrepancies in labeling noted in *Ladd,* and the government will elicit testimony from the person who numbered the samples and sent them to Quest, and from the representatives of the labs who received and processed the samples, pursuant to normal lab procedures. A similar showing of proof supports admissibility of the sample from CDT.

As detailed in the following sections, the government's proof at trial as to each of these items meets the basic authentication and chain of custody requirements required for admissibility under the Federal Rules of Evidence and Ninth Circuit precedent. For the reasons stated below, the government requests that the Court deny the defendant's motion.

## C. THE DEFENDANT'S SPECIFIC CLAIMS

### 1. The Blood and Urine Test Results

#### a. The Results Are Admissible Pursuant To Fed. R. Evid. 803(6) As Business Records.

The defendant seeks to exclude certain laboratory tests results for blood and urine samples. The defendant claims, without further explanation, that the test results are irrelevant,

hearsay, lack foundation, authentication, and chain of custody, and that they should be deemed inadmissible because of the "unreliability of the test results and procedures." Mot. 8. The defendant then requests a *Daubert* hearing, and finishes with an unexplained assertion that the admission of the test results would create undue confusion and prejudice.

Federal Rule of Evidence 803(6) provides that:

"A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness are not excluded by the hearsay prohibition."

*See also United States v. Ordonez,* 737 F. 2d 793, 805 (9th Cir. 1984).

The failure of the testifying knowledgeable party to have personally completed the record, or even to know who completed the record, does not prevent a document from being admissible as a business record. *United States v. Bland,* 961 F. 2d 123, 127 (9th Cir. 1992). Nor does the fact that the record contains erasures or is incomplete preclude admission under this rule. *Id.* Instead, the accuracy, fullness, and completeness of the record goes to the weight to be given the evidence, and not to its admissibility. *United States v. Catabran,* 836 F. 2d 453, 458 (9th Cir. 1988).

Laboratory reports and medical records are admissible under Rule 803(6). *United States v. Blackburn*, 922 F.2d 666, 670 (7th Cir. 1993); *see also* Fed. R. Evid. 803(6) ("opinions" and "diagnoses" admissible as business records). Laboratory results that are admitted under the business record exception may also be used to prove the truth of the information contained within them. *United States v. Arteaga,* 117 F.3d 388, 396 (9th Cir. 1997) (by definition a hearsay problem only arises when evidence is being used to assert the truth of the matter and a hearsay exception alleviates any barrier to that use). For example, in *United States v. Doe*, 805 F. Supp. 1513, 1517 (D. Hawaii 1992), the court permitted the government to introduce "HIV database records as proof that the independent laboratories conducting the tests said the HIV tests were

negative." *Id.* at 1517; *see also United States v. McKenney*, 846 F.2d 528, 529 (9th Cir. 1988) (admitting the results of intoxilyzer tests to prove intoxicated state of defendant).

A district court has "wide discretion" in determining whether a business record meets the trustworthiness standard. *United States v. Scholl*, 166 F.3d 964, 978 (9th Cir. 1999). A record may be found trustworthy where the document's creator had no incentive to generate untrustworthy evidence, and circumstantial guarantees of trustworthiness were present. *Sana v. Hawaiian Cruises, Ltd.,* 181 F.3d 1041, 1046 (9th Cir. 1999). "There are circumstantial guarantees of trustworthiness in a record contemporaneously prepared by one who acts under a business duty of care and accuracy, particularly when the business entity for which the record is made relies on it." *United States v. Licavoli,* 604 F.2d 613, 622 (9th Cir. 1979).

Fed. R. Evid. 104(a) states that preliminary questions about the admissibility of evidence shall be determined by the court, and that in making that determination, the court is not bound by the rules of evidence except those with respect to privileges. The trial court's decision is based upon a preponderance of the evidence. *Bourjaily v. United States,* 483 U.S. 171, 172 (1987); *In re Napster, Inc.,* 479 F.3d 1078, 1095 (9th Cir. 2007).

In the present case, the government will present evidence from custodians or other qualified witnesses from each of the labs that will establish that the labs handled the samples appropriately and according to established laboratory protocol. These witnesses will also testify that the reports were made at or near the time of the events by or from information from a person with knowledge, that the reports were kept in the course of a regularly conducted business activity, and that it was the regular practice of the labs to make the reports.

The defendant does not specify his basis for asserting that the testing results and procedures could be unreliable. In fact, each of the testing entities is a professional, reliable laboratory engaged in the business of accurately testing samples and reporting same. The reports themselves contain no facial discrepancies that would create any doubt as to their accuracy, and the defendant's unsupported and conclusory allegations are insufficient to raise any. Further, the defendant has admitted ingesting THG, one of the substances detected in the lab reports. Likewise, he has admitted using the "cream," which, when used in conjunction with the "clear,"

U.S. OPP. TO DEFENSE MOTION IN LIMINE
[CR 07-0732-SI]                                    10

can result in blood test results showing suppressed testosterone levels, which is exactly what some of the proffered lab results indicate. Thus, the lab reports are trustworthy based on the defendant's own admissions and are therefore admissible.

The defendant also makes a generalized request for a *Daubert* hearing on "these issues," but again identifies no specific ground for such a hearing. The *Daubert* demand is inapposite to these exhibits, as the government is not proffering these results through the testimony of an expert, but is instead introducing them as business records prepared in the regular course of business. In other words, the government is simply offering these exhibits to prove that the labs reported these results for these specific specimens. The defendant is not entitled to a *Daubert* hearing under such circumstances.

The Urine/Blood Test Results are set forth in Exhibit 1 filed concurrently herewith and the evidentiary foundation and legal argument for each of these samples is addressed herein by laboratory.

1. Quest Diagnostics Inc.

Quest Diagnostics, Inc. ("Quest") performed a large number of tests on urine specimens obtained from the defendant. Each sample followed the following procedure, with foundational evidence listed below each entry:

a. The defendant gives Anderson urine sample.

- The defendant's testimony in grand jury stating that he gave urine samples to Anderson for him to bring to Balco for testing;

- Testimony of Valente that Anderson gave sample to him and identified it as the defendant's sample, admissible as summarized below.

• b. Anderson gives the defendant's sample to Valente.

- The defendant's grand jury testimony that he believed his urine samples were going to Balco;

- Testimony of Valente that Anderson gave sample to him and identified it as the defendant's sample, admissible as summarized elsewhere herein;

- Balco log, including ID/donor numbers for the defendant's samples that match

Quest's.

c. Valente sent samples to Quest.

   - Valente's testimony;

   - Balco log, including ID/donor numbers for the defendant's samples that match Quest's;

   - Valente/Quest correspondence at Balco referencing Bonds's identification numbers;

   - Quest's records file, which reflect referral from Balco.

d. Quest's internal chain of custody documents, except for the test relating to donor # 100145, collected on 02/05/2001, which documents could not be located by Quest.

   - Quest's own internal chain of custody documents, which provide detailed and specific sequence of events in terms of handling and testing sample, which is identified by identification number given to sample by Balco and contained in Balco records;

   - Quest records custodian witness.

e. Quest sends test results back to Valente/Balco.

   - Quest's own correspondence files;

   - documents found at Balco;

   - testimony of Quest records custodian;

   - testimony of Valente.

f. Balco maintains actual test result.

   - test results found at Balco;

   - testimony of Valente.

g. Valente/Balco gives test result to Anderson.

   - testimony of Valente;

   - documents found at Anderson residence;

   - statements against penal interest by Anderson.

The foundation, authentication, and chain of custody documents (other than the

02/05/2001 sample) for each Quest sample are more than adequate for admission into evidence for each of the test results. Any defect in the chain of custody for the 02/05/2001 sample simply goes to the weight to be accorded to the evidence and not to its admissibility. These records are particularly trustworthy because they are found in various locations, thus providing interlocking corroboration against a charge of later alteration. Both the Balco and the Quest contributors to the records are under a business duty of care and accuracy and rely upon the accuracy of the records.

The defendant's objection on relevance grounds is difficult to understand. Fed. R. Evid. 401 defines relevant evidence as that which has any tendency to make the existence of any fact of consequence more or less probable than it would be without the evidence. The urine test results are plainly relevant. The test results: 1) consistently request that the samples be tested for the presence of anabolic steroids, for no medical treatment purpose; 2) show three separate positive tests for the injectable anabolic steroids methenolone and nandrolone; and 3) show other results (such as testosterone/epitestosterone ratios, suppression of natural testosterone, etc.) that are indicative of anabolic steroid use. Test results reflecting repeated steroid use are directly relevant to the issue of whether the defendant knowingly lied to the grand jury when he denied knowingly using anabolic steroids

2. LabOne & Specialty Lab

LabOne & Specialty Lab performed a number of tests on blood specimens obtained from the defendant. Each sample followed the following procedure, with foundational evidence listed below each entry:

a. Dr. Ting withdraws blood sample from the defendant.

- The defendant's testimony in grand jury;

- Ting's testimony that he drew blood from the defendant on multiple occasions for delivery by Anderson to Balco.

b. Ting gives the defendant's sample to Anderson.

- The defendant's testimony in grand jury that he thinks samples are going to Balco;

| | |
|---|---|
| 1 | - Ting's testimony. |
| 2 | c. Balco submits samples to LabOne & Specialty Lab. |
| 3 | - Ting's testimony; |
| 4 | - LabOne and Specialty Lab records. |
| 5 | d. LabOne's and Specialty Lab's internal chain of custody. |
| 6 | - LabOne's and Specialty Lab's internal chain of custody documents; |
| 7 | - LabOne's and Specialty Lab's records custodian. |
| 8 | e. LabOne and Specialty Lab sends test results back to Balco. |
| 9 | - LabOne's and Specialty Lab's correspondence files; |
| 10 | - documents found at Balco; |
| 11 | - LabOne's and Specialty Lab's records custodian; |
| 12 | - testimony of Valente. |
| 13 | f. Balco maintains actual test result. |
| 14 | - test results found at Balco; |
| 15 | - testimony of Valente. |
| 16 | g. Valente/Balco gives test result to Anderson. |
| 17 | - testimony of Valente. |

The foundation, authentication, and chain of custody for each LabOne and Specialty Lab sample are more than adequate for admission into evidence for each of the test results. These specimens were submitted under the defendant's name (or in the case of Specialty Lab, under "B, B") and are also identified by his date of birth. The fact that these records were found in various locations, thus providing corroboration against a claim that the documents themselves were altered after they came into Balco's possession.

Blood tests of the defendant that consistently request that the samples be tested for the presence of "testosterone, free and total," for no medical treatment purpose, and show other results (such as liver enzymes, cholesterol levels, etc.) that are indicative of anabolic steroid use, are relevant to the issue of whether the defendant knowingly lied to the grand jury about his use of anabolic steroids.

1    3. Major League Baseball ("MLB")/UCLA Olympic Lab

2        MLB obtained a urine specimen from the defendant in 2003 as part of a player drug

3    testing program. This sample was recovered by federal law enforcement agents during the

4    execution of a search warrant and subsequently tested by the UCLA Olympic Testing Lab.

5            a. Comprehensive Drug Testing ("CDT") contractor collected urine samples from the

6        defendant.

7            - testimony of CDT contractor;

8            - business record/form memorializing this event contains the name of the person

9            collecting the sample and the defendant's initials on the form acknowledging that

10           a sample was taken.

11           b. Urine sample forwarded from contractor to Quest.

12           - Quest documents indicating receipt of the sample from the contractor;

13           - Quest internal chain of custody documents at Quest while testing was

14           performed on the sample.

15           c. Agents seize defendant's samples from Quest.

16           - testimony of agents that the defendant's sample, along with the samples for

17           several other players, were seized from Quest in 2004.

18           d. Agents personally deliver samples to UCLA Olympic Lab.

19           - testimony of agents who personally delivered the samples to the UCLA

20           Olympic Lab for analysis;

21           - UCLA Olympic Lab records custodian testimony;

22           - UCLA Olympic Lab chain of custody documents.

23           e. Test result generated by UCLA Olympic Lab.

24           - UCLA Olympic Lab records custodian testimony;

25           - UCLA Olympic Lab chain of custody documents;

26           - testimony of Dr. Don Catlin, then-director of the UCLA Olympic Lab,

27           confirming presence of THG, Clomiphene, and exogenous testosterone in the

28           defendant's urine.

1    The foundation, authentication, and chain of custody for the MLB/UCLA sample are

2    more than adequate for admission into evidence for the test results. Similarly, the relevance is

3    obvious, showing that the defendant was using anabolic steroids, THG, and a drug typically

4    utilized by hard-core steroid users, Clomiphene.

5       4. St. Joseph's Hospital and Medical Center ("St. Joseph's") and Chandler Regional Lab

6          ("Chandler")

7       These labs obtained and tested blood samples from the defendant at the request of the San

8    Francisco Giants Major League Baseball team ("SF Giants"). The government obtained these

9    test results and will seek to admit them through the testimony of hospital and laboratory

10   personnel.

11         a. St. Joseph's and Chandler's internal chain of custody.

12            - St. Joseph's and Chandler's internal chain of custody documents;

13            - St. Joseph's and Chandler's records custodian.

14         b. St. Joseph's and Chandler send test results back to the SF Giants.

15            - St. Joseph's and Chandler's correspondence files;

16            - documents obtained from the SF Giants;

17            - St. Joseph's and Chandler's records custodian.

18      The foundation, authentication, and chain of custody for the St. Joseph's and Chandler

19   tests are more than adequate for admission into evidence for the test results.

20      The documents are relevant because they provide a baseline for the defendant's blood

21   chemistry for comparison to other tests and provide a broader basis for the government's experts'

22   opinions. Additionally, the data contained within these reports will be analyzed for other results

23   (such as liver enzymes, cholesterol levels, etc.) that are indicative of anabolic steroid use, and are

24   relevant to the issue of whether the defendant knowingly lied to the grand jury about his use of

25   anabolic steroids.

26      5. MLB/CDT/Institut National de la Recherche Scientifique ("INRS")

27      MLB obtained a urine specimen from the defendant in 2006 as part of a player drug-

28   testing program. The sample was sent to INRS, a lab in Montreal, tested and found to be positive

U.S. OPP. TO DEFENSE MOTION IN LIMINE
[CR 07-0732-SI]                        16

for D-amphetamine, an illegal controlled substance that is also banned by MLB. The government does not intend to introduce evidence of this test in its case in chief, but reserves its right to use this evidence for other purposes.

### b. The Results Are Admissible For The Non-Hearsay Purpose Of Proving Materiality

The urine and blood test results are admissible for the non-hearsay purpose of establishing the materiality of the false statements Bonds made to the grand jury. To be material, a "statement must have a natural tendency to influence, or be capable of influencing, the decision of the decision-making body to which it was addressed." *United States v. Gaudin*, 515 U.S. 506, 509 (1995) (internal quotations, bracket and citation omitted). The government is thus required to show that Bonds's false statements were material to the grand jury before whom he was testifying in that they had a natural tendency to influence, or were capable of influencing, the decisions of the grand jury. As part of its proof of the materiality of Bonds's false statements, the government will necessarily need to explain the course of the Balco investigation, the identification of Anderson and Conte as primary targets of that investigation, and a summary of the evidence presented to the grand jury. At the time of Bonds's grand jury appearance, the government believed that Conte, Anderson and their associates were involved in illegally distributing steroids. However, their distribution methods, payment arrangements, involvement in actually injecting or otherwise administering the drugs, and other specific details of their activities were not completely understood. The defendant's own public statements suggested a strong link between Bonds and Anderson and Conte, suggesting that Bonds, in particular, might have knowledge about some of these matters.

The seizure of the challenged blood and urine test results directly linked Bonds to Balco. By definition, this evidence plays an important role in the government's proof that Bonds's false statements before the grand jury regarding his knowing receipt and use of anabolic steroids from Anderson and Conte had the ability to influence the grand jury's decision in evaluating the case against those individuals. The test results raised the inference that Bonds was a knowing recipient of steroids who was knowingly having his blood and urine tested as part of his regimen

of steroids use and receipt; Bonds denied that he was knowingly participating in such a scheme. In explaining materiality, the government should be permitted, and is indeed required, to provide the context in which the false statements were made.

In sum, the government is, in part, offering the test results not for the truth of the information asserted within them, but for the relevant purposes of explaining the course of the government's investigative conduct and decisions in requiring Bonds to testify, and further proving the ways in which Bonds's testimony could have materially affected the grand jury, particularly as that testimony contradicted the test results. The test results should be deemed admissible for this non-hearsay purpose.

## 2. The Calendars

The defendant objects to the admission of calendars seized at Anderson's residence. Bonds argues that the calendars are not relevant, lack foundation and authentication, constitute hearsay, are unduly prejudicial, and are "fundamentally unreliable." Mot. 9. The government addresses each of these arguments in turn.

### a. Calendars Reflecting Distribution of Anabolic Steroids To Bonds

#### i. Foundation and Authentication

There is more than "sufficient evidence" to support a finding that the calendars reflect schedules for distribution of steroids and other substances to the defendant. Fed.R.Evid. 901(a). For authentication of the calendars, the government can rely on "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." Fed.R.Evid. 901(b)(4).

As the Third Circuit observed in describing how circumstantial evidence may provide an appropriate basis for authentication:

> [T]he showing of authenticity is not on a par with more technical evidentiary rules, such as hearsay exceptions, governing admissibility. Rather, there need be only a prima facie showing, to the court, of authenticity, not a full argument on admissibility. Once a prima facie case is made, the evidence goes to the jury and it is the jury who will ultimately determine the authenticity of the evidence, not the court. The only requirement is that there has been substantial evidence from which they could infer that the document was authentic.

*Link v. Mercedes Benz of North America*, 788 F.2d 918, 928 (3d Cir. 1981) (quoting *United*

*States v. Goichman,* 547 F.2d 778, 784 (3d Cir. 1976) (emphasis omitted)).

The Court may consider hearsay in evaluating whether the authentication threshold has been met. Fed.R.Evid. 104(a) expressly states that the Court, in making determinations on admissibility questions, "is not bound by the rules of evidence except those with respect to privileges." The government may accordingly lay a foundation for the admissibility of the calendars and other challenged exhibits through hearsay and other testimony that may not be admissible at trial.

The government will lay a foundation for the admissibility of the calendars through the following evidence at trial: (1) the testimony of Special Agent Jeff Novitzky; and (2) the testimony of Jeremy Giambi, Jason Giambi, Bobby Estalella, Marvin Benard, and Benito Santiago, all athletes who obtained steroids from Anderson. Agent Novitzky's testimony will provide ample evidence from which the jury can find that Anderson authored the calendars in question.

Agent Novitzky will testify that the calendars were seized during the September 3, 2003 search of Anderson's residence. Several files were found in Anderson's residence. The files were organized by athlete. Most of the athlete files, including the one for Bonds, contained doping calendars, notes, and other materials associated with the distribution of illegal steroids to the athletes. Anderson stated that he distributed anabolic steroids and human growth hormone to some of his professional athlete clients, an admission that corroborates the presence and contents of the calendars in the files. Many of the calendars contain the name of Anderson's ex-wife, another fact that tends to lead to the reasonable conclusion that Anderson created the calendars.

Agent Novitzky will further testify that Anderson told him that he often did not put his name on the packages of drugs he sent to his athlete clients because he thought it was "not such a good idea." Anderson further stated that when Major League Baseball began testing for steroids (in early 2003, before the 2003 baseball season) he began giving some of his baseball clients "the clear" and "the cream" that he had received from Balco. Anderson stated that he typically dealt with James Valente at Balco. Anderson stated that Valente had told him that "the cream" was a

combination of testosterone and epitestosterone that was safe for athletes being tested for steroids because the epitestosterone would mask the testosterone.

In addition, the government intends to call several client-athletes of Anderson to authenticate their own calendars. The athlete witnesses, all of whom received hard copies of calendars that are extremely similar to Bonds's calendars, are expected to testify that they received hard copies of some of their calendars from Anderson. While none of these athletes were familiar with the contents of Bonds's calendars, the athletes will uniformly testify that their own calendars, which closely resemble Bonds's calendars, came directly from Anderson.

A third basis for authentication could come from Anderson himself. The government intends to call Anderson to testify. If Anderson elects to testify truthfully, the government expects that he will authenticate the calendars. Anderson pleaded guilty before this Court in 2005 and provided a sworn statement in which he admitted distributing anabolic steroids to athletes through and including the date of September 3, 2003, another fact the Court may consider in determining the authentication issue. In 2006, Anderson was served with a grand jury subpoena requiring him to appear before a grand jury and answer questions pertinent to his activities. Anderson illegally refused to testify and was ultimately held in civil contempt by the Hon. William Alsup of this Court. Anderson spent over a year in prison until his release in November 2007 following the grand jury's return of an indictment against Bonds. Based on this background, the government does not know if Anderson will comply with his legal obligations and answer questions regarding these documents.

Even if Anderson does not testify, considering the above-summarized anticipated testimony from Agent Novitzky and the athletes, there is sufficient evidence to authenticate the calendars based on their contents. In *United States v. Reyes*, 798 F.2d 380, 383 (10th Cir. 1986), the defendant objected to the admission of handwritten notes on authenticity grounds. The notes were seized from the defendant's residence, and their contents included the name of the defendant, initials of his co-conspirators, notations of numbers and ounces, and phone numbers. The court found no abuse of discretion in the admission of the notes. It stated: "The source of the notes and the correspondence of information contained in the notes to members of the

conspiracy provided ample foundation for their admissibility." *Id.* at 383. This case is the same, because the contents of the notes indicate that they were written by someone involved in the conspiracy to distribute anabolic steroids to athletes. *Id.*

Similarly, in *United States v. Wilson*, 532 F.2d 641, 644-45 (8th Cir. 1976), the court admitted the contents of two notebooks found in a house that an informer said was being used in a narcotics operation. Although the author was unknown, the court found that the contents of the books, nicknames of the defendants, and code terms referring to heroin, were sufficient for authentication purposes. And in *United States v. Luschen*, 614 F.2d 1164, 1174 (8th Cir. 1980), a prosecution for conspiracy to distribute cocaine, the trial court allowed expert testimony as to the meaning of notations in a notebook found in the defendant's bedroom. The court allowed the contents of the writing to be used in determining the identity of the declarant for purposes of Rule 901 because dates and prices listed in the notebook corresponded to the dates of drug transactions in the case. Handwriting analysis was not required. *Id.* at 1174.

Here, Agent Novitzky will testify that he found the calendars in Anderson's residence. The calendars contained distinctive notes that referenced steroid distribution to Bonds and the other athletes. Some of the calendars bore the name of Anderson's ex-wife. Anderson acknowledged to Agent Novitzky that he distributed steroids and other drugs to some of the athletes. Several of the athletes will identify the calendars and confirm that they received drugs from Anderson consistent with the notations on the calendars as well as hard copies of the calendars themselves. In sum, ample evidence links Anderson to the calendars, and they are what the government offers them as, that is, doping calendars prepared by Anderson.

**ii. Relevance**

The calendars are relevant because they have a tendency to prove facts of consequence to this case, that is, they support the inference that the defendant knew that the items he was receiving from Anderson were steroids, and that he was therefore knowingly providing false statements when he told the grand jury that he had not knowingly taken steroids that he had received from Anderson. This inference is particularly supported by the testimony of the other athletes, several of whom will testify that Anderson discussed with them the steroids that he was

U.S. OPP. TO DEFENSE MOTION IN LIMINE
[CR 07-0732-SI]                                    21

providing to them. Furthermore, the fact that some of the entries on the calendars reference injectable items is also relevant to knowledge, and directly relevant to Count Four, the allegation that Bonds testified falsely when he stated that neither Anderson nor anyone associated with Anderson ever injected him with anything. The calendars are also directly relevant to Counts Six through Ten, all of which allege that Bonds testified falsely when he claimed that he did not begin to receive items from Anderson until after the 2002 season. Several of the calendars reflect the distribution of anabolic steroids and other drugs to Bonds in 2001 and 2002, contrary to the time frame to which he testified in his grand jury testimony. For all of these reasons, the calendars are relevant.

### iii. Hearsay

#### A. The Calendars Are Admissible For The Non-Hearsay Purpose of Establishing Materiality

As with the urine test results, the calendars are admissible in this case for the non-hearsay purpose of establishing the materiality of the false statements Bonds made to the grand jury. The government is required to demonstrate that the false statements were capable of influencing the decision of the grand jury. As a part of the government's investigation of Anderson and Conte, Bonds was repeatedly asked questions about the calendars in the grand jury. In his grand jury testimony, Bonds consistently denied knowledge of the calendars and the information contained within them. The calendars suggested Bonds's knowing receipt of anabolic steroids, a premise which Bonds denied repeatedly in the grand jury, thus presenting a conflict between the documentary evidence and Bonds's statements. The grand jury, of course, was evaluating the state of the evidence against Anderson and Conte. The calendars should thus be admitted for the non-hearsay purpose of demonstrating how Bonds's statements could have affected the grand jury's evaluation of the calendars.

#### B. Statements Against Penal Interest–Fed.R.Evid. 804(b)(3)

To gain admissibility of a statement under Fed.R.Evid. 804(b)(3), the party offering the statement must show: (1) the declarant is unavailable as a witness; (2) the statement so far subjected the declarant to civil or criminal liability that a reasonable person in the declarant's

U.S. OPP. TO DEFENSE MOTION IN LIMINE
[CR 07-0732-SI]                                    22

1  position would not have made the statement unless he believed it to be true; and (3)
2  corroborating circumstances clearly indicate the trustworthiness of the statement. *United States*
3  *v. Paguio,* 114 F.3d 928, 932 (9th Cir. 1997). "Rule 804(b)(3) is founded on the commonsense
4  notion that reasonable people, even reasonable people who are not especially honest, tend not to
5  make self-inculpatory statements unless they believe them to he true." *Williamson v. United*
6  *States,* 512 U.S. 594, 599 (1994).

7       The first requirement, of course, will not be subject to determination until the time of
8  trial. Anderson has been served with a trial subpoena requiring his testimony at trial. If he
9  testifies, Anderson will be available and this exception will not apply. In turn, if Anderson
10 refuses to testify he will be "unavailable" for purposes of the rule. Fed.R.Evid. 804(a)(2); *United*
11 *States v. Ramos-Oseguera*, 120 F.3d 1028, 1034 (9th Cir. 1997) (witness who persists in refusing
12 to testify despite order to do so is unavailable pursuant to Fed.R.Evid. 804(a)(2)).

13      The second requirement references the language in the rule that provides for admissibility
14 of hearsay from an absent declarant of a "statement which . . . was so far contrary to the
15 declarant's pecuniary interest . . . or so far tended to subject the declarant to civil or criminal
16 liability, . . . that a reasonable person in the declarant's position would not have made the
17 statement unless believing it to be true." Fed.R.Evid. 804(b)(3). The word "tending" broadens
18 this definition, so that the statement need not be a confession that conclusively establishes guilt.
19 *United States v. Slaughter,* 891 F.2d 691, 698 (9th Cir. 1989); *United States v. Satterfield*, 572
20 F.2d 687, 691 (9th Cir. 1978). "Whether a statement is in fact against interest must be
21 determined from the circumstances of each case," *Williamson*, 512 U.S. at 601, and "can only be
22 determined by viewing it in context." *Id.* at 603.

23      A reasonable person in Anderson's position would have known that creating the
24 documents tended to subject him to criminal liability, and Anderson's own statements to Agent
25 Novitzky at the time of the seizure of the calendars demonstrated that he did, in fact, know the
26 documentation of his illegal drug distribution activities subjected him to criminal liability.
27 Anderson admitted to Agent Novitzky that he didn't think it was a "good idea" to have his name
28 on the packages sending out the drugs by way of explaining why he did not affix his name to the

drug packages. Anderson stored the calendars in a closet. He used codes on the calendars as
shorthand for the drugs he was distributing, and used Bonds's initials "BB" as shorthand to
reference Bonds's calendar. After initially acknowledging distributing steroids to some athletes,
Anderson refused to answer any further questions once agents broached the subject of Bonds. In
short, all of his conduct surrounding the creation and maintenance of the calendars suggests that
Anderson knew he was acting illegally.

Rule 804(b)(3) also contemplates the admissibility of statements that run strongly
contrary to the declarant's "pecuniary interest." The rationale for admissibility under this theory
is equally strong. Anderson benefitted greatly from his association with Bonds. In addition to
receiving significant income from Bonds, Bonds bestowed upon Anderson the incalculable
benefit of publicly endorsing his work as a trainer. Anderson would have been ruined financially
if he had made false statements, or created false documents, reflecting Bonds's steroid use.
There is simply no sensible explanation for the existence of these documents other than to view
them as what they must be: a chronicle of Anderson's conduct in distributing steroids to Bonds
and instructions on how and when to use them.

As to the third element, the corroborating circumstances indicate the trustworthiness of
the calendars. The calendars were found in Anderson's home. Some of the calendars contained
Anderson's ex-wife's name. Several athletes testified in the grand jury regarding their personal
calendars, and in doing so confirmed that Anderson personally provided them with the calendars
and explained their contents. At least two athletes clearly understood, based upon their
conversations with Anderson, that the calendars outlined a regimen for their own steroid use.
There is overwhelming evidence that Anderson created the documents. Notably, for all of the
evasiveness and false statements in Bonds's grand jury testimony, Bonds never said that the
calendars were inaccurate, nor did he deny that Anderson provided him with substances. He
simply denied knowing what the substances were. Neither the evidence nor logic suggests that
the calendars lack trustworthiness.

The defendant's objection under this argument contains the mistaken assertion that a
declaration against penal interest may only be used to inculpate the declarant. The defense relies

1 on a misreading of *Williamson v. United States,* 512 U.S. 594, 599 (1994), to argue that the
2 calendars therefore cannot be used at trial against the defendant. Read in context, however,
3 *Williamson* reveals that the Supreme Court's concern was in permitting the party introducing the
4 statement to also introduce collateral, non-self-inculpatory statements along with the self-
5 inculpatory statements for purposes of context. *Id.* at 601. *Williamson* did not bar the use of a
6 legitimately self-inculpating statement against another party, and the defense argument that the
7 calendars would have to be redacted at trial in this case because they also have the effect of
8 inculpating Bonds is not accurate.

9     The statements in the calendars are solidly self-inculpatory. Anderson knew he was
10 subjecting himself to criminal liability through his conduct in this case. The totality of the
11 circumstances provides the calendars with a high level of reliability and trustworthiness and they
12 are admissible.

13                    **C.   Co-conspirator Statements – Fed. R. Evid. 801(d)(2)(E)**

14     The calendars at Anderson's residence are further admissible pursuant to Fed.R.Evid.
15 801(d)(2)(E) as co-conspirator statements. Rule 801(d)(2)(E) provides that a statement is not
16 hearsay if it is "a statement by a coconspirator of a party during the course and in furtherance of
17 the conspiracy." Before a statement may be admitted, the proponent must show: "(1) that the
18 declaration be in furtherance of the conspiracy; (2) that the declaration be made during the course
19 of the conspiracy; and (3) that there is independent proof of the existence of the conspiracy and
20 of the connection of the declarant and the defendant with it." *United States v. Perez,* 658 F.2d
21 654, 658 (9th Cir. 1981).

22     The calendars at Anderson's residence were declarations in furtherance of the conspiracy
23 to defraud the United States through the illicit distribution of misbranded drugs. The original
24 indictment against Anderson alleged, in Count Eight, that Anderson was involved in distributing
25 misbranded drugs for the purpose of defrauding the United States. The indictment alleged that,
26 as part of the conspiracy, Anderson, Conte, and the other charged co-conspirators distributed "the
27 Cream," an anabolic steroid in the form of a testosterone-based cream, for the purpose of
28 concealing the elevated testosterone levels of individual athletes from drug testing authorities.

1  Anderson, Conte, and the other charged defendants also distributed "the Clear," a newly
2  manufactured, designer steroid not yet recognized by law enforcement or the testing community,
3  as a drug that would have steroid-like effects but would likely not result in positive steroid tests
4  given its novel structure. In furtherance of the conspiracy, the charged defendants also warned
5  athletes to keep their use of the drugs secret, and provided athletes with false cover stories in the
6  event they were caught with the drugs and needed to provide an explanation. The evidence in
7  this case demonstrates that Bonds, like many of the athletes, was a joint venturer in the secrecy
8  facet of the Balco conspiracy.

9         The evidence of Bonds's activity in submitting blood and urine samples to Balco so that
10  his samples could be screened for any positive steroid results establishes that his role was not
11  simply that of a user, but a person who was actively furthering the objects of the conspiracy, i.e.
12  monitoring test results to ensure the substances remained undetectable. Under such
13  circumstances, the calendars Anderson designed to assist him in successfully executing the
14  conspiracy should be appropriately admissible against Bonds as statements in furtherance of the
15  conspiracy. Finally, the ledgers, calendars, and statements by Anderson ("this is Barry's urine")
16  were clearly in furtherance of the conspiracy's goal of creating undetectable steroids. *See e.g.*
17  *United States v. Cerone*, 830 F.2d 938, 949 (8th Cir. 1987) (co-conspirator's notes documenting
18  meetings, disbursement of funds, etc. properly admitted under exception).

19         Bonds may claim that he was simply an end user of the drugs, and that therefore he
20  should not be viewed as a co-conspirator. However, as discussed, Bonds did much more than
21  simply purchase a small quantity of drugs. *United States v. Egge*, 223 F.3d 1128 (9th Cir. 2000).
22  He agreed to have his blood and urine tested to ensure their products worked and were
23  undetectable. These activities tangibly benefitted the conspiracy in a manner that far exceeds the
24  simple, limited benefit of a person buying a small amount of drugs from a drug dealer.

25                    **D.    Business Records – Fed. R. Evid. 803(6)**

26         The calendars are further admissible as business records pursuant to the authority
27  discussed previously. If Anderson testifies truthfully, the government expects that he would
28  testify that he created the calendars as distribution and usage records in connection with his

distribution of anabolic steroids and other drugs to his client athletes. The evidence, including Anderson's own guilty plea in 2005, overwhelmingly suggests that such conduct in supplying steroids, and making recommendations regarding their use, was a part and parcel of Anderson's professional relationship with these athletes. Anderson plainly maintained these calendars as a part of his regularly conducted business activity. Such testimony would clearly fulfill the requirements of Fed.R.Evid. 803(6).

Even if Anderson refuses to testify, these records are admissible under Rule 803(6) based upon: (1) Anderson's statements against penal interest to Agent Novitzky at the time of the search warrant, in which Anderson admitted that he distributed steroids to athletes; and (2) the testimony of the other client-athletes whom the government intends to call as witnesses in its case-in-chief, all of whom will acknowledge receipt of the calendars and authenticate them as records of the drugs they received from Anderson pursuant to his training recommendations. While these athletes are clearly not employees of Anderson, they are qualified witnesses knowledgeable of the manner in which Anderson routinely prepared these calendars based on their own client relationships with Anderson. Their testimony satisfies the requirements for admissibility under Rule 803(6). A witness is not required to have knowledge of the preparation of the record for a business record so long as the records "have all the indicia of trustworthiness that the federal rules requires for the admission of hearsay evidence." *United States v. Ullrich*, 580 F.2d 765 (5th Cir. 1978). For the reasons stated above in the discussion viewing the calendars as statements against penal interest, the calendars have a very high level of trustworthiness based upon the circumstances in which they were maintained, the anticipated testimony of Anderson's other client-athletes, and the strong self-inculpating effect they have as to Anderson.

The Eighth Circuit's holding in *United States v. Pfeiffer*, 539 F.2d 668, 671 (8th Cir. 1968), supports admissibility of the challenged calendars as business records based on the testimony of the client athletes. In *Pfeiffer*, the Eighth Circuit introduced records prepared by a common carrier through the testimony of an employee of a shipper familiar with the common carrier's practices. The shipping employee was sufficiently well-versed in the common carrier's

1  billing and record keeping practices to demonstrate a "circumstantial guarantee of
2  trustworthiness," and the Court upheld the admissibility of the records under a business records
3  theory despite the employee's lack of knowledge regarding the preparation of the actual records
4  admitted. *Id.* at 671. The Fifth Circuit reached a similar conclusion in *United States v. Flom*,
5  558 F.2d 1179, 1182 (5th Cir. 1977), finding records of a company admissible under the business
6  records exception based upon the informed testimony of an employee of a second company. The
7  Fifth Circuit noted that "[a]lthough the usual case involves an employee of the preparing
8  business laying the necessary foundation under 803(6), the law is clear that under circumstances
9  which demonstrate trustworthiness it is not necessary that the one who kept the record, or even
10  had supervision over their preparation, testify." *Id.*

11  In *United States v. Ullrich*, 580 F.2d 765, 771 (5th Cir. 1978), the prosecution introduced
12  records to prove the identity of an automobile through the testimony of an employee of an
13  automobile dealership. The records were prepared by an automobile manufacturer and a credit
14  agency, and sent to the dealership. The Fifth Circuit held that their introduction was proper.
15  "Although these documents were furnished originally from other sources, [the employee-witness]
16  testified that they were kept in the regular course of the dealership's business. In effect, they
17  were integrated into the records of the dealership and were used by it." *Id.* at 771.

18  *Pfeiffer*, *Flom*, and *Ullrich* all support the proposition that Anderson's calendars are
19  admissible as business records even if Anderson refuses to testify. In addition to the client
20  athletes' anticipated testimony, Agent Novitzky will testify to Anderson's statements regarding
21  his steroid distribution activities. These statements, which are plainly statements against penal
22  interest and occurred after Agent Novitzky had entered the residence to execute a search warrant,
23  provide a foundational basis and circumstances that demonstrate trustworthiness, in that
24  Anderson confirmed his role in illegally distributing anabolic steroids to several of his athletes.
25  His statements, when combined with the statements of the client-athletes in which they
26  authenticate their own calendars and acknowledge receiving them from Anderson as part of their
27  receipt of drugs, provides ample reassurances of trustworthiness, and supports the admission of
28  the calendars under Rule 803(6).

1

**E.      The Residual Exception – Fed. R. Evid. 807**

2      A proponent of evidence under this exception must satisfy the following: (1) the evidence
3   must have circumstantial guarantees of trustworthiness; (2) it must be offered to prove a material
4   fact; (3) it must be more probative on the point for which it is offered than any other evidence
5   which the proponent can procure through reasonable efforts; (4) the adverse party must be
6   notified of the proponent's intention to introduce the evidence sufficiently in advance of trial to
7   permit the adverse party a fair opportunity to meet the evidence; and (5) admission of the
8   evidence must serve the general purposes of the Rules of Evidence and must be in the interests of
9   justice. Fed. R. Evid. 807; *United States v. Bachsian*, 4 F.3d 796, 798 (9th Cir. 1993) (dealing
10  with Fed. R. Evid 803(24), predecessor to Fed. R. Evid. 807).

11     The calendars satisfy these requirements. They obviously relate to material facts. There
12  are abundant circumstantial guarantees of trustworthiness, some of which have been previously
13  referenced, but are briefly summarized again here: (1) Bonds admitted in his grand jury
14  testimony that he obtained, and used, the clear and cream provided by Anderson as a part of his
15  training regimen; (2) the calendars were found in Anderson's residence and contained the name
16  of his ex-wife, suggesting he created them; (3) Anderson admitted to Agent Novitzky that he
17  distributed steroids to athletes; and (4) other client-athletes will testify regarding their receipt of
18  drugs from Anderson and his creation and use of the calendars to monitor their receipt and usage.
19  Furthermore, there is no evidence suggesting that the documents lack trustworthiness; it was in
20  Anderson's self-interest to make sure that the records accurately tracked the steroid regimen of
21  his athletes both to keep the athletes healthy and to keep them from getting caught by drug-
22  testing authorities. The conduct in this case was Anderson's profession; it would make no sense
23  for him not to take great care in maintaining these records accurately, and it would have been
24  professionally self-destructive for him to handle them inaccurately. The defense has provided no
25  evidence suggesting the calendars lack trustworthiness, and does not even bother to articulate any
26  basis for questioning the trustworthiness of the calendars in its filing.

27     As Anderson may refuse to testify, the Anderson-related evidence is more probative than
28  anything else the government may offer on the pertinent issues. Furthermore, admissibility

1 vindicates the general purposes of the rules and interests of justice are satisfied, in that there are
2 sufficient indicia of reliability. The alternative in this case would be that the defendant succeeds
3 in keeping out inculpating evidence based upon the illegal refusal of his close associate to testify.
4 That would be unjust. The calendars should accordingly be admitted under Rule 807.

## b. The Calendars Unrelated To Bonds

6 The calendars unrelated to Bonds are admissible not for the truth of the matter asserted
7 but to demonstrate materiality, as they corroborate Bonds's calendars and provide further
8 evidence of the nexus of Anderson's role in the distribution of steroids to athletes, the topic
9 which was the focus of the investigation in 2003. If the calendars for the other athletes are
10 hearsay, they are admissible under the same exceptions to the hearsay rule that governed the
11 analysis of Bonds's calendars, that is, as statements against penal interest, co-conspirator
12 statements, business records, and under the residual hearsay exception.

13 The defense argues that the calendars are not relevant. This argument is without merit.
14 The calendars of other athletes are relevant to establish Bonds's relationship with Anderson. As
15 discussed previously, the calendars belonging to other athletes tend to prove that Bonds's
16 calendars, which were virtually identical, were, in fact, calendars associated with Anderson's
17 distribution of steroids to Bonds, by virtue of their physical proximity to Bonds's calendars and
18 their virtually identical appearance and content. Furthermore, the calendars of other athletes will
19 corroborate the testimony by those athletes related to their steroid activities with Anderson.

20 ## 3. Balco's Log Sheets Are Admissible

21 ### a. Introduction

22 Bonds argues that the Balco log sheets at Defense Exhibit C.2.b. are inadmissible on the
23 following grounds: irrelevance (Fed. R. Evid. 402); lack of foundation and authentication (Fed.
24 R. Evid. 901); lack of chain of custody; hearsay (Fed. R. Evid. 802); undue prejudice (Fed. R.
25 Evid. 403); and "fundamental unreliability under the Due Process Clause." Mot. at 8-9. The
26 objections should be overruled because the evidence is relevant, will be authenticated by its
27 creator, and is admissible pursuant to three hearsay exceptions: (1) as business records pursuant

28

to Fed. R. Evid. 803(6); (2) pursuant to the residual exception in Fed. R. Evid. 807; and (3) as statements of a co-conspirator pursuant to Fed. R. Evid. 801(d)(2)(E).

### b. The evidence.

The Balco log sheets record results of urinalyses that were performed on urine samples submitted to Balco by its clients. The log sheets were created by James Valente, who will authenticate them and lay the foundation for their creation. Mr. Valente was the Director of Operations at Balco from 1995 through September 2003, when the log sheets were discovered during the execution of the Balco search warrant. As this Court is aware, Mr. Valente pleaded guilty to conspiring to distribute anabolic steroids in connection with his employment at Balco. According to Mr. Valente, the log sheets constituted records kept at Balco in the regular and ordinary course of its business, made at or near the time of receiving the information contained in the log sheets, and by a person, *i.e.* Mr. Valente, with knowledge of the information entered in the log sheets. Specifically, the log sheets documented the receipt of urine samples, the identity of the sample provider, the assignment of an identification number to the urine sample, and the results of analyses performed upon the urine by outside laboratories to whom Balco sent the samples. In other words, with respect to the last point, upon receipt of a urine sample, Mr. Valente sent it to an outside laboratory for analysis and subsequently received the results of the analysis via facsimile and mail. Mr. Valente then recorded that information from the results onto the log sheets. The entries on the log sheets associated with the defendant bear his name or initials and were entered by Mr. Valente based upon the defendant's personal trainer, Greg Anderson, submitting urine samples to Mr. Valente and advising Mr. Valente that the samples were from the defendant. Upon receipt of a urinalysis of the defendant's urine, Mr. Valente recorded the results on the log sheet, filed a hard copy of the results at Balco, and provided a copy to Greg Anderson.

### c. The Balco Log Sheets Are Relevant And Not Prejudicial.

The log sheets are relevant because they provide a link in the chain of custody of the defendant's urine samples and, through the assigned identification numbers, allow the trier of fact to match urinalyses with the defendant's urine samples. The results from the laboratories

contain only identification numbers, and therefore the log sheets are necessary to identify the individual associated with a particular identification number. The log sheets also corroborate other witnesses who submitted urine samples to Balco for the same purpose as the defendant. For example, the Balco log sheets contain entries for Armando Rios, Marvin Benard, Benito Santiago, Jason Giambi, and Jeremy Giambi, all of whom will confirm that they submitted urine samples to Balco.

The defendant's argument for excluding the evidence as unfairly prejudicial is without merit for two reasons. First, as stated, the evidence is directly relevant to the elements of the offense, *i.e.* that the defendant testified falsely about his knowing steroid use. Second, the evidence is neither unduly prejudicial nor is its probative value substantially outweighed by any arguable prejudice. In order to exclude evidence pursuant to Rule 403, the evidence must be unfairly prejudicial, and not merely constitute relevant evidence of guilt. "Unfairly prejudicial" evidence refers to "the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *United States v. Gonzalez-Flores*, 418 F.3d 1093, 1098 (9th Cir. 2005) (evidence that aliens suffered heat stroke was unfairly prejudicial in case where defendant charged with alien smuggling). Further, the probative value of the evidence must be "substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403 (emphasis added). Proof that the defendant's urine tested positive for steroids on multiple occasions obviously possesses significant probative value, and the jury deserves to be presented with the complete facts. The defendant's motion is akin to a bank robber moving to exclude video evidence of himself inside of the bank for no other reason than it is going to prove his guilt. The evidence is not "unfairly" prejudicial simply because it tends to prove guilt.

### d. The Log Sheets Are Admissible As Non-Hearsay To Prove Materiality.

The Balco log sheets are admissible for the non-hearsay purpose of establishing the materiality of the false statements Bonds made to the grand jury. As noted in previous sections, the government is required to prove that Bonds's false statements to the grand jury were material, that is, capable of influencing the grand jury's decisions. A necessary part of that showing will

1 include a presentation of the evidentiary context in which Bonds made the false statements.
2 Anderson and Conte were primary targets of the investigation. As the Balco log sheets raise
3 questions about the nature of Bonds's involvement with Conte, including details about the testing
4 program, the government should be permitted to offer the Balco log sheets for the non-hearsay
5 purpose of explaining how Bonds's false statements about the timing and nature of the items he
6 received from Anderson could have influenced a grand jury which was reviewing such evidence
7 as a part of its decision-making process.

### e. The Log Sheets Are Admissible Pursuant To Three Hearsay Exceptions.

#### i. The Log Sheets Are Business Records Pursuant To Fed. R. Evid. 803(6).

11 Mr. Valente's testimony will satisfy each of the business records requirements discussed
12 above. He will testify that he was the custodian of the log sheets at Balco and that they were
13 created at or near the time of his receipt of the items indicated on the log sheets from information
14 transmitted by people with knowledge of the events. For example, he can testify that entries for
15 the defendant were made at or near the time the Anderson delivered urine samples to Valente at
16 Balco and told Valente they were the defendant's. Valente will further testify that it was Balco's
17 regular practice to make the log sheets and they were kept in the regular course of Balco's
18 business activities. Drug dealers' ledgers have been ruled admissible as business records with
19 far fewer indicia of legitimacy than Balco's log sheets. *See United States v. Foster*, 711 F.2d
20 871, 882 (9th Cir. 1983) (defendant's co-conspirator's ledger of her heroin transactions in the
21 course of their drug dealing admissible as a business record despite facts that ledger was
22 incomplete, contained blank pages, and recorded entries out of sequence).

23 The fact that some of the information Valente recorded in the log sheets came from other
24 sources – such as Anderson telling Valente he was giving Valente Bonds's urine and the
25 urinalyses from another laboratory – does not preclude application of the exception. In this
26 "double hearsay" situation, if "each statement [qualifies] under some exemption or exception to
27 the hearsay rule" the log sheets are admissible. *United States v. Arteaga*, 117 F.3d 388, 396 n.12
28 (9th Cir. 1997).

## A. Anderson's Statements To Valente Are Admissible As Statements Against Interest - Fed. R. Evid. 804(b)(3), Pursuant To The Residual Exception - Fed. R. Evid. 807, And As Statements Of A Co-conspirator - Fed. R. Evid. 801(d)(2)(E).

Each time Anderson brought one of the defendant's urine samples to Valente, he said words to the effect of "this is Barry's urine." Valente relied upon those statements by Anderson in creating the log sheets, and the statements are admissible for several reasons: (1) as statements against Anderson's interest; (2) pursuant to the residual hearsay exception; and (3) as statements by a co-conspirator.

First, pursuant to the authorities cited above, and assuming Anderson unlawfully refuses to testify at trial, Anderson's statements to Valente about the defendant's urine samples are admissible as being against Anderson's interest because they so far subjected him to criminal liability at the time he made them that he would not have done so if they were untrue. Furthermore, the statements are amply corroborated by independent evidence. At the time Anderson submitted the defendant's urine samples to Valente, Anderson was engaged in distributing steroids and other illegal substances to the defendant. Valente will testify that Balco regularly submitted athlete's urine samples to Quest Laboratories for analysis to determine whether steroids were detectable in the urine. Accordingly, when Anderson transported the defendant's urine samples to Valente for that purpose, he had no incentive or motive other than to be completely accurate when he told Valente the source of the urine sample. Those statements obviously subjected Anderson to criminal liability because he subsequently pleaded guilty to a criminal offense related to his steroid dealings in conjunction with Balco. Although nothing further is necessary, additional corroboration comes from the defendant himself, who repeatedly admitted in his grand jury testimony providing urine samples to Anderson for Anderson to deliver to Balco for testing.

Second, Anderson's statements to Valente regarding the identity of the source of a urine sample are also admissible pursuant to the residual hearsay exception of Fed. R. Evid. 807. The government can satisfy each of the required elements discussed above and several Ninth Circuit cases support admissibility pursuant to the exception.

1    Ninth Circuit precedents – with factual scenarios far less compelling than this case –
2    establish that there are numerous circumstances in which the application of Fed. R. Evid. 807 to
3    Anderson's statements is appropriate. Indeed, the fact that Anderson may unlawfully refuse to
4    testify represents exactly the type of scenario that the residual exception was intended to remedy
5    by providing the proponent of reliable evidence another mechanism through which to present that
6    evidence to the trier of fact. Anderson's choice to spend more than a year in jail rather than
7    simply tell the truth about his knowledge of the defendant's steroid use, places the evidence of
8    his statements directly into the residual exception's ambit.

9        In *United States v. Sanchez-Lima*, 161 F.3d 545, 549 (9th Cir. 1998), the Ninth Circuit
10   held that it was reversible error for the district court to exclude video-taped statements by eye-
11   witnesses taken in Mexico. Sanchez-Lima was charged with assaulting a federal officer and,
12   pursuant to Rule 807, offered video-taped statements of eyewitnesses taken in Mexico in support
13   of his self-defense and mistake theories. *Sanchez-Lima*, 161 F.3d at 548.

14       The statements possessed guarantees of trustworthiness because the declarants (1) were
         under oath and subject to the penalty of perjury; (2) made the statements voluntarily; (3)
15       based the statements on facts within their own personal knowledge; (4) did not contradict
         any of their previous statements to government agents and defense investigators; and (5)
16       had their testimony preserved on videotape which would allow the jurors an opportunity
         to view their demeanor . . . The government had an opportunity to develop the testimony
17       of these witnesses before they were deported, and the government also had notice and the
         option to participate in taking the videotaped statements.
18
     *Id.* The Ninth Circuit further noted, "Ordinarily, exceptional circumstances exist when the
19
     prospective deponent is unavailable for trial and the absence of the testimony would result in an
20
     injustice." *Id.* Like the witnesses in *Sanchez-Lima*, Anderson made his statements to Valente
21
     voluntarily based on his own knowledge. His statements do not contradict any other statements
22
     of which the government is aware, and they communicated information that Anderson had
23
     enormous incentive to be accurate about. Anderson was entrusted by his clients, including the
24
     defendant, to submit their urine to Balco for testing to determine whether steroids were
25
     detectable in the urine. It is axiomatic that he was under a significant duty to accurately advise
26
     Balco about the identity of the urine provider so that the correct urinalysis results could later be
27
     attributed to the correct client. Finally, just as the government had an opportunity to address the
28
     witnesses in *Sanchez-Lima*, the defendant has direct access to Anderson, his close friend for

U.S. OPP. TO DEFENSE MOTION IN LIMINE
[CR 07-0732-SI]                                35

1  decades. Thus, pursuant to *Sanchez-Lima*, in the event Anderson is legally unavailable for trial,

2  it would be an injustice – and error – to exclude his statements to Valente regarding the

3  defendant's urine samples.

4  In *United States v. Valdez-Soto*, 31 F.3d 1467, 1473 (9th Cir. 1994), the Ninth Circuit

5  held that hearsay statements by a trial witness inculpating the defendant were properly admitted

6  pursuant to the residual hearsay exception. The witness, Cortez, implicated himself and others,

7  including the defendant, in statements he made to the F.B.I. immediately following his arrest.

8  *Valdez-Soto*, 31 F.3d at 1470. When Cortez changed his story at trial, the government was

9  allowed to introduce the previous statements pursuant to the residual hearsay exception. *Id.*

10  The Ninth Circuit found that "Rule 803(24)[1] easily encompasses a case like ours where the

11  evidence has the requisite indicia of trustworthiness but is not otherwise admissible." *Id.* at

12  1471. Those indicia were as follows:

13      Cortez gave the statements to FBI agents soon after his arrest . . . [and] . . . if a statement
        is proximate in time to the event, less opportunity for fabrication exists . . . although the
14      interview was not directly recorded and transcribed, it was witnessed by a translator who
        contemporaneously recorded the details . . . [and] . . . Special Agent Fresques also took
15      notes . . . Cortez cooperated unhesitatingly from the start . . . [Cortez was] informed of his
        rights and signed a written waiver of them . . . [and] . . . He certainly would have realized
16      that lying in the face of such uncertainty would seriously jeopardize any chance he had to
        benefit from cooperating . . . In addition, as the district court recognized, id., his
17      statements-which were quite detailed-were consistent with the physical evidence in this
        case.
18

19  *Id.* at 1472. The Ninth Circuit noted that "the trial judge has a fair degree of latitude in deciding

20  whether to admit statements under" Fed. R. Evid. 807. *Id.* at 1471. Given that latitude, *Valdez-*

21  *Soto* favors admitting Anderson's statements, regardless of whether he testifies. "The rule [807]

22  requires only that the hearsay have 'equivalent circumstantial guarantees of trustworthiness' to

23  any of the rule's enumerated exceptions. In addition to factors such as 'the declarant's perception,

24  memory, narration, or sincerity concerning the matter asserted,' . . . we've recognized that

25  corroborating evidence is a valid consideration in determining the trustworthiness of out-of-court

26  statements for purposes of Rule 803(24)." *Id.* at 1471. Based on the indicia of trustworthiness

27  and corroboration of Anderson's statements to Valente identifying the defendant's urine samples,

28

---

[1] Predecessor to Fed. R. Evid. 807.

1 Fed. R. Evid. 807 "easily encompasses" the evidence and it is admissible pursuant to *Valdez-*
2 *Soto*.

3    In *Bachsian,* documents similar to the Balco log sheets were admitted pursuant to the
4 residual hearsay exception because of particularized guarantees of trustworthiness and the fact
5 that admission "furthered the federal rules' paramount goal of making relevant evidence
6 admissible." *Bachsian*, 4 F.3d at 799. The documents were ocean bills of lading, packing lists,
7 and commercial invoices, admitted for the purpose of proving the contents of stolen shipping
8 containers. *Id.* at 798. The trustworthiness factors were as follows: "customs brokers and United
9 States Customs regularly rely upon the accuracy of such documents . . . the bill of lading was
10 prepared by the shipper in the exporting country and that the documentation had to be accurate in
11 order to load the goods on the ocean vessel . . . the individual who prepared the documents would
12 have had been under some duty to insure that the documents were accurate and would have no
13 incentive to misrepresent the facts recorded on the documents [and] a customs broker testified
14 that he had processed similar documents for the same exporting company before and that they
15 had never been inaccurate." *Id.* Likewise, Balco and its clients regularly relied upon the
16 accuracy of the information in the Balco log sheets, which Valente kept for years. Anderson had
17 a duty to accurately report and Valente had a duty to accurately record the information and
18 neither of them had any incentive to misrepresent anything in the log sheets.

19    The Ninth Circuit in *Bachsian* also provided guidance regarding the need – or lack
20 thereof – of calling certain foundational witnesses in this situation. "Perhaps the testimony of
21 employees of the exporting companies would have been more probative, but it could not be
22 secured through reasonable efforts. We refuse to find that the government needed to drag the
23 shipping clerks of the exporting companies into court." *Id.* at 799. Anderson was performing an
24 equally routine and mundane, albeit against his penal interest, task by dropping off a urine
25 sample from a client, which he did countless times at Balco. Accordingly, even in the absence of
26 his recalcitrance, there should be no need for the government to have to "drag" him into court for
27 this particular testimony and it should be admissible pursuant to Rule 807.

28    In *United States v. Friedman*, 593 F.2d 109, 114 (9th Cir. 1979), the Ninth Circuit held

1 | that admitting hearsay letters from a Chilean official who was not the custodian of the records,
2 | wherein the official confirmed that he examined Chilean immigration records and that they
3 | confirmed certain visits by the defendants, was proper.

> The Chilean official who summarized the official immigration records surely encountered
> no problems of perception or memory in transferring the information from the records to
> the travel documents. There was no difficulty in the narration of the information; the
> information on the travel documents is simple and unambiguous; it pertains only to dates
> of entry and exit and involves no statements of a testimonial nature as to what Johnson or
> Garrity did in Chile. We are not persuaded that the Chilean official had any reason to
> falsify or misrepresent the documents. Consequently, we affirm the trial court's finding of
> equivalent trustworthiness.

*Friedman*, 593 F.2d at 119. Once again, because Anderson's statements to Valente are so simple and trustworthy, it necessarily follows that the log sheets possess abundant indicia of trustworthiness.

Anderson's statements to Valente, and therefore the Balco log sheets, satisfy the requirements under Fed. R. Evid. 807. They relate to material facts, *i.e.* the defendant's knowledgeable use of steroids and other substances, there are abundant circumstantial guarantees of trustworthiness, they are more probative than other evidence the government can procure, and the general purposes of the Federal Rules of Evidence and the interests of justice will best be served by admitting them. The purpose of the rules of evidence is that they "shall be construed to secure fairness in administration . . . to the end that the truth may be ascertained and proceedings justly determined." Fed. R. Evid. 102.

Third, for the reasons discussed above related to the conspiracy among Anderson and others to keep the clear and cream secret, statements by Anderson to Valente in furtherance of that conspiracy are admissible. Anderson's statements to Valente identifying individual urine samples furthered the goal of the conspiracy to test the urine of individuals using the clear and the cream and to accurately document and preserve the results of those tests.

Anderson's statements to Valente and the log sheets are links in the chain of evidence that the defendant knowingly used steroids. The only reason their admissibility is being litigated is because the defendant's close friend, Anderson, has thus far illegally refused to testify regarding his knowledge of the defendant's steroid use. There is abundant, credible evidence of

1  trustworthiness and if these proceedings are to be justly determined and fairly administered, this
2  evidence should be admitted.

3           **B.      The Documents Valente Relied Upon Are Independently
                       Admissible As Business Records Pursuant To Fed. R. Evid.
4                      803(6).**

5           As previously argued, the lab documents Valente used to create the log sheets are
6  admissible because they are business records of the laboratory that generated them. The outside
7  lab documents found within the Balco files are also admissible as Balco's own business records
8  because they possess sufficient indicia of trustworthiness. "Exhibits can be admitted as business
9  records of an entity, even when that entity was not the maker of those records, so long as the
10 other requirements of Fed. R. Evid. 803(6) are met and the circumstances indicate the records are
11 trustworthy." *United States v. Childs*, 5 F.3d 1328, 1333 (9th Cir. 1993) (certificates of title,
12 purchase orders, and odometer statements possessed by auto dealer were admissible business
13 records even though auto dealer did not create them because other requirements of Fed. R. Evid.
14 803(6) were met and circumstances indicated they were trustworthy). Just like the auto dealer in
15 *Childs*, Balco retained lab reports generated for Balco in order to conduct its business. Balco
16 routinely relied upon the lab reports, and there is no evidence the reports were inaccurate.
17 Businesses routinely compile their own records by virtue of information or documentation
18 transmitted from outside sources.

19         Thus, because information Valente received orally from Anderson and in lab reports from
20 the outside laboratory is independently admissible, the double hearsay requirement of *Arteaga* is
21 satisfied, and the Balco log sheets are admissible as Balco's business records.

22                    **ii.    The Log Sheets Are Admissible Pursuant To The Residual Exception
23                              Of Fed. R. Evid. 807.**

24         If the Court should find that the log sheets do not qualify as business records, they are
25 nevertheless admissible pursuant to the residual exception of Fed. R. Evid. 807. As explained
26 above, the log sheets meet all of the requirements of this exception and, especially in light of
27 *Bachsian* and *Friedman*, where documents with no more guarantees of trustworthiness than the
28 log sheets were held admissible, it would be a significant injustice to allow the defendant to

1  dodge this evidence by virtue of his close friend's unlawful refusal to testify against him.

2
                    iii. **The Log Sheets Are Statements Of A Co-conspirator Pursuant To**
3                      **Fed. R. Evid. 801(d)(2)(E).**

4         Again, for the reasons discussed above related to the conspiracy among Valente and

5  others to keep the clear and cream secret, statements by Valente in the form of the log sheets and

6  in furtherance of that conspiracy are admissible. Valente documented Balco's receipt of urine

7  samples from known users of the clear and cream and the subsequent test results performed on

8  those samples to determine whether they revealed use of the clear and cream. That exercise

9  furthered the goal of the conspiracy to keep those substances undetectable by monitoring the

10 urine of known users such as the defendant. Accordingly, Valente's statements in the form of the

11 log sheets are admissible as statements of a co-conspirator in furtherance of the conspiracy.

12                    **4.  The Handwritten Notes**

13        Bonds further objects to five pages of handwritten notes. The first note to which the

14 defendant objects was found at Balco (Mot. Exhibit 2c, Bate Stamp BB 113, a sheet containing

15 various names and code numbers, along with the notation "Barry Bond 100121" in the middle of

16 the document). The remaining four pages of notes in Exhibit 2c were found at Anderson's

17 residence, including the following:

18
          (1) A sheet captioned "Barry" and followed by notes reflecting the dates and prices of
19        "blood tests," "G," "depo test cyp 3 bottles off & reg. season," "clear & cream," and
          "Clomifend;" (Bate Stamp 23955);
20
          (2) an envelope with the words "Barry's $6,000" (Bate Stamp 23826);
21
          (3) an envelope captioned "12-24-99" with the notation "$1,000 Sandy Face X-mas,"
22        "$500 Barry Stuff," and "$500 Tax's" (Bate Stamp 23837);

23        (4) A sheet captioned "Gary" with various dates referencing "pee," "G-40 little one,"
          "T.S. 1cc," "40 G little one," and 1cc T/ 40-G little one," followed by an entry stating
24                   "Barry
                     12-2-02
25                   T-1cc G-30 little
                     Pee"
26 (Bate Stamp 23844).

27        As noted previously, Rule 901(b)(4) permits authentication based upon "[a]ppearance,

28 contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction

U.S. OPP. TO DEFENSE MOTION IN LIMINE
[CR 07-0732-SI]                                    40

1  with circumstances." Fed.R.Evid. 901(b)(4). The contents of the challenged notes include the

2  defendant's name and the names of other athletes who had admitted knowingly receiving

3  illegally distributed anabolic steroids from Anderson. The notes were found on the Balco

4  premises and at Anderson's residence. These facts amply support the admission of these

5  documents under the authentication requirements of Fed. R. Evid. 901.

6  The note from Balco is a business record that should be deemed admissible pursuant to

7  Fed.R.Evid. 803(6). The government expects to lay a foundation for this document through the

8  testimony of James Valente, a Balco employee who created many of the Balco business records

9  and was personally involved in handling and creating drug logs, correspondence pertaining to

10 blood and urine tests, and other documents associated with the defendant's regime of blood and

11 urine screening for steroids. Valente's testimony will lay an appropriate foundation for the

12 document; it is therefore admissible pursuant to Fed. R. Evid. 803(6).

13 The notes from Anderson's residence are admissible under the same rationales as

14 discussed previously for the calendars. These notes are admissible for the non-hearsay purpose

15 of establishing the materiality of Bonds's false statements before the grand jury. They are further

16 admissible under the same theories described above for the calendars: (1) as statements against

17 penal interest; (2) co-conspirator statements; (3) business records of Anderson's steroid

18 trafficking enterprise; and (4) under the residual hearsay exception.

19
20  **5. Greg Anderson's Tape-Recorded Statements To Steve Hoskins Are Admissible.**

21  **a. Introduction**

22  The defendant argues that a recorded conversation between Greg Anderson and Steve

23 Hoskins is inadmissible because it is irrelevant and constitutes hearsay. Mot. at 20. The

24 objections should be overruled because the evidence is undeniably relevant and admissible

25 pursuant to two hearsay exceptions.

26  **b. The Evidence.**

27  Steve Hoskins was the defendant's friend since childhood and the defendant's personal

28 assistant for many years beginning in approximately 1993. During the course of their

1 relationship, Hoskins learned firsthand through observation and conversations with the defendant

2 that he was acquiring and using anabolic steroids with Greg Anderson's assistance. Hoskins

3 subsequently decided to discuss the defendant's steroid use with the defendant's father, Bobby

4 Bonds. According to Hoskins, Bobby Bonds did not believe that his son was using steroids, so

5 Hoskins decided to tape a conversation with Greg Anderson wherein Anderson discussed the

6 defendant's steroids use and the fact that Anderson assisted the defendant with steroids.

7 According to Hoskins, the conversation took place between himself and Greg Anderson in

8 approximately March of 2003 at PacBell Park near the defendant's locker. They were having the

9 conversation in normal voices until another player walked by them, at which point they started to

10 whisper. Hoskins captured the following statements on tape during his conversation with

11 Anderson:

12 **Hoskins**: You know, um, when Barry's taking those shots, Dr. Ting said that one of, one of the basketball players....he's was taking them shots, and doing it in his thigh....and he's...oh
13 shit...it's fuckin'....

14 **Anderson**: Oh, I know. Yeah, you can't even, you can't even walk after that.

15 **Hoskins**: Yeah, no, he said he had to go in and graft his...

16 **Anderson**: Oh yeah, you know what happened? He got uh...

17 **Hoskins**: He must have put it in the wrong place.

18 **Anderson**: No, what happens is, they put too much in one area, and what it does, it 'ill, it 'ill actually ball up and puddle. And what happens is, it actually will eat away and make an
19 indentation. And it's a cyst. It makes a big fuckin' cyst. And you have to drain it. Oh yeah, it's gnarly...Hi Benito...oh it's gnarly.

20
**Hoskins**: He said his shit went....that's why he has to, he had to switch off of one cheek to the
21 other. Is that why Barry's didn't do it in one spot, and you didn't just let him do it one time?

22 **Anderson**: Oh no. I never. I never just go there. I move it all over the place.

23 . . .

24
**Hoskins**: Yeah, that's why he was like...(laughs) he was like, tell Greg if he's puttin' it in one
25 fuckin' place, to tell him to move that shit somewhere else.

26 **Anderson**: Oh, no, no, no. I learned that when I first started doing that shit....sixteen years ago...because uh...guys would get a gnarly infections...and it was gross...I mean, to the point
27 where you had to have surgery just to get that fuckin' thing taken out.

28 . . .

1  **Hoskins**: What if they decide that...I think, didn't they say they're going to test...um...they
   don't know. They're not testing the players yet. They're just doing random shit. So they're just
2  going to get a percentage. And then after they figure out the percentage...then if it's high
   enough, then they'll do whatever.
3
   **Anderson**: Well, what, what I understand is that, what they're doing is they're...um...they're,
4  they did 25 players, random, supposedly, in spring training.

5  **Hoskins**: Oh, so you don't even...

6  **Anderson**: And then, so those guys have already been tested twice. They got tested, then a
   week later they got tested again. Same guys. So what happens is, is those guys are pretty much
7  done for the year.

8  **Hoskins**: Okay

9  **Anderson**: They don't ever have to get tested again. Now supposedly, there's gonna to be three
   guys...excuse me, not three...one hundred and fifty guys tested during, random during the
10 season...Which he's going to be on that list, easy....

11 **Hoskins**: Oh yeah, definitely.

12 **Anderson**: So, in that...after...but they're going to test him once, then test him again. And
   then after, he supposed to be...
13
   **Hoskins**: But do we know?
14
   **Anderson**: Do we know when they're going to do it?
15
   **Hoskins**: Yeah. Does he know?
16
   **Anderson**: I, I, I have an idea. See I gotta..., where, where the lab that does my stuff, is this lab
17 that does entire baseball...

18 **Hoskins**: Oh okay. Oh the same...

19 **Anderson**: Yeah. So, they...I'll know...I'll know like probably a week in advance, or two
   weeks in advance before they're gonna do it. But it's going to be in either the end of May,
20 beginning of June. It's right before the All-Star break definitely. So after the All-Star
   break...fucking, we're like fucking clear as a mother.
21
   **Hoskins**: Okay, so what you want...so they'll...the guys from Major League Baseball....so
22 baseball will tell, you'll know when they're gonna do it, but you won't know exactly if it's gonna
   be him.
23
   **Anderson**: Right.
24
   **Hoskins**: Or will you know...
25
   **Anderson**: He may not even get tested.
26
   **Hoskins**: Right, that's what I'm saying.
27
   **Anderson**: Because it's supposed to be computerized.
28
   **Hoskins**: But we just know if....he's gonna be....

U.S. OPP. TO DEFENSE MOTION IN LIMINE
[CR 07-0732-SI]                                    43

**1** | **Anderson**: He's gonna be. But the whole thing is...everything that I've been doing at this point, it's all undetectable.

**2** | **Hoskins**: Right.

**3**
**4** | **Anderson**: See, the stuff that I have...we created it. And you can't, you can't buy it anywhere. You can't get it anywhere else. But, you can take it the day of and pee...

**5** | **Hoskins**: Uh-huh.

**6** | **Anderson**: And it comes up with nothing.

**7** | **Hoskins**: Isn't that the same shit that Marion Jones and them were using?

**8** | **Anderson**: Yeah same stuff, the same stuff that worked at the Olympics.

**9** | **Hoskins**: Right, right.

**10** | **Anderson**: And they test them every fucking week.

**11** | **Hoskins**: Every week. Right, right.

**12** | **Anderson**: So that's why I know it works. So that's why I'm not even trippin'. So that's cool.

**13** | . . .

**14** | ### c. The Tape-Recorded Statements Are Relevant.

**15** | The relevancy of this evidence could not be more apparent. In the course of the

**16** conversation, the defendant's personal trainer, Anderson, makes statements related to injecting

**17** the defendant, possessing access to inside information related to when Major League Baseball

**18** would test the defendant, and providing the defendant with an undetectable substance also being

**19** used by Marion Jones. This is overwhelming evidence that the defendant committed perjury as

**20** set forth in the second superseding indictment when he denied knowingly using steroids or ever

**21** being injected by anyone other than a doctor.

**22** | ### d. The Tape-Recorded Statements Are Admissible Under Two Hearsay Exceptions.

**23**
**24** | #### i. The Tape-Recorded Statements Were Against Anderson's Interests Pursuant To Fed. R. Evid. 804(b)(3).

**25** | In *United States v. Boone,* the Ninth Circuit held that a tape recorded statement under

**26** almost identical circumstances was properly admitted as a statement against the declarant's

**27** interest:

**28** | Unbeknownst to Lamar Williams, his girlfriend Tarchanda Cunningham surreptitiously tape recorded him implicating himself and Defendant Anthony Boone in an armed

U.S. OPP. TO DEFENSE MOTION IN LIMINE
[CR 07-0732-SI]                                    44

robbery. Over Boone's hearsay and Confrontation Clause objections, Williams's out-of-court statements were received in evidence against Boone as statements against interest . . . We affirm.

*United States v. Boone*, 229 F.3d 1231, 1232 (9th Cir. 2000). The Ninth Circuit admitted the taped statement as one against Williams's interest pursuant to Fed. R. Evid. 804(b)(3), and its reasoning is equally applicable here. *Boone*, 229 F.3d at 1233. At the time the recording was made, Williams was confiding in his girlfriend/co-conspirator and had no motive to shift the blame to someone else or to minimize his own culpability. Williams was charged as a co-conspirator, but remained at large at the time of trial, and Cunningham was cooperating with the F.B.I. when she recorded the conversation. *Id.* at 1232. "Here, the taped conversation between Williams and his girlfriend occurred in what appeared *to Williams* to be a private setting and in which, as far as *he knew*, there was no police involvement." *Id.* at 1234 (emphasis in original). "Williams's lack of exculpatory motive while inculpating himself provides the circumstantial guarantee of reliability that underpins the hearsay exception for statements against interest." *Id.* at 1232. The facts herein are even more compelling than *Boone* for admitting the tape recording. Like Williams, Anderson was speaking to a close confidant, as they both served the defendant, and Anderson had no motive to shift any blame or say anything untrue about the defendant or to minimize his own involvement with the defendant's steroid use. As far as Anderson knew, the conversation with Hoskins was private and did not involve law enforcement in any way. Like Williams, Anderson may be legally unavailable at trial because he may unlawfully refuse to testify. However, unlike Williams, who was a fugitive and beyond the defendant's subpoena power, there is nothing – except his fear of the truth – preventing this defendant from calling Anderson to trial to testify. Lastly, unlike Cunningham, Hoskins was not cooperating with law enforcement in any way when the tape was made.

In *Padilla v. Terhune*, 309 F.3d 614, 619 (9th Cir. 2002), a trial witness, Munoz, was allowed to testify about statements made to him by one of two people who participated in the robbery and murder that the defendant was charged with. Munoz could not even remember which person made the statement to him, he was very young and allegedly under the influence of drugs and alcohol when he heard the statement, and he testified from memory (versus possessing

notes or a recording of exactly what was said). *Id.* Despite these facts, the statements against interest were admitted through Munoz's testimony pursuant to Rule 804(b)(3) – "The speaker made his admission to Munoz, a close friend, in a private setting, with no reason to think the police would become involved, unabashedly inculpating himself while making no effort to mitigate his own conduct or to shift blame." *Id.* The circumstances surrounding Anderson's tape-recorded statements to Hoskins are more compelling than the facts in *Padilla*. Hoskins possesses none of Munoz's shortcomings as a witness, and the statements are documented in the recording. Similar to the declarant in *Padilla*, Anderson made his admissions to a confidant in a private setting while making no effort to mitigate his own conduct or shift blame.

According to *Boone* and *Padilla*, Anderson's tape-recorded statements to Steve Hoskins are admissible pursuant to Fed. R. Evid. 804(b)(3) and the defense objections related to this hearsay exception should be rejected.

### ii. Anderson's Tape-Recorded Statements Are Admissible Pursuant To The Residual Exception Of Fed. R. Evid. 807.

As a preliminary matter, since *Padilla* and *Boone* rely on the residual trustworthiness doctrine of *Ohio v. Roberts*, 448 U.S. 56, 66 (1980), they are equally applicable in the context of analyzing the residual hearsay exception of Rule 807, and Anderson's tape-recorded statements are therefore admissible pursuant that authority in this context as well. *See Padilla*, 309 F.3d at 618; *Boone*, 229 F.3d at 1233. Nevertheless, the Ninth Circuit authorities discussed above directly addressing Rule 807, *i.e. Sanchez-Lima, Valdez-Soto, Bachsian*, and *Friedman*, provide additional, independent authority for admitting Anderson's tape-recorded statements pursuant to this exception.

The tape-recorded statements relate to material facts and are more probative than any other evidence the government can procure through reasonable efforts. Further, there are abundant indicia of trustworthiness surrounding Anderson's statements to Hoskins:

- ‣ Anderson was speaking with a close confidant
- ‣ Anderson had no motive or reason to lie
- ‣ Anderson implicated himself in the defendant's illegal steroid use

1      ▸ Anderson had no reason to think law enforcement was involved in the conversation

2      ▸ the conversation setting was private

3      ▸ Anderson was involved in distributing steroids at the time in conjunction with Balco

4      ▸ Balco was distributing the cream and the clear at the time, which were undetectable

5      ▸ Marion Jones had received the clear at the time

6      These statements are admissible for the same reasons Anderson's statements to Valente

7 regarding the urine samples are admissible. There is no credible, logical, or reasonable

8 explanation for why they should not be believed. It makes absolutely no sense that Anderson

9 would have made false statements to Hoskins regarding the fact that he injected the defendant,

10 was privy to MLB's steroid testing schedule, and was not too worried about the defendant getting

11 caught because the substance he was administering to the defendant, *i.e.* the clear, was

12 undetectable. On their face, these statements are patently believable, but when coupled with the

13 fact that Anderson chose to spend over a year in jail rather than answer questions about these

14 statements, the argument in favor of admissibility becomes overwhelming. The recording should

15 be deemed admissible.

16      **6. Expert and Lay Testimony Pertinent To Steroid Use**

17      **a. The government's expert testimony is relevant and reliable.**

18      At trial, the government intends to call two expert witnesses, Dr. Larry Bowers and Dr.

19 Don Catlin. As set forth above, Dr. Bowers is the medical director for the United States Anti-

20 Doping Agency.[2] He will testify that steroid users develop symptoms such as increased muscle

21 mass, shrunken testicles, acne on the upper back, moodiness, and an erratic sexual drive. Dr.

22 Bowers will further testify that the urine and blood test results for Bonds reflect steroid use, and

23 that the steroids revealed by the blood and urine tests are usually administered by injection. Dr.

24 Catlin will testify that he tested the urine sample Bonds submitted to Major League Baseball in

25 2003 and determined that the sample was positive for THG and Clomid, an anti-estrogen drug

26 typically used by steroid users to "jump-start" the replenishment of natural testosterone following

27

28

---

[2] Dr. Bowers's declaration with his attached CV is attached as Exhibit 2.

its suppression by the use of anabolic steroids.[3] In addition, Dr. Catlin will testify that Bonds's sample is positive for exogenous, that is foreign, testosterone, itself an anabolic steroid and controlled substance under federal law. As the Court is aware, the Court found that both Dr. Catlin and Dr. Bowers qualified as experts on the subjects on which they would testify in this trial in *United States v. Thomas*, No. CR 06-0803-SI, although only Dr. Catlin testified in that trial, and Dr. Bowers testified as an expert in *United States v. Graham*, No. CR 06-0725-SI. Both Dr. Bowers and Dr. Catlin also testified in the grand jury, and their grand jury testimony was produced to defendant on September 25, 2008.

Without addressing in detail either doctor's expertise or the basis for, or nature of, their grand jury or proposed trial testimony, Bonds argues (Mot. 20-23) that testimony from Drs. Catlin and Bowers would be neither relevant nor reliable. In particular, he argues that their expert testimony would consist of "nothing more than anecdotal junk science," and is inadmissible because the two doctors "lack the necessary expertise in the relevant field," the side effects of steroid use "are not established by scientifically reliable principles," and "the testimony is irrelevant and unduly prejudicial." Motion at 23. In fact, Dr. Catlin's testimony will rest on and reflect scientific testing of samples of Bonds's urine. Bonds cannot meaningfully challenge the relevance or reliability of that testimony. Similarly, Dr. Bowers's proposed testimony on the physical and mental effects of steroid use is relevant because it would tend to prove the central factual allegation of the indictment – that Bonds lied when he denied that he knowingly took anabolic steroids. His testimony would assist the jury by explaining the nature of anabolic steroids and how steroids affect the body, and he would provide direct testimony that Bonds's blood and urine tested positive for illegal steroids. Finally, Bonds's cursory challenge to the experts' qualifications is without merit. In short, Bonds has given the Court no reason to reach a different result than it reached in the *Graham* and *Thomas* trials.

Federal Rule of Evidence 702 allows a court to admit testimony based on "scientific,

---

[3] Dr. Catlin's CV is attached as Exhibit 3. Excerpts from Dr. Catlin's grand jury testimony are attached as Exhibits 4 (2003 testimony) and 5 (2006 testimony). Exhibits 4 and 5 retain the original pagination of the grand jury transcript.

1    technical, or other specialized knowledge" that "will assist the trier of fact" in understanding the

2    evidence or in determining a fact in issue. A witness may qualify as an expert "by knowledge,

3    skill, experience, training, or education." As the Ninth Circuit has made clear, Rule 702

4    "contemplates a broad conception of expert qualifications" and is "intended to embrace more

5    than a narrow definition of qualified expert." *Thomas v. Newton International Enterprises*, 42

6    F.3d 1266, 1269 (9th Cir. 1994) (citing Fed. R. Evid. 702, Advisory Comm. Notes).

7           Testimony from a qualified expert "is admissible pursuant to Rule 702 if it is both

8    relevant and reliable." *Elsayed Mukhtar v. California State University,* 299 F.3d 1053, 1063 (9th

9    Cir. 2002); *see Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). As the

10   Supreme Court explained, "[t]he inquiry envisioned by Rule 702 is...a flexible one." *Daubert*,

11   509 U.S. at 594. Although the Court in *Daubert* provided a list of factors for determining

12   whether expert testimony is reliable, *id.* at 593-94, a court should not "mechanically apply the

13   *Daubert* factors," *Hangarter v. Provident Life & Accident Insurance Co.*, 373 F.3d. 998, 1017

14   (9th Cir. 2004), because *Daubert*'s list of specific factors "neither necessarily nor exclusively

15   applies to all experts or every case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141-42

16   (1999). Instead, the *Daubert* factors are meant to be "helpful, not definitive." *Id.* at 151. A

17   district court has "broad latitude in determining whether an expert's testimony is reliable" and

18   "in deciding how to determine the testimony's reliability." *Elsayed Mukhtar,* 299 F.3d at 1064.

19   Although a court should make "a preliminary determination that [a proffered] expert's testimony

20   is reliable," *Elsayed Mukhtar*, 293 F.3d at 1063, a court need not hold a separate *Daubert* hearing

21   before admitting expert testimony. *United States v. Alatorre*, 222 F.3d 1098, 1102 (9th Cir.

22   2000).

23           The testimony of Dr. Catlin and Dr. Bowers easily meets these standards. First, both

24   doctors are qualified to testify as experts. As his attached curriculum vitae and grand jury

25   testimony make clear, Dr. Catlin is a medical doctor who served as a professor of medical and

26   molecular pharmacology and as the director of the UCLA Olympic Analytic Laboratory. *See*

27   Exhibit 5 at 4-5; Exhibit 4 at 3-5. Since the early 1980s, Dr. Catlin's career has been entirely

28   dedicated to developing testing for the presence of steroids in the bodily fluids of athletes. *See*

Exhibit 4 at 7-8. As of the date of his 2003 grand jury testimony his laboratory performed steroid testing for the U.S. Olympic Committee, the National Collegiate Athletic Association, and the National Football League and conducted 22,000 tests per year. Exhibit 4 at 8, 12. He personally developed the means to test for THG, which prior to Dr. Catlin's research had been an undetectable steroid. Exhibit 4 at 36-40. In short, Dr. Catlin is plainly an expert in researching and analyzing the effect of performance-enhancing substances on athletes, and he is eminently, if not uniquely, qualified to test urine samples for the presence of steroids and other performance-enhancing drugs and to testify about the results of that testing.

Dr. Bowers has likewise devoted much of his career to the analysis of performance-enhancing drugs. From 1992 to 2000, while serving as a professor in the Department of Pathology and Laboratory Medicine at Indiana University Purdue University at Indianapolis, Dr. Bowers was director of athletic drug testing and the toxicology laboratory. Exhibit 2 at ¶ 3. As Dr. Bowers explains in his declaration, his research on performance-enhancing drugs has allowed him to become familiar with the physiological results of anabolic steroid use. *Id.* at ¶¶ 4-5. Accordingly, it is irrelevant that, as Bonds argues (Mot. 22), Dr. Bowers does not have a degree in pharmacology; his primary expertise is in the physical and mental manifestations of anabolic steroid use. As this Court found in *Graham*, he easily qualifies as an expert in that field.

Second, both doctors' testimony also rests on reliable methodology. Dr. Bowers's testimony will rely on years of study, empirical analysis, and scientific testing. As noted, for the last 16 years, Dr. Bowers has participated in or overseen testing in the effects of performance-enhancing drugs, and his conclusions are accepted in the scientific community. Indeed, some of Dr. Bowers's anticipated testimony will merely explain to the jury aspects of the effects of performance-enhancing substances such as testosterone and human growth hormone that are widely understood by the public. For example, there is little controversy over Dr. Bowers's assertion that testosterone "is a chemical that causes muscle growth and retention of muscle" and "can make a person stronger…benefit a person's ability to recover." Exhibit 2 at ¶ 6.b. As Dr. Catlin testified in the grand jury, the effects of anabolic steroids "are well known. They are described in many scientific articles. The mechanism of how they happen is known. …And the

1  full pharmacology of these agents is pretty well known. It is very well known. There is no
2  question about it." Exhibit 4 at 23.

3         Similarly, there is no "junk science" in Dr. Catlin's methodology. As he explained in his
4  grand jury testimony, Dr. Catlin has tested athletes' urine samples for steroids for nearly 30
5  years. His testing has been accepted at the highest levels of professional athletics, including by
6  the NFL, NCAA, and the U.S. Olympic Committee. He performs 22,000 tests a year for those
7  and other clients, and his laboratory has been certified by the World Anti-Doping Agency, an
8  entity formed by the International Olympic Committee. Exhibit 5 at 4-5. In addition, as Dr.
9  Catlin explained, his laboratory employs procedures that ensure the integrity and chain of custody
10 on each test that it performs. Exhibit 4 at 8-9. Bonds has not suggested any reason to challenge
11 Dr. Catlin's methodology in testing for steroids, and accordingly, this Court should find that his
12 expert testimony would be reliable.[4]

13        In sum, Drs. Bowers and Catlin are qualified to testify as experts, and their testimony is
14 both relevant and reliable. For those reasons, the Court need not hold a *Daubert* hearing before
15 admitting their testimony. To the contrary, Dr. Catlin's testing for the presence of steroids
16 presents a case where "the reliability of an expert's methods is properly taken for granted,"
17 *Kumho Tire*, 526 U.S. at 152-53, and a hearing would result in the kind of "unjustifiable expense
18 and delay" that the Rules of Evidence are intended to avoid. *See United States v. Alatorre*, 222
19 F.3d at 1102. Similarly, Dr. Bowers's declaration and CV demonstrates the basis for his
20 specialized knowledge of the effects of steroids the human body. Defendant, who had Dr.
21 Bowers's CV and grand jury testimony before filing their motion in limine, has raised no specific
22 objection to his testimony or given the Court any reason to doubt his methodology. Accordingly,
23 both witnesses should be permitted to testify as experts without further proceedings to establish
24 the admissibility of their testimony.

25

26        [4] Because there is no basis to question the methodology that Dr. Catlin uses to conduct
27 steroid testing, the government submits that the Court need not inquire into that methodology
   before finding that he is qualified to testify as an expert. If necessary, however, the government
28 can submit a declaration from Dr. Catlin that explains his methodology or simply ask Dr. Catlin
   to explain that methodology when he testifies at trial.

## b. The government's lay witnesses will offer percipient, not opinion, testimony.

Bonds also moves (Mot. 24-25) to exclude testimony from lay witnesses as to changes in his physical or mental condition. He argues that such testimony is not percipient evidence, but instead constitutes lay opinion testimony that fails to satisfy the requirements of Federal Rule of Evidence 701. That contention rests on a misapprehension of the testimony the government intends to present. The government's lay witnesses will testify only to changes that they observed in Bonds's physical or mental condition; they will not offer an opinion on whether those changes were the result of Bonds's use of steroids. *See United States v. Durham*, 464 F.3d 976, 985 n.13 (9th Cir. 2006) (distinguishing between percipient and opinion testimony); *United States v. Beckman*, 298 F.3d 788, 795 (9th Cir. 2002) (testimony from "personal knowledge" is not lay opinion testimony). Moreover, the relevance of the witnesses' testimony concerning Bonds's physical and mental condition will be established by expert testimony from Dr. Bowers, who, as explained above, will explain that steroid use results in specific mental and physical changes in the user. Because Dr. Bowers's testimony is relevant and admissible, the lay witnesses who will testify about Bonds's mental and physical condition is also admissible.

Bonds also argues (Mot. 24) that the government should be barred from presenting testimony from any lay witness it failed to identify in its December 26, 2008 letter. The government was not required to give Bonds a witness list in that letter; instead, the government will provide a witness list on February 13, 2009, pursuant to the Court's standard scheduling order. Moreover, the procedure in which the parties exchanged letters pursuant to the Court's December 16, 2008 order was an informal attempt to narrow pretrial issues and did not create a right of exclusion. Accordingly, the defendant's effort to rely on that procedure to bar the government from presenting relevant and admissible testimony should be rejected.

## IV. CONCLUSION

For the above-stated reasons, the government respectfully requests that the defendant's motion in limine be denied. The government respectfully requests a ruling of the Court providing for the admissibility of all of the challenged items of evidence, subject to the government laying an appropriate foundation for their admissibility at trial.

DATED: January 29, 2009                    Respectfully submitted,


                                           JOSEPH P. RUSSONIELLO

                                           United States Attorney


                                           MATTHEW A. PARRELLA
                                           JEFFREY D. NEDROW
                                           JEFFREY R. FINIGAN
                                           J. DOUGLAS WILSON
                                           Assistant United States Attorneys

| 1 | CERTIFICATE OF SERVICE |

The undersigned hereby certifies that he is an employee of the office of the United States

Attorney, Northern District of California and is a person of such age and discretion to be

competent to serve papers. The undersigned certifies that he caused copies of

**UNITED STATES' MOTION AND [PROPOSED] ORDER FOR SEALING ITS OPPOSITION; UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE EVIDENCE (FILED UNDERSEAL); EXHIBITS TO UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION (FILED UNDERSEAL); MOTION FOR LEAVE TO FILE OVERSIZED BRIEF AND [PROPOSED] ORDER**

in the case of **U.S. v. BARRY LAMAR BONDS, No. CR-07-0732 SI,**

to be served on the parties in this action, addressed as follows which are the last known

addresses:

**Dennis Patrick Riordan**
Riordan & Horgan
523 Octavia Street
San Francisco, CA 94102

___X___ (By Personal Service - Messenger), I caused such envelope to be delivered by hand
to the person or offices of each addressee(s) above.

**Allen Ruby**
Ruby & Schofield
125 South Market Street, Suite 1001
San Jose, CA 95113

___X___ (By Fed Ex), I caused each such envelope to be delivered by FED EX to the address
listed above.

_____ (By Facsimile), I caused each such document to be sent by Facsimile to the person or
offices of each addressee(s) above.

_____ (By Mail), I caused each such envelope, with postage thereon fully prepaid, to be placed
in the United States mail at San Francisco, California.

1    I declare under penalty of perjury that the foregoing is true and correct.

2    January 29, 2009

3

4                                                          WILSON WONG
5                                                          United States Attorney's Office

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28