1  ALLEN RUBY (SBN 47109)
   LAW OFFICES OF ALLEN RUBY
2  125 South Market Street #1001
   San Jose, CA 95113
3  Telephone: (408) 998-8500 ext. 204
   Facsimile: (408) 998-8503
4
   CRISTINA C. ARGUEDAS (SBN 87787)
5  TED W. CASSMAN (SBN 98932)
   ARGUEDAS, CASSMAN & HEADLEY, LLP
6  803 Hearst Avenue
   Berkeley, CA 94710
7  Telephone: (510) 845-3000
   Facsimile: (510) 845-3003
8
   DENNIS P. RIORDAN (SBN 69320)
9  DONALD M. HORGAN (SBN 121547)
   RIORDAN & HORGAN
10 523 Octavia Street
   San Francisco, CA 94102
11 Telephone: (415) 431-3472

12 Attorneys for Defendant
   BARRY LAMAR BONDS
13

FILED

FEB ⅄ ♂ 2009

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

RECEIVED

FEB - 2 2009

R?
CLERK ...... W. WIEKING
NORTHERN U S DISTRICT COURT
DISTRICT OF CALIFORNIA

14               **UNITED STATES DISTRICT COURT**

15              **NORTHERN DISTRICT OF CALIFORNIA**

16                **SAN FRANCISCO DIVISION**

17
   UNITED STATES OF            )  Case No. CR 07 0732 SI
18 AMERICA,                    )
                               )
19                             )
              Plaintiff,       )
20                             )
       vs.                     )
21                             )  Date:  February 5, 2009
   BARRY LAMAR BONDS,          )  Time:  10:30 a.m.
22                             )  Judge: The Honorable Susan Illston
              Defendant.       )
23 ─────────────────────────────

24      **DEFENDANT'S REPLY TO UNITED STATES' OPPOSITION**
        **TO MOTION IN LIMINE TO EXCLUDE EVIDENCE**
25

26

27

28

Defendant's Reply To United States' Opposition

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.  THE HEARSAY PROVISIONS RELIED UPON BY
    THE GOVERNMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.  BUSINESS RECORDS - FRE 803(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B.  STATEMENTS OF CO-CONSPIRATORS - FRE 801(D)(2)(E) . . . . . . . . . . . . . 5

    C.  DECLARATIONS AGAINST INTEREST - FRE 804(b)(3) . . . . . . . . . . . . . . . 6

    D.  THE RESIDUAL EXCEPTION - FRE 807 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

II. THE CHALLENGED EVIDENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    A.  Lab Urine/Blood Test Results . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    B.  Internal Balco Documents Allegedly Recording the Receipt
        And/or Transfer of Urine And/or Blood Samples . . . . . . . . . . . . . . . . . . . . . . . . 11

        1.  Business Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

        2.  Anderson's Statements to Valente as Statements Against
            Interest under Fed.R.Evid. 804(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        3.  The Residual Exception . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        4.  Statements of Co-Conspirators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    C.  The Calendars Allegedly Concerning Bonds . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        1.  Business Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        2.  Declarations Against Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        3.  The Residual Exception . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        4.  Co-conspirator Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    D.  Calendars Unrelated To Bonds And The Testimony of Other Athletes . . . . . . . 19

    E.  Handwritten Notes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    F.  Greg Anderson's Tape Recorded Statements to Steve Hoskins . . . . . . . . . . . . . 20

        1.  The Residual Exception . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**Table of Contents continued**

2.    Statements Against Interest ................................... 21

G.    Non-Hearsay Uses ............................................... 22

H.    Opinion Evidence ................................................. 22

1.    Government's Proffered Expert Testimony Concerning
      the Supposed Side Effects of Steroids, HGH and Other
      Substances Should be Excluded ............................ 22

2.    Lay Witnesses' Observations and Opinions Concerning
      the Supposed Side Effects of Steroids and Other Substances
      Should be Excluded ......................................... 27

CONCLUSION ............................................................. 28

-ii-

# TABLE OF AUTHORITIES

## CASES

*Belber v. Lipson*,
905 F.2d 549 (1st Cir. 1990)                                                                 4

*Brown v. Uphoff*,
381 F.3d 1219 (10th Cir. 2004)                                                              9

*California v. Green*,
399 U.S. 149 (1970)                                                                          2

*Conoco Inc. v. Department of Energy*,
99 F.3d 387 (Fed. Cir. 1997)                                                                8

*Crawford v. Washington*,
541 U.S. 26 (2004)                                                                      3, 16

*Dallas County v. Commercial Union Assurance Co.*,
286 F.2d 388 (5th Cir. 1961)                                                               9

*Fong v. American Airlines, Inc.*,
626 F.2d 759 (9th Cir. 1980)                                                          10, 21

*Huff v. White Motor Corp.*,
609 F.2d 286 (7th Cir. 1979)                                                               9

*Idaho v. Wright*,
497 U.S. 805 (1990)                                                                          8

*Latman v. Burdette*,
366 F.3d 774 (9th Cir. 2004)                                                               4

*Lilly v. Virginia*,
527 U.S. 116 (1999)                                                                          2

*NLRB v. First Termite Control Co.*,
646 F.2d 424 (9th Cir. 1981)                                                               4

*Ohio v. Roberts*,
448 U.S. 56 (1980)                                                                           8

*Padilla v. Terhune*,
309 F.3d 614 (9th Cir. 2002)                                                               21

*Swan v. Peterson*,
6 F.3d 1373 (9th Cir. 1993)                                                                9

*United States v. Keplinger*,
572 F. Supp. 1068 (N.D. Ill. 1983)                                                         4

-iii-

# Table of Authorities continued

*United States v. Licavoli*,
604 F.2d 613 (9th. Cir. 1979) — 4

*United States v. Patrick*,
248 F.3d 11 (1st Cir. 2001) — 4

*United States v. Snyder*,
787 F.2d 1429 (10th Cir. 1986) — 4

*United States v. Arteaga*,
117 F.3d 388 (9th Cir. 1997) — 13

*United States v. Bachsian*,
4 F.3d 796 (9th Cir. 1993) — 14

*United States v. Bonty*,
383 F.3d 575 (7th Cir.2004) — 8

*United States v. Boone*,
229 F.3d 1231 (9th Cir. 2000) — 21

*United States v. Butler*,
71 F.3d 243 (7th Cir.1995) — 7

*United States v. Deeb*,
13 F.3d 1532 (11th Cir. 1994) — 9

*United States v. Dent*,
984 F.2d 1453 (7th Cir. 1993) — 8

*United States v. Egge*,
223 F.3d 1128 (9th Cir. 2000) — 5

*United States v. Feola*,
420 U.S. 671 (1975) — 6

*United States v. Flom*,
558 F.2d 1179 (5th Cir. 1977) — 4

*United States v. Gordon*,
844 F.2d 1397 (9th Cir.1988) — 5

*United States v. Hughes*,
535 F.3d 880 (8th Cir. 2008) — 10

*United States v. Monaco*,
735 F.2d 1173 (9th Cir.1984) — 7, 14

*United States v. Perez*,
658 F.2d 654 (9th Cir. 1981) — 5

-iv-

**Table of Authorities continued**

*United States v. Pfeiffer,*
539 F.2d 668 (8th Cir. 1968)                4

*United States v. Ricardo,*
472 F.3d 277 (5th Cir. 2006)                21

*United States v. Sanchez-Lima,*
161 F.3d 545 (9th Cir. 1998)                14

*United States v. Satterfield,*
572 F.2d 687 (9th Cir. 1978)                7

*United States v. Silverman,*
861 F.2d 571 (9th Cir.1988)                5

*United States v. Slaughter,*
891 F.2d 698 (9th Cir. 1989)                7

*United States v. Tamez,*
941 F.2d 770 (9th Cir. 1991)                5

*United States v. Ulrich,*
580 F.2d 765 (5th Cir. 1978)                4

*United States v. Valdez-Soto,*
31 F.3d 1467 (9th Cir. 1994)                9, 14

*Williamson v. United States,*
512 U.S. 594 (1994)                7

**STATUTES**

Fed.R.Evid. 104(b)                21

Fed.R.Evid. 403                22

Fed.R.Evid. 801(d)(2)(E)                5

Fed.R.Evid. 803(6)                4, 10, 21

Fed.R.Evid. 804(b)(3)                13

Fed.R.Evid. 806(d)(2) (E)                6

Fed. R. Evid. 807                8

-v-

**Table of Authorities continued**

**MISCELLANEOUS**

*McCormick on Evidence* 259 at 453 (6th ed. 2006)                5, 9

Mueller & Kirkpatrick, *Evidence* 8.33 at 797 (3d ed. 2003)        5, 9

# INTRODUCTION

Prior to the filing of the government's opposition (hereafter "Opp.") to defendant Bonds's' motion in limine, this prosecution had been the focus of enormous public attention, but for reasons wholly unrelated to its legal significance. Barry Bonds is one of the greatest athletes ever to play baseball. Whether he knowingly took steroids as a player, as the government has alleged, is of real interest to fans of the sport. His grand jury testimony, however, was a peripheral event in an investigation of individuals distributing performance-enhancing substances, an investigation which culminated in guilty pleas to relatively minor charges and which resulted in sentences ranging from probation to four months in custody. The charges of false statements and obstruction of justice lodged against Mr. Bonds, while certainly of deep concern to him and his family, largely appeared to raise questions of fact rather than legal issues of great importance.

In its pleading last week, however, the government signaled its intention to break new ground in curtailing the core protection of the Constitution's fair trial guarantee, that is, a defendant's right to confront and cross-examine the witnesses against him. The issues now before the Court are of sweeping jurisprudential import.

In the government's view, its key witness is Greg Anderson, Mr. Bonds' former weight trainer, who the government contends can provide crucial evidence needed to make its case against the defendant. The government's in limine response reveals that it fears Anderson will refuse to testify against Mr. Bonds, or at least will refuse to testify in the manner that the government desires. In Anderson's stead, the government intends to proffer out of court statements purportedly made by him, and to ask the jury to find those statements accurate and credible beyond a reasonable doubt.

For example, the government has indicated that it intends to introduce against Mr. Bonds lab results of blood and urine tests. No such result is relevant to this prosecution unless the sample at issue is demonstrated to have come from the defendant. It appears that as to every proffered test result, the government can attempt to link Mr. Bonds to the sample in question only through purported hearsay statements of Anderson. It also will proffer hearsay statements of

1

1 Anderson concerning matters other than testing samples: calendars, handwritten notes, the
2 Novitzky interview, the Hoskins tape recording.

3 But statements can be true or false, accurate or mistaken, made by witnesses either
4 impartial or biased, with meanings clear or cryptic. The law prescribes a method for testing the
5 reliability of evidence admitted against a party: its submission to cross-examination, the "greatest
6 legal engine ever invented for the discovery of truth." *California v. Green*, 399 U.S. 149, 158
7 (1970) (quoting 5 John H. Wigmore, Wigmore on Evidence 1367); *accord Lilly v. Virginia*, 527
8 U.S. 116, 124 (1999). If Anderson does not testify for the government, the truth of any statement
9 he may (or may not) have made out of court cannot be so tested. Mr. Bonds will be stripped of
10 the opportunity to confront and cross-examine the most prejudicial but least reliable evidence
11 against him. That deprivation would surely make the prosecution's job exponentially easier, but
12 would not provide Mr. Bonds with the fair proceeding that the Constitution guarantees.

13 The government claims it is entitled to introduce hearsay statements immune from cross-
14 examination on one or more of four different grounds: as (a) co-conspirator statements (FRE
15 801(d)(2)(E); (b) declarations against penal interest (FRE 804(b)(3)); (c) business records (FRE
16 803(6) ; or (d) under the residual exception to the hearsay rule (FRE 807). This reply
17 memorandum will rebut the government's analysis of each provision in turn before turning to the
18 categories of hearsay evidence that the government seeks to introduce under them. The hearsay
19 statements of Anderson are the principal subject of this reply, although it also addresses the
20 *Daubert* issues raised by certain expert opinion testimony the government has proffered, as well
21 as the admissibility of testimony from, and documents concerning, other athletes who had
22 dealings with Anderson.

23 Two threshold comments are in order. The government repeatedly complains that
24 Anderson may refuse to provide it with the testimony inculpatory of Bonds to which it claims
25 legal entitlement. (See, e.g. Opp, at 20) The prosecution's brief suggests that the Court should
26 consider his anticipated refusal as an indication that Anderson is protecting his former client, an
27 injustice that this Court must remedy. Anderson, however, may well have reasons for declining
28 to testify that have nothing to do with a desire to avoid incriminating Mr. Bonds. Given the

2

1  energy and resources invested by the government in the present prosecution, Anderson could

2  well conclude that if he gives evidence other than that which the government demands of him, he

3  will be prosecuted for perjury, irrespective of the truth of his testimony. In any case, other than

4  being a foundational requirement for the admission of declarations against penal interest,

5  Anderson's unavailability cannot in any way be considered as support for the government's effort

6  to gain admission of his hearsay statements.

7       Finally, the government claims over and over again that its hearsay evidence is truthful,

8  and must be admitted on that basis. Defendant will demonstrate below that, to the contrary, the

9  proffered hearsay is subject to every one of the potential flaws which require that cross-

10  examination play a critical role in the truth seeking process. Furthermore, a mantra of

11  "reliability" is insufficient to open the door of admissibility. As Justice Scalia recently noted

12            To be sure, the [Confrontation] Clause's ultimate goal is to ensure
              reliability of evidence, but it is a procedural rather than a
13            substantive guarantee. It commands, not that evidence be reliable,
              but that reliability be assessed in a particular manner: by testing in
14            the crucible of cross-examination. The Clause thus reflects a
              judgment, not only about the desirability of reliable evidence (a
15            point on which there could be little dissent), but about how
              reliability can best be determined. Cf. 3 Blackstone,
16            Commentaries, at 373 ("This open examination of witnesses ... is
              much more conducive to the clearing up of truth"); M. Hale,
17            History and Analysis of the Common Law of England 258 (1713)
              (adversarial testing "beats and bolts out the Truth much better").
18
    *Crawford v. Washington*, 541 U.S. 36, 62 (2004)
19
                                    **ARGUMENT**
20
    **I.    THE HEARSAY PROVISIONS RELIED UPON BY THE GOVERNMENT**
21
         **A.    BUSINESS RECORDS - FRE 803(6)**
22
              To qualify as a business record under Rule 803(6), the document (1) must have been
23
    prepared in the normal course of business, (2) must be based on the personal knowledge of the
24
    preparer, and (3) must be prepared at or near the time of the events it records. To have been
25
    prepared "in the normal course of business," the document must have been made in the regular
26
    course of business of a regularly conducted business activity, and it must have been the regular
27
    practice of that business to have made the record. 5 Weinstein's Federal Evidence (2d. ed. 2008),
28

                                          3

Sec. 803.08 at p. 803-56.

In terms of the qualifications of the foundational witness required by Fed.R.Evid. 803(6), "[w]hat is important is that the witness be familiar with the recordmaking practices of the business and with the manner in which records of the particular sort being offered are made and kept . . . . Thus he needs firsthand knowledge about the normal processes of the business . . . ." Mueller & Kirkpatrick 8.45 (3d ed. 2003) *see also Latman v. Burdette*, 366 F.3d 774, 787 & n.9 (9th Cir. 2004) (Error to permit trustee's counsel to lay foundation for bank records because he "had no regular connection to the [bank] account bank and no knowledge of the account except that gained by hearsay, [and thus was] not a "qualified witness." )

The rationale for the business records exception is rooted in "regularity and continuity which produce habits of precision ... and by a duty to make an accurate record as part of a continuing job or occupation." *U.S. v. Keplinger*, 572 F. Supp. 1068, 1070 (N.D. Ill. 1983). Some authorities speak to "a business duty of care and accuracy..." *U.S. v. Licavoli*, 604 F. 2d 613, 622 (9th. Cir. 1979). "Records sometimes fail to come within the [business records] exception because the supplier of the data did not act within the course of a regular business activity." Cotchett, Federal Courtroom Evidence, 5th ed. 2008, Sec. 803.7.4 at p. 22-38. *See, for example, U.S. v. Patrick*, 248 F. 3d 11,22 (1st Cir. 2001) and *U.S. v. Snyder*, 787 F. 2d 1429, 1433-1434 (10th Cir. 1986).

It is true that someone other than the custodian of records can authenticate, and it is true that the person who authenticates does not have to have personal knowledge of the particular record, but someone who is not even an employee of the business, and who never saw any of the records being produced, cannot possibly authenticate them.

In support of its arguments that non-employees can authenticate, the government relies on decades-old, out-of-circuit authority. See Opp. at 27-28, citing *United States v. Pfeiffer*, 539 F.2d 668, 671 (8th Cir. 1968); *United States v. Flom*, 558 F.2d 1179, 1182 (5th Cir. 1977); and *United States v. Ulrich*, 580 F.2d 765, 771 (5th Cir. 1978). The Ninth Circuit has never adopted that reasoning — to the contrary, it has explicitly criticized the reasoning of those three cases. *NLRB v. First Termite Control Co.*, 646 F.2d 424 (9th Cir. 1981); *see also Belber v. Lipson*, 905 F.2d

4

1   549, 552 (1st Cir. 1990); *HSBC Insurance v. Scanwell Container Line*, 2002 A.M.C. 411, 416

2   (C.D. Cal. 2001) ("A third party hired by a business cannot properly authenticate the business

3   records of an entity or those records received by a business.") As will be demonstrated below, no

4   document supposedly generated by Anderson or BALCO can be qualified as a business record.

## B. STATEMENTS OF CO-CONSPIRATORS - FRE 801(D)(2)(E)

6       The government agrees that in order to gain admission of documents or statements under

7   Fed.R.Evid. 801(d)(2)(E), it must demonstrate: (1) the existence of a conspiracy, (2) that a

8   proffered statement was made in furtherance of the conspiracy, and (3) that both the declarant

9   and the party against whom the statement was offered were participants in the conspiracy at the

10  time the statement was made (Opp., at 25, citing *United States v. Perez*, 658 F.2d 654, 658 (9th

11  Cir. 1981); *see also* Fed.R.Evid. 801(d)(2)(E); *McCormick on Evidence* § 259 at 453 (6th ed.

12  2006)). The government does not dispute that the proponent of the statement must present

13  "fairly incriminating" evidence independent of the proffered statement to show, *inter alia*, the

14  existence of the conspiracy and the declarants and the defendant's involvement at the time the

15  proffered statement was made. *United States v. Silverman*, 861 F.2d 571, 578 (9th Cir.1988).

16  *See also United States v. Tamez*, 941 F.2d 770, 775 (9th Cir. 1991); *United States v. Gordon*, 844

17  F.2d 1397, 1402 (9th Cir.1988); Mueller & Kirkpatrick, *Evidence* § 8.33 at 797 (3d ed. 2003).

18      The government's brief recognizes that the "simple purchase" of drugs by an individual

19  does not render the buyer a member of a drug distribution conspiracy or network; more is

20  required. (Opp., at 26, citing *United States v. Egge,* 223 F.3d 1128 (9th Cir. 2000)) To the

21  question of what conspiracy provides the basis for the invocation of Fed.R.Evid. 801(d)(2)(E) the

22  government answers:

23              [A] conspiracy to defraud the United States through the illicit
               distribution of misbranded drugs. The original indictment against
24              Anderson alleged, in Count Eight, that Anderson was involved in
               distributing misbranded drugs for the purpose of defrauding the
25              United States. The indictment alleged that, as part of the
               conspiracy, Anderson, Conte and the other charged co-conspirators
26              distributed "the Cream," an anabolic steroid in the form of a
               testosterone-based cream, for the purpose of concealing the
27              elevated testosterone levels of individual athletes from drug testing
               authorities. Anderson, Conte, and the other charged defendants
28              also distributed "the Clear," a newly manufactured, designer

5

steroid not yet recognized by law enforcement or the testing community, as a drug that would have steroid-like effects but likely would not result in positive steroid tests given its novel structure.

(Opp., at 25-26)

Having alleged a criminal agreement to defraud the United States government of its power to regulate drugs, the government must prove by "fairly incriminating" independent evidence that at the time of each and every proffered hearsay statement of Anderson allegedly made in furtherance of that conspiracy, Mr. Bonds knew of, and shared, the objective of defrauding the United States. *United States v. Feola*, 420 U.S. 671, 686 (1975) ("[I]n order to sustain a judgment of conviction on a charge of conspiracy to violate a federal statute, the Government must prove at least the degree of criminal intent necessary for the substantive offense itself")

While, as the government notes, it indicted Anderson and Conte for this same conspiracy, it did not allege at that time that Mr. Bonds was a member of the conspiracy to defraud, and it elected to dismiss the charge against the named co-conspirators rather than attempt to prove the scheme at trial. Its attempt to shoehorn into this defendant's narrowly defined false statement prosecution evidence of a sprawling uncharged conspiracy offense could be rejected on the basis of FRE 403 alone. (Court has discretion to exclude evidence that is more unduly prejudicial than probative and the admission of which would consume too much time). Even viewed in its most favorable light, the government's evidence contains not a hint that Mr. Bonds was aware of, much less intended to, "defraud the United States" of its intangible right to approve and control the distribution of performing enhancing drugs. As will be developed below, the government cannot meet its threshold burden under Fed.R.Evid. 801(d)(2) (E) as to any of the proffered hearsay statements.

## C. DECLARATIONS AGAINST INTEREST - FRE 804(b)(3)

Defendant's January 15, 2009 motion in limine argued that the government could not demonstrate the admissibility of hearsay statements under the specific criteria set forth in Rule 804(b)(3). *Id.*, at 11-13. Specifically, Bonds contended that in the event it could show Anderson was unavailable to testify (see Rule 804[b]), the government could not meet the rule's remaining

6

1 conditions because it could not show: (1) that the statements "'*at the time* of their making. . . *so*
2 *far* tended to subject the declarant to. . . criminal liability. . . that a reasonable person in the
3 declarant's position would not have made the statement[s] unless believing [them] to be true.'"
4 *Williamson v. United States*, 512 U.S. 594, 603-04 (1994), quoting FRE 804(b)(3) (emphasis
5 added); and (2) that, whatever might be true of other portions of the statements, those relating
6 specifically to Bonds were not specifically inculpatory of Anderson, and were therefore
7 inadmissible under the Supreme Court's holding in *Williamson*. (See Motion, at 12)

8     The government's opposition contends that various statements of Anderson are
9 admissible as against his penal and pecuniary interests. (Opp., at 23-25) As to the former, the
10 government seeks to expand the category of statements that may be deemed self-inculpatory, and
11 hence against penal interest, contending that under the rule they need only "tend" to subject the
12 subject to liability. (Opp, at 23, citing *United States v. Slaughter,* 891 F.2d 698 (9th Cir. 1989)
13 and *United States v. Satterfield*, 572 F.2d 687, 691 (9th Cir. 1978)).

14     To begin, the government's effort to broadly construe the tendency of a statement to
15 subject the speaker to liability under the Rule contravenes the most authoritative statement of the
16 rule. *Slaughter* and *Satterfield* were decided before the Supreme Court's decision in *Williamson*,
17 which, consistent with Sixth Amendment concerns, placed a narrow and demanding reading on
18 what statements should be deemed sufficiently against interest to overcome a hearsay objection.
19 *Williamson*, 512 U.S at 599 (adopting the "narrower reading" of rule 804(b)(3) to hold that it
20 "cover[s] only those declarations or remarks within [a] confession that are individually
21 self-inculpatory.") To the extent that *Slaughter* and *Satterfield* support a broader construction of
22 the Rule, they do not survive *Williamson*.

23     Furthermore, even before *Williamson*, the Ninth Circuit had explained that the potential
24 threat to the declarant's penal interests must be very substantial before it will meet the Rule's
25 criteria. See *United States v. Monaco*, 735 F.2d 1173, 1176 (9th Cir.1984) ("Rule 804(b)(3) is
26 not limited to confessions of criminal responsibility, although the statements must, in a real and
27 tangible way, subject the declarant to criminal liability. . . . A showing that the statements solidly
28 inculpate the declarant is required."). See also *United States v. Butler*, 71 F.3d 243, 253 (7th

7

1  Cir.1995) ("The hearsay exception does not provide that any statement which 'possibly could' or
2  'maybe might' lead to criminal liability is admissible; on the contrary, only those statements that
3  'so far tend to subject' the declarant to criminal liability, such that 'a reasonable person would
4  not have made it unless it were true' are admissible. Fed.R.Evid. 804(b)(3)."). Cf. *United States*
5  *v. Bonty*, 383 F.3d 575, 579 (7th Cir.2004) ("It is simply not enough that during the interview
6  Bonty admitted to some facts ... that 'possibly could' lead to criminal liability; to be inculpatory
7  he must admit to criminal behavior.")

## D. THE RESIDUAL EXCEPTION - FRE 807

In seeking to admit a variety of hearsay against the defendant, the government relies
heavily on the residual exception, Fed. R. Evid. 807. There are three fundamental problems that
run throughout the government's arguments for the exception's application.

First, the government seeks to admit types of statements that are covered by other specific
hearsay exceptions but which fail to meet the requirements of those exceptions. Thus, for
example, where the government seeks to admit a business record but is unable to produce the
foundational witness required by Rule 803(6), the government argues that the record may be
admitted under Rule 807 instead. Such an approach would obliterate the requirement of a
foundational witness. Although the Ninth Circuit has never explicitly ruled on the issue, several
other courts have rejected this "near miss" approach to the residual exception. *See Conoco Inc.*
*v. Dep't of Energy*, 99 F.3d 387, 392-93 (Fed. Cir. 1997); *United States v. Dent*, 984 F.2d 1453,
1465-66 (7th Cir. 1993) (Easterbrook, J., concurring).

Second, in arguing for the purported reliability of the various hearsay statements offered,
the government relies heavily (sometimes solely) on corroborating circumstances. The Supreme
Court has held, however, that assessments of reliability must be based on "only those
[circumstances] that surround the making of the statement" — not on other corroborating
evidence. *Idaho v. Wright*, 497 U.S. 805, 819 (1990).[1]  *Wright* notwithstanding, the government

[1] The Court's opinion in *Wright* was focused primarily on the now-overruled test of *Ohio
*v. Roberts*, 448 U.S. 56 (1980) under the Confrontation Clause. The *Roberts* test was
functionally very similar to the residual exception. Courts have thus held that the "no

8

argues that under *United States v. Valdez-Soto*, 31 F.3d 1467, 1470-71 (9th Cir. 1994), corroborating circumstances may be considered. But in *Valdez-Soto*, the Ninth Circuit distinguished *Wright* based on one "crucial" difference: the declarant was testifying at trial. *Id.* at 1470. In this case, like *Wright* but unlike *Valdez-Soto*, Anderson may not testify and thus will not be subject to cross-examination.[2]

In short, the government's basic argument is that the various statements should be admissible because they are *true*, but "the probability that the statement is true, as shown by corroborative evidence, is not . . . a consideration relevant to its admissibility under the residual exception to the hearsay rule." *Huff v. White Motor Corp.*, 609 F.2d 286, 293 (7th Cir. 1979).

Third and finally, the government argues repeatedly that the residual exception should be applied in order to prevent "injustice." (*See, e.g.*, Govt. Opposition at 35, 36, 39.) (Of course, in the government's view, since the defendant is guilty, anything that will help to produce a finding of guilt constitutes justice.)

A bit of history exposes the flaw in the government's argument. The modern residual exception draws from the famous case of *Dallas County v. Commercial Union Assurance Co.*, 286 F.2d 388 (5th Cir. 1961). *Dallas County* involved the admissibility of a small-town newspaper report of a fire at the local courthouse that took place a half-century before litigation ensued. Although no specific exception applied, the court admitted the newspaper report because it was unlikely that any witnesses with firsthand knowledge were still alive, and because it was simply "inconceivable" that a small-town newspaper would have falsely reported a fire at the local courthouse. *Id.* at 397.

The residual exception was written into the rules, but on the understanding that it should

---

corroborating evidence" rule applies to Rule 807 just as it did to the *Roberts* test. *See Brown v. Uphoff*, 381 F.3d 1219, 1229-30 (10th Cir. 2004); *United States v. Deeb*, 13 F.3d 1532, 1538 (11th Cir. 1994); *Swan v. Peterson*, 6 F.3d 1373, 1382 (9th Cir. 1993).

[2] Moreover, even if corroborating circumstances can provide a partial basis for admission (which is dubious), they cannot provide the sole or primary basis for admission. *See McCormick on Evidence* § 324 (6th ed. 2006); Mueller & Kirkpatrick, *Evidence* § 882 (3d ed. 2003).

9

only apply in cases presenting unique circumstances like those in *Dallas County*. When the Federal Rules were enacted, the House Committee rejected the residual exception altogether, but the Senate Committee argued for a very limited one.

> The committee . . . agrees with those supporters of the House version who felt that an overly broad residual hearsay exception could emasculate the hearsay rule and the recognized exceptions or vitiate the rationale behind codification of the rules.
>
> . . .
>
> It is intended that the residual hearsay exceptions will be *used very rarely, and only in exceptional circumstances*. The committee does not intend to establish a broad license for trial judges to admit hearsay statements that do not fall within one of the other exceptions contained in rules 803 and 804(b). The residual exceptions are not meant to authorize major judicial revisions of the hearsay rule, including its present exceptions. Such major revisions are best accomplished by legislative action. . .

Fed. R. Evid. 803(24), Notes of Committee on the Judiciary, S.R. No. 93-1277 (emphasis added); *see Fong v. American Airlines, Inc.*, 626 F.2d 759, 763 (9th Cir. 1980) (quoting the same language); *accord United States v. Hughes*, 535 F.3d 880, 882 (8th Cir. 2008).

In short, contrary to the government's pleadings, the residual exception was never intended to confer some wide-ranging authority on courts to "do justice" by admitting otherwise inadmissble hearsay. This case does not present the sort of unique and exceptional circumstances that justify the use of the residual exception — much less the repeated use for multiple pieces of evidence.

## II. THE CHALLENGED EVIDENCE

### A. Lab Urine/Blood Test Results

The blood and urine test results are inadmissible as business records, because there is no foundation that the specimens tested came from Barry Bonds. The records of Quest Laboratories, Lab One and Speciality Labs (the "Labs") are not business records that the blood or urine of Barry Bonds was tested. The Labs do not purport to know, or investigate, or inquire into whose specimens were sent to them by Mr. Valente. Any reference to Barry Bonds in their records simply reflects what Mr. Valente — who was not an employee or agent of the Labs — told them. It is therefore inadmissible hearsay under Rule 803(6), unless an independent hearsay

10

exception authorizes admission of Mr. Valente's statements.

For his part, Valente has testified that: "[T]here was no chain of custody on the urine." Grand Jury testimony [GJT] of James Valente, May 25, 2006. (Rep. Exh. A, at 54:18-19)[3] The government carefully refrained from asking Mr. Valente to confirm that there was likewise no chain of custody for blood samples, but his answer would have been the same.

Based solely on the testimony of a witness who has acknowledged "no chain of custody" for biological specimens, and who has no personal knowledge of the source or manner of collection of the specimens, the government proposes to place in evidence highly prejudicial laboratory reports as "business records." There is no such exception. Although the government goes to great lengths to obscure what happened, the foundational evidence is very simple:

> Q: So what was your basis for putting down Barry B. and those
> numbers on these samples? I mean how did you know it was
> Barry's urine?

> A: 'Cause Greg gave it to me and told me.

(Rep. Exh. A, at 55:7-11)

Anderson's statements to Valente are of course hearsay, the admission of which must be independently justified. Valente has no independent record of when and where they were made. To the extent the government alleges the statements of Anderson are reflected in BALCO logs, they do not meet the requirements for business records, for the reasons stated below.

**B.** **Internal Balco Documents Allegedly Recording the Receipt And/or Transfer of Urine And/or Blood Samples**

**1.** **Business Records**

Valente's "Log Sheets" are irrelevant unless they pertain to blood or urine specimens of Mr. Bonds. Valente claims no independent recollection in this regard. He says, however, that when Anderson brought him blood or urine which Anderson said came from Mr. Bonds, Valente made an entry in BALCO's records. Rule 803(6) requires that the record be "made at or near the time" of the events recorded. Cotchett, Federal Courtroom Evidence, 5th ed. 2008, Sec. 803.7.3

---

[3] The defense exhibits in support of this reply will be filed under seal with the Court on Tuesday, February 3, 2009.

11

1  at p. 22-38. There is nothing in the documents about when the specimens were taken, and

2  therefore no basis to determine whether Mr. Valente's "record" was near or distant in time from

3  the events.

4      The government asserts that Rule 104(a) governs the admissibility of the logs, but that

5  subsection does not apply to authenticity questions. The advisory committee notes to Rule 901

6  say: "Authentication and identification represent a special aspect of relevancy . . . . This

7  requirement of showing authenticity or identity falls in the category of relevancy dependent upon

8  fulfillment of a condition of fact and is governed by the procedure set forth in Rule 104(b)".

9  Rule 104(b) is different than 104(a); it provides:

10      (b) Relevancy conditioned on fact. When the relevancy of evidence depends upon
        the fulfillment of a condition of fact, the court shall admit it upon, or subject to,
11      the introduction of evidence sufficient to support a finding of the fulfillment of the
        condition.

12      The advisory committee notes to 104 provide guidance about how such determinations

13  ought to be made:

14      The judge makes a preliminary determination whether the foundation evidence is
15      sufficient to support a finding of fulfillment of the condition. If so, the item is
        admitted. If after all the evidence on the issue is in, pro and con, the jury could
16      reasonably conclude that fulfillment of the condition is not established, the issue
        is for them. If the evidence is not such as to allow a finding, the judge withdraws
17      the matter from their consideration.

18      The records prepared by Valente were not, by his own admission, necessarily accurate.

19  He acknowledged to the Grand Jury at least one instance where he mislabelled a blood sample,

20  supposedly at Anderson's request, because "Barry wanted, you know, some privacy." (Rep. Exh.

21  A, at 120:9-10) How many other samples were mislabeled for one reason or another is an open

22  question.

23      A more pervasive fraud permeates the BALCO records. Almost every request for

24  laboratory analysis of specimens attributed to Mr. Bonds is purportedly based on an order from

25  "Dr. Goldman." [4] BALCO made multiple requests to Lab One and Specialty Labs purporting to

26  _____

27      [4] See Rep. Exh. B, letters from Mr. Valente to Quest Laboratories dated July 6, 2001,
    October 22, 2001, February 6, 2003, and May 30, 2003 representing that "Dr. Goldman would
28  like the [testing] performed ..."

12

1  show Dr. Goldman as the physician authorizing the tests.[5]

2  Dr. Goldman is a psychiatrist. As he told the Grand Jury, Mr. Bonds has never met Dr.

3  Goldman. Valente admitted to the Grand Jury that he never saw or heard Dr. Goldman

4  consulting with Mr. Bonds. (Rep. Exh. A, at 104). The "business records" whose reliability the

5  government touts are fraudulent on their face.

6  Whether or not James Valente can lay an adequate foundation for the admission of

7  documents as business records of BALCO, the government acknowledges that the business

8  records exception cannot suffice to gain entry of the portion of the records that most matter: the

9  purported statements of Anderson contained in the records that attribute a given sample to Mr.

10  Bonds. Rather, the government must justify admission of this second level of hearsay by some

11  other exception to the bar on hearsay. (Opp., at 33, *citing United States v. Arteaga*, 117 F.3d 388,

12  396 n. 12 (9th Cir. 1997); *see also* FRE 805).

13  Anderson was not an employee of BALCO (Rep. Exh. A, at 28). Anderson plainly was

14  not operating under any business duty, much less a business duty of "care and accuracy." How

15  often or on what basis Anderson elected to provide items to Valente is beyond Valente's

16  first-hand knowledge — from his Grand Jury testimony it is beyond his hearsay knowledge as

17  well. The essential element of "regular business activity" by Anderson is absent.

18  As demonstrated below, the government cannot gain admission of Anderson's purported

19  statements under any other legal basis. The BALCO logs are therefore irrelevant.

20
### 2.  Anderson's Statements to Valente as Statements Against Interest under Fed.R.Evid. 804(b)(3)

21
22  The government argues that statements of Anderson attributing samples to Bonds can be

23  admitted by application of the statement against interest hearsay exception codified in

24  Fed.R.Evid. 804(b)(3). (Opp., at 34) Specifically, the government argues that Anderson's

25  statements to Valente about Bonds's urine samples so far subjected him to criminal liability at

26  the time they were made that he would not have made them if untrue, citing in this connection

27  the fact that Anderson later pled to an offense related to steroid dealing. (Opp., at 34)

28  [5] See Rep. Exh. C, laboratory forms referencing Goldman.

13

1    The government has not identified facts showing why Anderson should have recognized a
2   risk of criminal exposure at the time the statements were actually made. Enunciating a name
3   while handling a urine sample cannot possibly in itself expose one to criminal prosecution. The
4   statements themselves do not approach anything in the nature of an admission to criminal
5   conduct. *Monaco*, 735 F.2d at 1176. ("A showing that the statements solidly inculpate the
6   declarant is required."). Furthermore, unlike other crimes that are malum in se, unlawful
7   distribution of steroids was then an offense that law enforcement had failed to seriously
8   investigate or punish; accordingly, nothing Anderson said to Valente concerning samples was
9   likely to trigger a conscious understanding that it was against his penal interest to utter the
10  statement. See Weinstein's Evidence (1990), ¶ 804(b)(3) [02]. Finally, the circumstances that
11  purportedly corroborate the Anderson statements (Opp., at 34) cannot serve to overcome the
12  failure to satisfy the controlling against-interest criteria stated in the rule. *Idaho v. Wright*,
13  supra.[6]

### 3.    The Residual Exception

15      The government argues that both the log sheets and Anderson's statements to Valente are
16  also admissible under the residual exception. The government's primary argument is it would be
17  a "significant injustice" to allow the defendant to "dodge" the evidence should Anderson refuse
18  to testify. The government cites no legal authority suggesting that such a consideration may even
19  be taken into account when applying the residual exception.

20      The three cases on which the government relies provide no real help. *United States v.*
21  *Sanchez-Lima*, 161 F.3d 545 (9th Cir. 1998), where the relevant statements were videotaped and
22  made under oath, is unconvincing on its face. The government then relies on *Valdez-Soto*, but as
23  described above, the central consideration driving the court's opinion in *Valdez-Soto* was that the
24  declarant testified at trial. See 31 F.3d at 1470. Finally, *United States v. Bachsian*, 4 F.3d 796
25  (9th Cir. 1993), involved formal shipping documents and bills of lading that were regularly relied

---

27  [6] Defendant does note, however, that his grand jury testimony about providing samples to
28  Anderson says nothing about the reliability of the statements made by Anderson to Valente at a
    *later* time and outside of defendant's presence.

14

1  on by both the government and other businesses. Anderson's oral statements to *Valente* bear no
2  resemblance to the bills of lading in Bachsian, and the government's claim that many people
3  relied on the BALCO log sheets is nothing more than an unadorned assertion.

4      **4.     Statements of Co-Conspirators**

5      The government asserts that the entries contained in the BALCO logs were made by co-
6  conspirators of the defendant, and thus admissible on that basis. The government simply cannot
7  demonstrate by independent evidence that at the time of these entries, Mr. Bonds was a member
8  of a conspiracy to defraud the United States of its right to control and regulate performance
9  enhancing drugs charged in the BALCO indictments.

10     **C.     The Calendars Allegedly Concerning Bonds**

11         **1.     Business Records**

12     The government seeks to lay the foundation for calendars supposedly linked to Bonds
13 with (1) Anderson's alleged hearsay statement to Novitzky, and (2) testimony of various athletes
14 who will talk about calendars that Anderson prepared for them. As demonstrated below,
15 Anderson's alleged statement to Novitzky is testimonial hearsay, inadmissible under *Crawford*.
16 The other athletes know nothing about Anderson's relationship with Mr. Bonds, know nothing
17 about what records, if any, Anderson ordinarily created in his business, and know nothing about
18 when, if ever, Anderson created the calendars that the government wants to introduce against Mr.
19 Bonds. Thus, they cannot lay the foundation for the purported Bonds calendars. *Latman v.*
20 *Burdette, supra.* (Error to permit trustee's counsel to lay foundation for bank records because he
21 "had no regular connection to the [bank] account bank and no knowledge of the account except
22 that gained by hearsay, [and thus was] not a 'qualified witness.'" )

23     The Opposition refers to the calendars as "maintained by BALCO and Anderson" (Opp.,
24 at 2) It says that the calendars "were seized during the ... search of Anderson's residence ..."
25 (Opp., at 19). It repeats that Novitzky "found the calendars in Anderson's residence." (Opp., at
26 21) From this — and the testimony of athletes who were admittedly unfamiliar with the contents
27 of the calendars in our case — the government concludes that the calendars are admissible
28 because "ample evidence links [them] to Anderson." (Opp., at 21). The law does not allow the

1    government to substitute "linkage to Anderson" as a basis for admissibility in place of the Rule's
2    requirements.

3        Furthermore, the government claims the calendars were found in files that were organized
4    by athlete, "including the one for Bonds." Opp. at 19. Yet the government has offered no
5    evidence showing any file or folder with Bonds's name on it was found in Anderson's residence.
6    This point is critical, since most of the calendars to which the defense objects have no identifying
7    marks or other indications that the calendars pertained to Bonds.

8        **2. Declarations Against Interest**

9        The primary factual proffer as to the calendars involves Anderson's statements to agent
10   Novitzky when the calendars were seized. These statements, however, are, by definition,
11   "testimonial" within the meaning of *Crawford v. Washington*, 541 U.S. 26 (2004). As such, and
12   in the absence of opportunity for cross examination, the statements are fundamentally unreliable,
13   and their use against defendant for any purpose, including gaining admission of the calendars,
14   would violate his rights under the Confrontation Clause. *Ibid*.

15       In addition, even were they subject to consideration — and they are not — the statements
16   attributed to Anderson by Novitzky, as well as the other circumstances cited by the government,
17   fail on their face to meet the Rule's precise requirements. That Anderson may have told
18   Novitzky he did not believe it a good idea to place his name on packages sending out drugs (see
19   Opp., at 23) says nothing about what Anderson was thinking about his entries on calendars, and
20   particularly *at the specific time* that he made any such entries. See FRE 804(b)(3); see also 4 J.
21   Weinstein & M. Berger, Weinstein's Evidence (1990) ¶ 804(b)(3) [02] (To have a statement
22   proffered under Rule 804(b)(3) admitted, proponent must demonstrate that the declarant had a
23   conscience understanding that the statement was against his interest when he made it.) Indeed,
24   without Anderson's testimony, it is flatly impossible to know at what specific time any such
25   entries were made at all.

26       In addition, and on a related point, any Anderson statement about omitting his name from
27   drug shipments, or evidence of his storing calendars in his closet or coding calendar entries does
28   not demonstrate that a reasonable person in Anderson's place would have recognized that the

16

1  calendar entries, when made, created an impending and substantial risk of *criminal liability.* The

2  calendar entries simply are not admissions, or even statements that approach admissions, such

3  that a reasonable person would decline to make them for fear that such an act alone would create

4  a realistic threat of criminal prosecution. Nor is there any evidence that at the time of the entries

5  — even if it could be identified — the United States had commenced any significant prosecution

6  for steroid distribution to the kind of athletes with whom Anderson was involved, much less that

7  Anderson had known of any such prosecution. (Whatever one may think of the unlawful

8  distribution offense to which Anderson later pled, the offense is not *malum in se*, and, for a

9  reasonable person, hardly carries same likelihood of investigation or prosecution as do other

10  crimes such as theft, robbery, assault, or murder. )

11  The government's claim that the entries are admissible as statements against Anderson's

12  pecuniary interest is likewise unavailing. The argument here is that Anderson purportedly

13  benefitted greatly from his association with Bonds, and that "Anderson would have been ruined

14  financially if he had made false statements, or created false documents, reflecting Bonds's steroid

15  use." (Opp., at 24)

16  As a preliminary matter, Bonds notes that this approach turns the proper analysis on its

17  head. The theory of the exception is that a given statement, if true, would be harmful to the

18  declarant's interest; a reasonable person would not lie in a way that would harm that interest;

19  therefore, the statement must be true. (See Bonds's motion in limine, at 12) The government,

20  however, applies a reverse analysis, essentially contending that the statements, if false, would

21  have harmed Anderson's financial interests; therefore, they must be true. Such reasoning flatly

22  defies the approach mandated by the Rule.

23  Moreover, preparing false notes or entries relating to Bonds would create or bolster the

24  appearance of Anderson's association with him, the very link in which the government contends

25  Anderson was most interested. In any event, and again, the government has not and cannot

26  demonstrate when the entries were made and thus cannot plausibly demonstrate what Anderson

27  must have been thinking at those specific times. The government's financial interest argument is

28  an exercise in sheer speculation.

17

1   The government concludes its discussion of Rule 804(b)(3) argument by citing various

2   circumstances which purportedly corroborate the calendar entries and demonstrate their

3   trustworthiness. (Opp., at 24) As noted above, Rule 804(b)(3), however, does not permit

4   admission of a statement as against interest where, as here, the party who proffers has failed to

5   establish that it is against interest in the first instance. Furthermore, the listed circumstances do

6   nothing to advance the claim of trustworthiness here. The fact that they were seized from

7   Anderson's home or included references to Anderson's ex-wife bears on the issue of

8   authentication and is irrelevant to the Rule 804(b)(3) test. Finally, that Bonds never testified that

9   the calendars were inaccurate (Opp., at 24) is meaningless given that, as Bonds testified, he had

10  never seen the calendars and had no idea what they were.

11      Given the nature of the calendar entries supposedly relating to Bonds and the little that

12  can be known of the time and circumstances surrounding their making, they may not be admitted

13  as statements against interest under Rule 804(b)(3).

14      **3.      The Residual Exception**

15      In arguing for the admissibility of the calendars under the residual exception, the

16  government relies almost solely on corroborating evidence to prove their supposed reliability.

17  Since it knows nothing about the circumstances surrounding the making of the calendars, the

18  government can point to nothing in those circumstances that shows reliability. *See Wright*, 497

19  at 819. It thus utterly fails to satisfy the reliability prong. The government criticizes the defense

20  for failing to present evidence showing the lack of reliability. But it is of course the proponent's

21  burden to establish the applicability of a hearsay exception, and given the exceptional nature of

22  the residual exception, that is a heavy burden. The government has not carried it.

23      **4.      Co-conspirator Statements**

24      As with the BALCO logs, the government argues that the calendars were statements of a

25  co-conspirator in furtherance of a conspiracy of which Mr. Bonds was a part at the time the

26  calendar entries were made. The government cannot prove when the entries were made, much

27  less demonstrate by independent evidence that at those times, Mr. Bonds was a member of a

28  conspiracy to defraud the United States of its right to control and regulate performance enhancing

18

1 drugs.

## D. Calendars Unrelated To Bonds And The Testimony of Other Athletes

3 The government has indicated that it wishes to spend a substantial part of Mr. Bonds' trial
4 calling other athletes who: (1) were not employees of Anderson or BALCO and have no
5 "firsthand knowledge about the normal [recordkeeping] processes of the business" (Mueller &
6 Kirkpatrick 8.45); and (2) have never seen the supposed Bonds calendars, and know nothing
7 about when or how they were created.

8 Additionally, as the defendant will demonstrate in court if necessary, the grand jury
9 testimony of the athletes will demonstrate that their testimony cannot even establish with
10 reliability what their own calendars signify, much less what calendars they have never seen
11 represent. The testimony of Gary Sheffield, Benito Santiago, Bobby Estelella, and the Giambi
12 brothers are replete with instances in which they testify, contrary to the prosecution's theory, that
13 entries in their calendars do not represent occasions on which they were given, or ingested,
14 performance enhancing drugs.[7] Since their calendars are not reliable evidence of events they
15 themselves were involved in, those calendars can prove nothing about Mr. Bonds. The testimony
16 and documents of the other athletes cannot satisfy the foundational requirements for business
17 records and thus are inadmissible for that purpose.

18 In his motion, Mr. Bonds also addressed the question of whether the athlete witnesses
19 could be called to show that Anderson acted in certain ways with regard to them, permitting an
20 inference that he acted in the same fashion in his relationship with Mr. Bonds. FRE 404(b),
21 however, prohibits evidence of a person's "character" or past "acts" to prove that the person
22 acted in conformity with those past acts on a separate occasion. Mr Bonds demonstrated that
23 evidence could not be admitted under FRE 406, which provides that evidence of a person's

---

25 [7] See, e.g., Sheffield GJ at 20-21; Sheffield GJ at 22; Sheffield GJ at 26-27; Sheffield GJ
26 at 28; Sheffield GJ at 29; Sheffield GJ at 29; Santiago GJ at 21; Santiago GJ at 23; Santiago GJ
at 23-24; Santiago GJ at 31-32; Santiago GJ at 32-33; Santiago GJ at 36; Estalella GJ at 48-49;
27 Jason Giambi GJ at 18; Jason Giambi GJ at 24-25; Jason Giambi GJ at 44-45; Jeremy Giambi GJ
28 at 23; and Jeremy Giambi GJ at 25-26.

19

"habit" is admissible to prove that the person acted in conformity therewith. The government's opposition makes no mention of section 406, and thus has conceded that it cannot provide a conduit for the admission of any testimonial or documentary evidence concerning the other athletes.

**E. Handwritten Notes**

The government seized five pages of handwritten notes during searches of Anderson's residence and BALCO. The notes are barely comprehensible. Their author(s) are unknown, as are the time and purposes of their preparation. The government does not offer to prove what "regular course of business" was served by them. Nevertheless the government wants to offer them in evidence, presumably in the hope that the jury will attribute some nefarious content to them. The government claims that handwritten "notes from Anderson's home are admissible under the same rationales as discussed previously for the calendars," referring to all four grounds for admission described above without elaboration. Just as the calendars are not admissible as either business records, statements of co-conspirators, declarations against interest, or under the residual exception to the hearsay rule, the same is true of the handwritten notes attributable to Anderson. They are significant only as a measure of the government's zeal to convict Mr. Bonds by any means at all.

**F. Greg Anderson's Tape Recorded Statements to Steve Hoskins**

The government seeks to admit a tape of a portion of a conversation between Steve Hoskins and Greg Anderson apparently recorded by Hoskins in the Giants locker room in March of 2003. (Opp., at 41-47) The portions of the conversation attributable to Hoskins are obviously inadmissible hearsay, and there simply is no portion of what Anderson states in reply to Hoskins' questioning that unambiguously refers to Mr. Bonds. The government seeks to admit the records under the residual exception to the hearsay rule and as a declaration against Anderson's interest.

**1. The Residual Exception**

Nothing said by the government in its Opposition is as risible as its assertion that the truth of statements made in a casual conversation in a men's locker room simply cannot be questioned. "There is no credible, logical, or reasonable explanation for why they should not be

20

believed." (Govt. Opposition at 47.) It is hard to think of a locus in which statements are more prone to mendacity and braggadocio. Even if the government's assertion was accurate, probable truth is simply not the criterion of admissibility under Rule 807. What is required is a showing of exceptional circumstances, *United States v. Ricardo*, 472 F.3d 277, 287 (5th Cir. 2006); *Fong*, 626 F.2d at 763, and the government has made no such showing here.

## 2. Statements Against Interest

The government also seeks admission of Anderson's recorded statements to Hoskins as statements against penal interest within the meaning of Fed.R.Evid. 803(b)(3). (Opp., at 44-46) In support of this claim, the government relies on *United States v. Boone*, 229 F.3d 1231 (9th Cir. 2000) and *Padilla v. Terhune*, 309 F.3d 614 (9th Cir. 2002) for the proposition that a third party statement in a private setting to an acquaintance or confidante may, under certain circumstances, qualify as a statement against the declarant's penal interest within the meaning of 804(b)(3) (*Boone*) and without offending the Confrontation Clause (*Boone* and *Padilla*). (Opp., at 44-46)

This argument fails for two key reasons. First, the nature of Anderson's specific statements to Hoskins, as quoted by the government (Opp. at 42:12 - 44:13) is so fundamentally ambiguous that is impossible to determine whether Anderson (as opposed to Hoskins) is at any given point making reference to Bonds at all. Because the statements can only be relevant if they make reference to Bonds, and because the evidence is insufficient to support a finding that they do so, the statements must be excluded pursuant to Fed.R.Evid. 104(b) in the first instance.

Second, even were the court to determine that the Anderson statements refer to Bonds, Rule 804(b)(3) does not supply a basis for overcoming defendant's hearsay objection to them. The statements cannot be understood as resembling an admission to criminal activity, particularly where, again, the activity, even if understood as involving steroids, was not known to be of any particular interest to law enforcement when it occurred. This aspect of Anderson's statements distinguishes those considered in *Boone* and *Padilla*, which constituted the declarants' direct admissions that they had committed robbery (*Boone*) and robbery and murder (*Padilla*). Because a reasonable person in Anderson's position would be unlikely to recognize a danger of criminal prosecution for the activity his locker room statements describe — activity which, again, is a far

21

cry from the serious criminal conduct admitted by the declarants in Boone and Padilla — the
statements cannot be deemed as truly against interest under Rule 804(b)(3).

### G. Non-Hearsay Uses

The government also seeks admission of much of the above described hearsay evidence
on the grounds that the jury should consider it for the non-hearsay purpose of determining
whether Bonds's testimony to the grand jury was material. See Opp., at 17-18 (urine and blood
results); *id.*, at 22 (calendars); *id.*, at 32-33 (BALCO log sheets).

Defendant has demonstrated above that all of these materials should be excluded for
purposes of establishing the truth of the express and implied statements contained therein.
Furthermore, defendant submits that the true reason the government has invoked its non-hearsay
theory of admission is to circumvent defendant's well-founded hearsay objections and place the
statements before the jury in the hope that they will be considered and accepted as true. It is
certainly the case that the government has sufficient means of supporting its materiality claim
other than relying on admission of these statements. Given their contents, defendant objects to
admission of the statements for the cited purpose on the grounds that it would unduly prejudice
defendant, confuse the issues, and mislead the jury within the meaning of Fed.R.Evid. 403.

### H. Opinion Evidence

#### 1. Government's Proffered Expert Testimony Concerning the Supposed Side Effects of Steroids, HGH and Other Substances Should be Excluded

The defense has objected to expert testimony "concerning the supposed physical,
physiological, and behavioral effects of steroids and other substances... ." on the grounds that (1)
its witnesses lacked expertise in this field, (2) the supposed side effects are not established by
scientifically reliable principles, methodology, data or facts, and (3) the testimony is irrelevant
and prejudicial. (Motion In Limine at 21 -23.) Given that objection, the government was
required to present evidence sufficient to permit this Court, as the gate-keeper, to conclude that
the proffered testimony is admissible under Rule 702. The government's response fails that test.

The government relies upon Dr. Donald Catlin's and Dr. Larry Bower's resumes,
together with a short declaration from Dr. Bower and excerpts of Dr. Catlin's lengthy grand jury

22

testimony during two appearances. (Opp., exhibits 2, 3, 4 and 5) Significantly, the government explains that Catlin's testimony will be limited (1) to a description of the testing that his laboratory performed on a urine sample previously collected from Mr. Bonds by Major League Baseball and (2) to an explanation and interpretation of the results of that test. (Opp., at 47-48) Thus, Dr. Catlin's proffered testimony, as described in the government's pleadings, does not appear to fall within the purview of the defense objections.[8]

Similarly, Dr. Bowers' proffered testimony "that urine and blood tests for Bonds reflect steroid use, and that the steroids revealed by the blood and urine tests are usually administered by injection" falls outside the scope of the current posed objection. *See* Government Opposition at 47.[9] By contrast, Dr. Bowers' proffered testimony that "steroid users develop symptoms such as increased muscle mass, shrunken testicles, acne on the upper back, moodiness, and an erratic sexual drive" falls precisely within our objection. See Government Opposition at 47.[10] Here, conspicuously, the government chose not to present the Court with excerpts of Dr. Bowers' relevant grand jury testimony. We do so now. (See Rep. Exh. D)

In his testimony, Dr. Bowers ascribed the following side effects to "steroids": increased hair growth, development of acne especially on the upper back, decrease in testicular size, increased aggressiveness, feelings of invincibility, "roid rage," weakening of the heart, hypertension, injury to the liver and possible links to prostate cancer. (Rep. Exh. D, at 13-17) Regarding HGH, Dr. Bowers testified that, in addition to promoting growth in stature, the side

---

[8] On the other hand, to the extent the government relies on Dr. Catlin's conclusory assertions that the "effects of steroids" extend beyond a demonstrated anabolic effect to support Dr. Bowers' proposed testimony, those assertions are subject to the same defense objections made below. Opp., at 50-51 and Exhibit 4, at 23.

[9] This is by no means a concession that Dr. Bowers' opinions on these matters are valid or admissible. To the contrary, they are not valid and will be challenged by the defense. They are not, however, the subject of the present motion.

[10] The Government's Opposition fails to address testimony concerning the side effects of HGH, insulin and EPO. However, Dr. Bowers' declaration specifically does address those substances. *See* Bowers Declaration, ¶ 6. For this reason, we will address the admissibility of such testimony as well and lodge our objections.

23

1  effects of using this hormone include increased size of one's head or skull, jaw, hands and

2  fingers, and feet and toes, as well as improved eye-sight. (*Id.*, at 23-26, 36) Conspicuously

3  absent from Dr. Bowers' testimony is any reference to relevant scientific literature, especially

4  including peer reviewed studies, demonstrating any of these effects. Nor did Dr. Bowers make

5  any attempt to link these supposed side effects with any specific dosage and/or length of

6  treatment with these substances. Thus, Dr. Bowers' testimony concerning these side-effects fails

7  to pass muster under Rule 702 because (1) it is not based upon sufficient facts or data, (2) it is

8  not the product of reliable principles and methods, and (3) the witness has not applied the

9  principles and methods reliably to the facts of the case.

10  Dr. Bowers' Declaration, submitted in support of the Government's Opposition, fails to

11  advance the ball any further. After recounting his impressive credentials describing his

12  education, training and experience in chemistry and drug testing, Dr. Bowers states that he has

13  "conducted or overseen research on performance-enhancing drugs, including testosterone, human

14  growth hormone, erythrprotein, and other drugs, and the way the body metabolizes drugs."

15  Bowers' Declaration, ¶ 4. Significantly, however, Dr. Bowers does not claim to have any

16  experience, knowledge, training or expertise of any kind concerning the physical and/or mental

17  side effects of these substances. Instead, the most he can say is that as a result of his work he has

18  "become *familiar* with the physiological results of taking anabolic steroids and other

19  performance enhancing drugs in terms of their impact on a persons' physique, blood and urine."

20  Bowers' Declaration, ¶ 4 (emphasis added). Then, based upon his experience, his review of

21  peer-reviewed scientific literature, his own research and his ongoing discussions with other

22  "scientists in the anti-doping community," Dr. Bowers makes statements that are far less

23  expansive than his previous grand jury testimony and that do not support the broad assertions

24  contained in the Government's Opposition.

25  First, Dr. Bowers' Declaration does not support the government's assertion that "*steroid

26  users* develop symptoms such as increased muscle mass, shrunken testicles, acne on the upper

27  back, moodiness, and an erratic sexual drive." (*Compare* Opp., at 47, emphasis added). Instead,

28  Dr. Bowers makes representations concerning *testosterone only*, not *steroids* of *anabolic*

24

1   *steroids* in general. As to the exogenous introduction of testosterone *only*, Dr. Bowers states that
2   it "*can cause* a variety of physiological effects in a person, including acne, physiological effects
3   on the genitalia, an ability to rapidly increase muscle mass, and other effects." (Bowers'
4   Declaration, ¶6.b, emphasis added.)

5   Dr. Bowers new-found restraint is understandable. There are no scientific and/or peer
6   reviewed studies supporting the government's broad assertions, let alone Dr. Bowers' previous
7   testimony to the grand jury, that "steroids" or "anabolic steroids" have the effects described
8   therein. By contrast, there is some peer-reviewed literature reporting that relatively massive
9   doses of testosterone may cause acne but did not produce any anger, hostility or other
10  psychological effects. (See Rep. Exh. E, *The Effects of Supraphysiologic Doses of Testosterone*
11  *on Muscle Size and Strength in Normal Men*, New England Journal of Medicine (1996), Volume
12  335, No. 1.)[11]

13  Second, even as to testosterone, Dr. Bowers does not assert there is a causal connection to
14  increased hair growth, genitalia shrinkage, moodiness or erratic sexual drive. Bowers'
15  Declaration, ¶ 6.b. *Compare* Opp., at 47. Nor, in his declaration, does Dr. Bowers even attempt
16  to associate steroids use with increased aggressiveness, feelings of invincibility, "roid rage,"
17  weakening of the heart, hypertension, injury to the liver and possible links to prostate cancer.
18  *Compare* Bowers Grand Jury Testimony, Rep. Exh. D, at 13-17. Absent evidence of scientific
19  reliability for these assertions, they must be excluded.

20  Third, Dr. Bowers makes no attempt to evaluate the potential effect of the dosages of

21

22

23  [11] In this blind study, half of 43 male subjects were injected with 600 mg. of testosterone
24  on a weekly basis for 10 weeks. The other half received a placebo. Half in each group worked
    out with weights. The other half did not. Those injected with testosterone experienced
25  significantly more weight gain and increased muscle mass than those receiving the placebo.
    Acne developed in three men receiving testosterone and in one receiving the placebo. There was
26  no demonstrable effect on mood or behavior, specifically including anger and aggression. Liver-
    enzyme concentrations, hemacrits and red-cell counts were unaffected. Cholesterol levels were
27  not implicated. There was a small change in creatinine levels for those who received testosterone
    and exercised. There was no observed change in the serum concentration of prostate-specific
28  antigen. Apparently, the study did not monitor testicle size. Rep. Exh. E, at 3-5.

25

1 substances and length of treatment that were allegedly administered in this case. Perhaps this

2 void stems in part from the fact that the government has presented no evidence what those

3 alleged dosages and length of treatment were. This failure, in turn, may stem from the fact that

4 the government can present no direct evidence that Mr. Bonds received even a single dose of an

5 anabolic steroid except as Mr. Bonds himself described during his grand jury testimony. (Mr.

6 Bonds stated that he received substances similar to the cream.) The ingestion of relatively minor

7 amounts of substances over relatively short durations of time cannot logically be assumed to have

8 the same effects or side effects as ingestion of those same substances in greater dosages and for

9 longer periods of time. Absent reliable scientific studies showing that a specific side effect may

10 be caused by substances ingested in doses and for durations applicable to Mr. Bonds, Dr.

11 Bowers' opinions are irrelevant and misleading.

12 Turning to HGH, Dr. Bowers asserts that its consumption "can enhance athletic

13 performance" and "can cause changes to the body by itself or, in connection with other

14 substances, e.g. anabolic steroids and insulin, that can be responsible for the growth of ... muscles

15 and bones." Bowers' Declaration, ¶ 6.c. Again, however, Dr. Bowers cites not a single study or

16 source to support these propositions. In fact, Dr. Bowers' assertions that HGH enhances athletes

17 performances are contradicted by the most comprehensive literature review on this subject:

18     Claims that growth hormone enhances physical performance are
    not supported by the scientific literature. Although the limited
19     available evidence suggests that growth hormone increases lean
    body mass, it may not improve strength; in addition, it may worsen
20     exercise capacity and increase adverse events. More research is
    needed to conclusively determine the effects of growth hormone on
21     athletic performance.

22 Annals of Internal Medicine, Systematic Review: The Effects of Growth Hormone on Athletic

23 Performance, Vol. 148, No. 10, p. 747 (May 20, 2008). (See Rep. Exh. F). Thus, Dr. Bowers'

24 assertions concerning the performance enhancing effects of HGH are inconsistent with the latest

25 available scientific literature.

26 Equally important is the fact that Dr. Bowers' declaration makes no reference to the

27 specific side effects of HGH identified in his grand jury testimony – i.e. increased head, hand and

28 foot sizes, and improved eye-sight. Compare Exhibit D, pp. 23-26, 36. Absent reliance on peer

1    reviewed studies and literature supporting the existence of these side effects, tied to evidence of
2    a dosage and course of treatment shown to exist in this case, Dr. Bowers' opinions concerning
3    such side effects should be excluded.

4         Turning to insulin, Dr. Bowers' Declaration offered only the most conclusory assertions.
5    Without citation or attribution, Dr. Bowers states that insulin "is used to regenerate energy stores
6    in the cell and prevent muscle breakdown." Bowers' Declaration, ¶ 6.d. Bowers further asserts,
7    without citation, that "insulin is frequently used in conjunction with ... HGH ... resulting in faster
8    recovery and more muscle accumulation than either substance alone." *Id.* We are aware of no
9    authority for this assertion. Nor has the government made any proffer that this assertion is
10   relevant to the facts of this case, and the topic does not relate to any of the charged counts.

11        Finally, with regard to erythropoietin (EPO), Dr. Bowers describes a theoretical
12   mechanism by which it can increase the number of red blood cells in a person's blood system and
13   hypothesizes that it "can enhance a person's ability to train for athletic performances and perform
14   in athletic competitions." Bowers' Declaration, ¶ 6.e. Once again, Dr. Bowers' opinions are
15   unsupported by citation to peer reviewed studies or literature or any other scientific source. Nor
16   has the government presented any evidence that EPO consumption is relevant to the charges in
17   this case. Mr. Bonds was not asked about EPO at the grand jury, and EPO is not referenced in
18   any of the charges in this case.

19        For these reasons, the Court should exclude the government's proffered expert testimony
20   concerning the side effects of steroids, HGH, insulin and EPO.

21            **2.    Lay Witnesses' Observations and Opinions**
                **Concerning the Supposed Side Effects of**
22              **Steroids and Other Substances Should be**
                **Excluded**
23

24        There are two thrusts to the defense objection. First, we object to any lay opinion that
25   Mr. Bonds was using steroids because, for example, he supposedly developed acne. Apparently,
     the government does not intend to present such lay opinion evidence. Instead, the government
26   will seek only to present percipient witness testimony "concerning Bonds's physical and mental
27   condition [consistent with] ... expert testimony from Dr. Bowers ... that steroid use results in
28

                                            27

1  specific mental and physical changes in the user." (Opp., at 52).

2  This brings us to the second thrust of our objection. To the extent the government would
3  present eye witness testimony describing supposed changes in Mr. Bonds' physical or mental
4  condition, that testimony must be excluded unless it is tied to scientifically reliable expert
5  testimony that such changes are attributable to substances that the evidence shows were actually
6  ingested by Mr. Bonds. As demonstrated by Dr. Bowers' grand jury testimony, there is a great
7  deal of lore and legend regarding the use and common side effects of performance enhancing
8  drugs. It is likely that jurors and witnesses alike will have preconceived notions concerning such
9  matters, many of them false and unsubstantiated. To the extent that a lay witness would testify to
10 his or her observation of a supposed change in Mr. Bonds' physical or mental condition that
11 cannot be scientifically linked to a substance Mr. Bonds is shown to have ingested in a dosage
12 and for a duration that could cause such changes, such testimony would be both irrelevant and
13 highly prejudicial. Accordingly, it should be excluded under Rules 402 and 403.

## CONCLUSION

15 For the foregoing reasons, the Court should (1) conduct such further proceedings as are
16 necessary to assess the admissibility of the evidence that defendant has moved to exclude and (2)
17 issue an order excluding such evidence as the Court deems inadmissible.

18 Dated: February 2, 2009                    Respectfully submitted,

19                                            LAW OFFICES OF ALLEN RUBY

20                                            ARGUEDAS, CASSMAN & HEADLEY, LLP

21                                            RAINS, LUCIA & WILKINSON, LLP

22                                            RIORDAN & HORGAN

23
                                             By  /s/  Dennis P. Riordan
24                                                   Dennis P. Riordan

25                                             By  /s/  Donald M. Horgan
                                                    Donald M. Horgan
26
                                             Counsel for Defendant
27                                           Barry Lamar Bonds

28

28