ALLEN RUBY, (SBN 47109)
Law Offices of Alan Ruby
125 S Market St #1001
San Jose, CA 95113-2285
Phone: (408) 998-8500

CRISTINA C. ARGUEDAS (SBN 87787)
TED CASSMAN (SBN 98932)
MICHAEL ANDERSON (SBN 232525)
ARGUEDAS, CASSMAN & HEADLEY, LLP
803 Hearst Avenue
Berkeley, CA 94710
Phone: 510.845.3000

DENNIS RIORDAN (SBN 69320)
DONALD HORGAN (SBN 121547)
RIORDAN & HORGAN
523 Octavia St
San Francisco, CA 94102
Phone: (415) 431-3472

Attorneys for Defendant
BARRY LAMAR BONDS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO VENUE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>BARRY LAMAR BONDS,<br><br>　　　　　Defendants.<br>_____/ | NO. CR 07-0732 SI<br><br>DEFENDANT BONDS' SUPPLEMENTAL MEMORANDUM RE: ADMISSIBILITY OF GOVERNMENT'S PROFFERED EXPERT TESTIMONY |

## I. INTRODUCTION

Having reviewed the government's most recent submission concerning the admissibility of its proffered expert testimony regarding the supposed side effects of anabolic steroids and human growth hormone (HGH), we are constrained to admit that we actually agree with the government on one thing. There is no necessity for the Court to take testimony on the *Daubert* issue. Of course, our reasons differ. We submit that the government's proffer utterly fails to establish that Dr. Bower's opinions constitute admissible expert testimony under Rule 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). In some instances, that is because there is no reliable factual predicate which would render the opinion testimony relevant to this case. In other instances, it is because Bowers' testimony concerning the effects of steroids has no reliable scientific basis. Finally, where there is a conceivable connection between the opinion testimony and the particular facts of the case, the probative value of the evidence is so minimal, while the consumption of time of time and potential prejudice it would involve is so great, that the evidence plainly should be excluded under Rule 403. For these reasons, we renew our request to exclude Dr. Bowers' proffered testimony with respect to alleged side effects of anabolic steroids and HGH that are clearly inadmissible.

## II. APPLICABLE LAW

In our original moving papers, Mr. Bonds challenged the admissibility of expert opinion evidence on three grounds: relevancy, inappropriate expert testimony and undue prejudice. (Defendant's Motion In Limine at 23.) As an initial matter, the first hurdle that the government must clear under *Daubert* is relevance – i.e. it must demonstrate that its proffered evidence tends "to make the existence of any fact that is of consequence to the determination of the action more probable or less probable... ." Rule 401, Fed. Rules Evid. As the Ninth Circuit recently explained:

1

Federal Rule of Evidence 702 provides that a court may admit testimony from a qualified expert if it will help the trier of fact understand the evidence or determine a fact in issue. Such evidence must still be relevant; *"[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 591, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (internal quotation marks and citation omitted).

*United States v. 97.98 Acres of Land*, 530 F.3d 899, 904 (9th Cir), cert. denied, __ U.S. __, 129 S.Ct. 606 (2008) (emphasis added). *See also United States v. Downing,* 753 F.2d 1224, 1242 (3d Cir. 1985) ("An additional consideration under Rule 702 - and another aspect of relevancy - is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute"). The Supreme Court described this inquiry as a question of "fit" which "is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Daubert*, 509 U.S. at 591. To demonstrate this principle, the Court cited the following:

> The study of the phases of the moon, for example, may provide valid scientific "knowledge" about whether a certain night was dark, and if darkness is a fact in issue, the knowledge will assist the trier of fact. However (absent creditable grounds supporting such a link), evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an indvidual was unusually likely to have behaved irrationally on that night. Rule 702's "helpfulness" standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.

*Id*. at 591 -592.

After the proponent establishes that the proffered expert testimony has "a valid scientific connection to the pertinent inquiry", the Court must turn to questions of validity and reliability under Rule 702 – whether the (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. Under Rule 702,

> federal judges perform a "gatekeeping role" . . .; to do so they must satisfy themselves that scientific evidence meets a certain standard of reliability before it is admitted. This means that the expert's bald assurance of validity

> is not enough. Rather, the party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology.

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995) (following remand from the Supreme Court). This inquiry requires consideration of at least five factors: (1) whether the expert's technique has been or can be tested, (2) whether the technique or theory has been subject to peer review and publication, (3) the known or potential error rate for the technique or theory, (4) the existence and maintenance of controls and (5) whether the technique or theory is generally accepted in the relevant scientific community. *Daubert*, 509 U.S. at 593-594.

Finally, assuming the proponent passes the first two hurdles, expert testimony must nevertheless be excluded under Rule 403 if its probative value is outweighed by the potential for undue delay, confusion or prejudice. See *Daubert*, 509 U.S. at 595; *U.S. v. 87.98 Acres of Land*, 530 F.3d at 904-905. As the Supreme Court recognized:

> Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.

*Daubert*, 509 U.S. at 595, *quoting Weinstein, Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended*, 138 F.R.D. 631, 632 (1991). Given the natural propensity of lay persons to rely on so-called experts, the Court must be especially vigilant to ensure that misleading and prejudicial testimony is not presented under Rule 702.

The government has argued that these objections go to the weight of the evidence, not its admissibility. But that thoroughly misconstrues *Daubert* and the role of this Court as "gatekeeper" under the Federal Rules. Absent persuasive preliminary evidence out of the jury's presence showing that proffered expert opinions are relevant, meet the *Daubert* standards and are not unduly time-consuming, prejudicial or

confusing under Rule 403, the Court should exclude the testimony.

### III. THE PROFFERED TESTIMONY

The government's proffer fails to meet each of these hurdles. First, the government asserts that "Dr. Bowers's testimony on the physical and mental effects of steroid use is relevant because it would tend to prove the central allegation of the indictment – that Bonds lied when he denied that he knowingly took anabolic steroids." (Govt. Opp. To In Limine Motions at 48.) Yet, the government has never even attempted to explain how it would establish the factual predicates that might render the proffered expert opinions relevant. For example, the government would present testimony that the use of anabolic steroids can cause male pattern baldness. (Bowers' Declaration, ¶ 3.) Yet, Dr. Bowers' opinion concerning male pattern baldness – at least it relates to an adult male with normal levels of testosterone – is completely unsupported by any of the materials cited by Dr. Bowers and will be disputed by a defense expert at trial. Millions of American men have become bald without ingesting steroids. That being true, the fact that Mr. Bonds might be bald has no probative value to show that he took steroids, even assuming there was a temporal link, which the government has not demonstrated. For all of these reasons, Bowers' testimony concerning baldness should be excluded under Rules 402, 403 and 702.

The government's proffered expert testimony suffers from yet another flaw. Dr. Bowers is an accomplished chemist and laboratory technician. To quote the government, he has spent "an entire professional career devoted to studying and combating the use of anabolic steroids, human growth hormone, and other performance enhancing drugs in sports." (Govt. Supp. Brief Re: *Daubert,* at 4.) But he is not an endocrinologist. He is not even a medical doctor. He does not claim to have treated, let alone examined a single individual who was known or suspected of using steroids or HGH. He has no first hand experience, training or knowledge concerning

4

the side effects of these substances.  Instead, he relies on three or four medical textbooks, several published articles (but only two controlled studies concerning anabolic steroids) and anecdotal information received from others.  Moreover, as we will demonstrate, Dr. Bowers apparently misinterpreted or ignored much of the information contained in those sources.[1]  For these reasons, under Rule 702, Dr. Bowers lacks the "specialized knowledge" required to testify as expert on the issue of the side effects of steroids and HGH.

**A.  ANABOLIC STEROIDS**

We begin by addressing several of the alleged side effects of anabolic steroids identified by Dr. Bowers in his declaration.  (Bowers Declaration, ¶ 3.)  In support of our position, we present the declaration of Ronald S. Swerdloff, M.D.  Dr Swerdloff is a renowned endocrinologist with extensive experience research, including clinical studies, involving the administration of anabolic steroids and HGH.  (Dr. Swerdloff's declaration and curriculum vitae are appended as Exhibits B and C, respectively.)  Dr. Swerdloff has reviewed the Declarations submitted by Dr. Bowers as well as the studies and sources upon which Dr. Bowers relies.  (Swerdloff Declaration, Exhibit B at ¶ 2.)

**1. Hair growth on the trunk and extremities**.

a. <u>Factual Predicate</u>.  The government has proffered no evidence that Mr. Bonds developed hair growth on his trunk or extremities.

b. <u>Reliability of the Opinion</u>.  In none of the literature cited by Dr. Bowers

---

[1] We have searched in vain through all of the materials cited by Dr. Bowers for a single reference to the development of male pattern baldness in healthy adult males who had normal levels of testosterone before using anabolic steroids.  We append, for example, the relevant chapter from one of the two medical texts upon which Dr. Bowers relies.  (Bowers Declaration at 2.)  See Hardman, J.G, Limbird, L.E., and Gilman, A.G. (Eds.). (2006) *Goodman & Gilman's the Pharmacological Basis of Therapeutics* (11th ed.). New York: McGraw-Hill, appended as Exhibit A.)  Its rather extensive discussion of the side effects of testosterone and other anabolic steroids includes no mention of male pattern baldness in adult males.  *Goodman & Gillman*, Exhibit A, pp 6-9.

5

provided did we locate any support for this effect in healthy adult men who had normal levels of testosterone. Dr. Swerdloff confirms that he is unaware of any study demonstrating that the ingestion of an anabolic steroid had the effect of increasing hair growth in an otherwise healthy adult male. (Swerdloff Declaration, Exhibit B at ¶ 4.a.)

**2. Testicular atrophy**

a. <u>Factual Predicate</u>. Apparently, a former girlfriend (who says she was wronged by Mr. Bonds, pressed a legal claim against him and has shopped a book about their relationship) claims to have noticed that Mr. Bonds' testicles became smaller. We are aware of no similar observation by anyone else, certainly not by any of Mr. Bonds' many trainers and attending physicians. There is, in fact, no medical evidence to support this claim. The government's presentation of testimony from the former girlfriend will invite the defense to present contradictory evidence.

b. <u>Reliability of the Opinion</u>. There are studies, some cited by Dr. Bowers, that have found evidence of this effect on the testicles after several months of the administration of therapeutic doses of testosterone.[2] However, the effect is dependent on dosage and length of treatment, is usually minimal and is difficult to detect because even when the testes atrophy, the size of the scrotum does not. Given the relatively small effect, an untrained layperson would have difficulty discerning it even by touch. (Swerdloff Declaration, Exhibit B at 4.c.) As a consequence, even when the effect occurs, it cannot be visually discerned, most patients are not aware of the effect and detection usually requires a medical examination by a trained examiner using a special device called an orchidometer to document any reduction in size. (Swerdloff Declaration, Exhibit B at 4.c.)

Given all of these circumstances, testicular atrophy is an especially apt issue for

---

[2]The *Goodman & Gilman* textbook states that if the "administration [of pharmacological doses of androgens] continues for many years, testicular size may diminish." (Exhibit A, at 8.)

exercise of the Court's discretion under Rule 403, as suggested by Judge Weinstein, *supra*.

**3. Psychological Effects – aggressiveness, feelings of invincibility, and "roid rage"**

a. <u>Predicate Fact</u>. The government has proffered none. Assuming the government is prepared to present lay witnesses that Mr. Bonds was on occasion hostile, angry or aggressive, such evidence would be irrelevant absent some temporal or other link to the alleged use of steroids. We are not aware of any witness who claims that there was.

b. <u>Reliability of the Opinion</u>. These observations are controversial and complicated by the inability to isolate causative factors. (Swerdloff Declaration, Exhibit B at 4.d.)[3] One of the papers cited by Dr. Bowers, is a good example. Thiblin I, Lindquit O, Rajs R. 2000; *Causes and Manner of Death Among Users of Anabolic Androgenic Steroids*; Journal of Forensic Science 45;16-23. This retrospective study examined the manner of death of 34 males who were known to have used anabolic steroids. Its findings were thoroughly confounded by the subjects consumption of numerous other substances including alcohol, marijuana, cocaine, amphetamines and other stimulants or illicit drugs. As for controlled prospective studies, the results are decidedly mixed. One blinded study, for example, (not cited by Dr. Bowers) found no significant psychological effects after a ten week treatment of testosterone at 600 mg./week. Bhasin, S., et al., The Effects of Suprapysiologic Doses of Testosterone on Muscle Size and Strength in Normal Men, New England Journal of Medicine (1996), Volume 335, No. 1. Dr. Bowers cited a different study – Pope Jr HG, et al., 2000. *Effects of Suprapysiological Doses of Testosterone on Mood and Aggression in Normal Men: A*

---

[3]The textbook, *Goodman & Gilman*, states that other "side effects have been suggested by many anecdotes but not confirmed, including psychological disorders and sudden death due to cardiac arrest... ." (Exhibit A at 8.)

7

*Randomized Controlled Trial*. Arch Gen Psych 57:133 40 – which made limited findings as expressed in the abstract:

> Testosterone administration, 600 mg/wk significantly increased ratings of manic symptoms in normal men. This effect, however, was not uniform across individuals; most showed little psychological change, whereas a few developed prominent effects. The mechanism of these variable reactions remains unclear.

Thus, Dr. Swerdloff opines that the study results concerning psychological effects are decidedly mixed and that there is no agreement in the scientific community. (Swerdloff Declaration, Exhibit B at 4.d.)

Given the potential for a sideshow of criticism from biased witnesses concerning Mr. Bonds' personality, together with the mixed scientific results and the axiom that human behavior may have many indistinguishable causes, we submit this is another area where the Court should exercise its discretion under Rule 403.

**4. Prostate cancer**.

    a. <u>Factual Predicate</u>. The government has proffered none.

    b. <u>Reliability of the Opinion</u>. The studies do not support the assertion that anabolic steroids cause prostate cancer. *(Goodman & Gilman*, Exhibit A at 4.) Nor is Dr. Swerdloff aware of any such evidence. (Swerdloff Declaration, Exhibit B at 4.e.)

**5. Male pattern baldness**

This was discussed previously. As Dr. Swerdloff explains, there is no evidence that exogenous anabolic steroids cause baldness in an otherwise healthy male with normal levels of testosterone, as opposed to women and children. (*Goodman & Gilman*, Exhibit A at 8; Swerdloff Declaration, Exhibit B at 4.b.)

**B. HUMAN GROWTH HORMONE**

Next, we turn to the specific side effects of HGH identified by Dr. Bowers. (Bowers Declaration, ¶ 5)

1. **Improved Eyesight**

    a. <u>Predicate Fact</u>.  The government has proffered no evidence.

    b. <u>Reliability of the Opinion</u>.  The studies and articles cited by Dr. Bowers provide no support for the proposition that exogenous HGH improves eyesight.  Nor is Dr. Swerdloff aware of any such evidence.  (Swerdloff Declaration, Exhibit B at 6.a.)

2. **Increased Size of the Head, Skull, Jaw, Hands, Fingers, Feet and Toes**

    a. <u>Predicate Fact</u>. The government has proffered no evidence.

    b. <u>Reliability of the Opinion</u>.  Dr. Bowers did not refer to any study, historical or prospective, controlled or otherwise, demonstrating that the introduction of exogenous HGH to healthy, adult athletes actually results in bony growth such as would cause an increase in the size of the skull, jaw, fingers, toes, etc.  *See, e.g.* Holt RI, et al. *Growth hormone, IGF-I and insulin and their abuse in sport*. Br. J Pharmacol. 2008; 154:542-56, p. 548 (the only potential physical adverse side effects of HGH arise from sodium and fluid retention, possibly leading to ankle swelling, hypertension and headache).  Some of the literature Dr. Bower cites relies solely upon an analogy to acromegaly to suggest that exogenous HGH in health adult athletes could have similar symptoms.  However, the analogy is strained, theoretical and untested.  In fact, the symptoms of acromegaly develop very gradually over many years of very elevated levels of HGH.  (Swerdloff Declaration, Exhibit B at 6.b.)  These facts are recognized even in the abstract of one of the very studies cited by Dr. Bowers, which notes that acromegaly has an "insidious onset and slow progression" with the result that the disease is "often diagnosed four to more than ten years after its onset." Chanson P, Salenave S. *Acromegaly*. Orphanet Journal Rare Diseases. 2008;25;3.17.  Thus, the analogy would suggest that an increase in bony growth due to exogenous HGH would occur very gradually over many years of elevated HGH levels.  Obviously, there is no evidence to support that premise.  Not surprisingly, there are no study documenting

such an effect from exogenous human growth hormone in healthy adult males. (Swerdloff Declaration, Exhibit B at 6.b.)

## IV.  CONCLUSION

For all of the reasons stated above and in our previous submissions to the Court, the government's proffered expert testimony concerning the alleged side effects of exogenous steroids and HGH should be excluded.

Dated: February 18, 2009

Respectfully submitted,

LAW OFFICES OF ALLEN RUBY
ARGUEDAS, CASSMAN & HEADLEY, LLP
RIORDAN & HORGAN


/s/ Allen Ruby
Allen Ruby