IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 07-00732 SI |
| Plaintiff, | **ORDER DENYING MOTION TO ACQUIT AND FOR A NEW TRIAL** |
| v. | |
| BARRY LAMAR BONDS, | |
| Defendant. | |

On August 25, 2011, the Court heard argument on defendants motion for acquittal or, in the alternative, a new trial. Having considered the arguments of counsel and the papers submitted, the Court hereby DENIES defendant's motion.

**BACKGROUND**

On April 13, 2011, the jury returned a partial verdict in this case. The jury was divided as to the three counts charging that defendant made false declarations to a grand jury in violation of 18 U.S.C. section 1623(a). The jury unanimously agreed that defendant was guilty of obstruction of justice in violation of 18 U.S.C. section 1503. The jury unanimously agreed that the one particular statement—Statement C—constituted the obstructive act. *See* Verdict (Doc. 373). Immediately after the verdict was read, defendant made a motion under Rule 29 for a directed verdict and Rule 33 for a new trial. TR 2148:15–2148:18 (Doc. 389).

**I.  The BALCO investigation**

The charges in this case arose from defendant's testimony before a grand jury in the Northern

District of California on December 4, 2003. The grand jury was investigating the distribution of anabolic steroids and other performance enhancing drugs by the Burlingame-based Bay Area Laboratory Co-operative ("BALCO"), as well as BALCO's laundering of money gained from sales of those drugs.

At defendant's trial, Special Agent Jeff Novitzky testified about the investigation. Novitzky testified that, by the summer of 2003, the government had identified Greg Anderson, an associate of BALCO, as a target of the investigation. Testimony of Jeff Novitzky, TR 225:9–225:15 (Doc. 318). The government believed that Anderson was involved with BALCO and in distributing performance enhancing drugs. *Id.* at TR 242:12–242:15. In September 2003, the government executed a search warrant at Anderson's home and car, where they found, among other things, human growth hormone in injectable form, injectable anabolic steroids, syringes of different sizes, and containers of a substance called tetrahydrogestrinone or THG, which Special Agent Novitzky called "a designer anabolic steroid" and which is not injected. *Id.* at TR 244:10–254:22; 264:4–264:7.[1]

In the fall of 2003, the government convened a grand jury "to determine the extent of the drug dealing, what drugs which of these individuals were getting, the amount of drugs they were getting, how they paid for the drugs," so that the government "could determine whether or not certain transactions could be money-laundering transactions." *Id.* at TR 272:4–272:15. Special Agent Novitzky, a lead investigator in the case, was interested in getting statements from athletes in connection with the investigation, in order to learn "what they were told about the drugs, the timing of them getting them, the volume of the drugs they were given, how they paid for them, how they were told to pay for them. Things of that nature." *Id.* at TR 273:3–273:13. Special Agent Novitzky had information connecting defendant to BALCO and to Anderson, and the government called defendant to testify before the grand jury. *Id.* at TR 225:9–225:15; 228:12–228:19; 273:24–273:25.

The individuals investigated in the BALCO case all eventually pled guilty. Anderson, for example, pled guilty to distribution of anabolic steroids and unapproved drugs, and to money laundering. *Id.* at TR 281:7–281:10. Special Agent Novitzky read the following excerpt of Anderson's

---

[1] Greg Anderson refused to testify at defendant's trial and was held in civil contempt. TR 203:6–204:9 (Doc. 318); *see also* USCA Order (Doc. 165) (upholding pretrial order excluding evidence if not authenticated at trial by Anderson).

2

plea agreement to the jury:

> I agree that I am guilty of the offenses to which I plead guilty, and I agree that the following facts are true:
> Between December 1st, 2001 and September 3rd, 2003, I knowingly participated in a conspiracy with Victor Conte and Jim Valente to illegally distribute anabolic steroids. I also laundered the proceeds of my steroid-trafficking activities by willfully causing another person to cash checks written to me for the sale of steroids, thus resulting in my concealment and disguise of the nature, location, source, ownership and control of the proceeds of the illegal distribution of anabolic steroids.
> I knowingly illegally distributed steroids, and I distributed other performance-enhancing drugs to athletes in furtherance of the conspiracy. The drugs I distributed to these athletes included a testosterone/epitestosterone cream, known as "the cream;" a synthetic and undetectable steroid-like derivative, tetrahydrogestrinone, also known as "THG," or "the clear;" injectable human growth hormone; clomid (an anti-estrogen medication used to help the body regenerate natural testosterone levels); injectable anabolic steroids; and oral anabolic steroids, including ones I referred to as "beans." In furtherance of the conspiracy, I obtained steroids from the Bay Area Lab Cooperative, or "BALCO."
> Upon receiving checks from athletes, portions of which were attributed as payment for steroids, I laundered the proceeds by willfully causing another person to cash the checks for me in that person's name. I asked this other person to cash the checks derived from the sale of steroids knowing that the purpose of the transaction was at least partially to conceal my receipt of checks from the athletes as payment for the sale of steroids.
> As alleged in count forty-two, I agree that on April 8, 2003, I caused another person to cash a check written to me for $1200, which in fact involved the proceeds of steroid distribution. I agree that check was cashed at a financial institution in San Mateo, California affecting interstate commerce.

*Id.* at TR 285:14–286:25.

## II. The immunity order

Defendant testified under a grant of immunity pursuant to 18 U.S.C. section 6002. The order provided that "BARRY BONDS . . . shall testify under oath and provide other information including documents in this case" and that "the testimony and other information compelled from BARRY BONDS pursuant to this order . . . may not be used against him in any criminal case, except a case for perjury, false declaration, or otherwise failing to comply with this order." *See* December 2003 Order (Doc. 228-2) (Gov't Ex. 38).

When defendant appeared to testify, the government explained to him that he had been called to testify before a grand jury investigating Anderson and others for conspiracy to possess or distribute illegal substances, and for money laundering. Grand Jury Transcript, Gov't Ex. 37 at TR 4:6–4:25. The government also read defendant the immunity order, and then explained it as follows:

3

> for today's purposes you've been ordered to testify, but there are limitations as to how the government could use those statements against you in the future. . . . And those limitations are that, because you're compelled to answer questions put [to you by the prosecutors] or the grand jury – because you're being compelled, the government can't use those statements either directly against you in any subsequent criminal proceeding or indirectly to develop evidence against you in a subsequent criminal proceeding. . . . Now, there's an exception to what I just said. And so let me make sure that that exception is clear. And [that] exception is that if it were to be the case that you were untruthful today or false – and I have no reason to think that you would be today, but I say this to every witness that comes in here – if there were a prosecution for perjury, false declaration, false statements or otherwise failing to comply with this [court order], that would be a circumstance where these statements could be used against you.

*Id.* at TR 6:14–10:25. The government also instructed defendant that, if he did not understand a question, he should ask the questioner to rephrase it. *Id.* at TR 6:4–6:5.

## III. The obstruction of justice charge

### A. The indictment

The third superseding indictment charged defendant with four counts of making false statements and one count of obstruction of justice, stemming from his testimony to the grand jury.[2] The obstruction count charged that defendant "did corruptly influence, obstruct, and impede, and endeavor to corruptly influence, obstruct, and impede, the due administration of justice, by knowingly giving material Grand Jury testimony that was intentionally evasive, false, and misleading, including but not limited to the false statements made by the defendant as charged in Counts One through Four of this Indictment." Third Superseding Indictment (Doc. 213).

### B. The jury instructions

With regard to this count, the jury was instructed as follows:

> The defendant is charged in Count Five with obstruction of justice in violation of 18 U.S.C. § 1503. In order for the defendant to be found guilty of Count 5, the government must prove each of the following elements beyond a reasonable doubt:
>
> 1. The defendant corruptly, that is, for the purpose of obstructing justice,
>
> 2. obstructed, influenced, or impeded, or endeavored to obstruct, influence, or impede the grand jury proceeding in which defendant testified,

---

[2] One count of false statements was dismissed before jury deliberation. See Docket, April 6, 2011 Dismissal of Counts.

4

3. by knowingly giving material testimony that was intentionally evasive, false, or misleading.

A statement was material if it had a natural tendency to influence, or was capable of influencing, the decision of the grand jury.

The government alleges that the underlined portion of the following statements constitute material testimony that was intentionally evasive, false or misleading. In order for the defendant to be found guilty of Count 5, you must all agree that one or more of the following statements was material and intentionally evasive, false or misleading, with all of you unanimously agreeing as to which statement or statements so qualify:

[…]

6. Statement C:

Q: Did Greg ever give you anything that required a syringe to inject yourself with?

A: I've only had one doctor touch me. And that's my only personal doctor. Greg, like I said, we don't get into each others' personal lives. We're friends, but I don't – we don't sit around and talk baseball, because he knows I don't want – don't come to my house talking baseball. If you want to come to my house and talk about fishing, some other stuff, we'll be good friends, you come around talking about baseball, you go on. I don't talk about his business. You know what I mean? …

Q: Right.

A: <u>That's what keeps our friendship. You know, I am sorry, but that – you know, that – I was a celebrity child, not just in baseball by my own instincts. I became a celebrity child with a famous father. I just don't get into other people's business because of my father's situation, you see…</u>

Instructions to Jury (Doc. 356), 10–12.

### C. Other grand jury testimony

During the trial, a transcript of defendant's grand jury testimony was read to the jury and provided to the jury as the government's Exhibit 37.[3] Immediately after making Statement C, defendant testified as follows:

[A.] So, I don't know -- I don't know -- I've been married to a woman five years, known her 17 years, and I don't even know what's in her purse. I have never looked in it in my lifetime. You know, I just -- I don't do that, I just don't do it, and you know, learned from my father and throughout his career, you don't get in no one's business, you can't -- there's nothing they can say, you can't say nothing about them. Just leave

---

[3] The transcript was complete, except for portions that were redacted because defendant or the questioners referred to evidence that was excluded from use in defendant's trial.

5

it alone. You want to keep your friendship, keep your friendship.

        Q. Did either Mr. Anderson or Mr. Conte ever give you a liquid that they told you to inject into yourself to help you with this recovery type stuff, did that ever happen?

        A. No.

Trial Exh. 37 at TR 42:24–43:13.

At this point, the questioning prosecutor was prepared to move on, but a second prosecutor interrupted to continue asking questions along this line.

        Q. Okay. At this time, Mr. Bonds, the grand jury has --

        MR. NADEL: If I could just go back to Mr. Nedrow's question a few moments ago.

        MR. NEDROW: Okay.

BY MR. NADEL:

        Q. I wasn't sure if I heard the answer to the question. Other than your own personal doctor that you referred to --

        A. Well, the team -- you know, you have to have a physical. I'm sorry. Forgot about the team. You have to have a physical, they take blood from you then. But I wouldn't let no one, no. That's why my personal doctor drew the blood for BALCO to begin with.

        Q. So no one else other than perhaps the team doctor and your personal physician has ever injected anything in to you or taken anything out?

        A. Well, there's other doctors from surgeries. I can answer that question, if you're getting technical like that. Sure, there are other people that have stuck needles in me and have drawn out -- I've had a bunch of surgeries, yes.

        Q. So --

        A. So sorry.

        Q. -- the team physician, when you've had surgery, and your own personal physician. But no other individuals like Mr. Anderson or any associates of his?

        A. **No, no.**

*Id.* at TR 43:14–44:17. Defendant was charged with making a false statement for the answer "[n]o, no" that appears above in bold.

Defendant's testimony continued as follows:

BY MR. NEDROW:

        Q. Just to follow-up before I go on to my other thing, have you ever yourself

6

injected yourself with anything that Greg Anderson gave you?

  A. I'm not that talented, no.

*Id.* at TR 44:19–44:22.

A short while later, the government once again asked questions about injections:

  Q. And, again, I guess we've covered this, but – and did he ever give you anything that he told you had to be taken with a needle or syringe?

  A. Greg wouldn't do that. He knows I'm against that stuff. So, he would never come up to me -- he would never jeopardize our friendship like that.

  Q. Okay. So, just so I'm clear, the answer is no to that, he never gave you anything like that?

  A. Right.

*Id.* at TR 48:22–49:5.[4]

## IV. The remainder of the trial

In addition to hearing from Special Agent Novitzky, and being read defendant's grand jury testimony, the jury heard testimony from the following individuals:

- Steven Hoskins, defendant's childhood friend who later worked for defendant. *See* Testimony of Steven Hoskins, beginning at TR 372 (Doc. 319). The jury also heard portions of a conversation between Steven Hoskins and Greg Anderson that Hoskins recorded in the Giants locker room at the beginning of the 2003 baseball season. *See id.* at TR 446.

- Larry Bowers, the chief science officer at the U.S. Anti-Doping Agency. *See* Testimony of Larry Bowers, beginning at TR 584 (Doc. 320).

- Miguel Murphy, the San Francisco Giants' equipment manager. *See* Testimony of Miguel Murphy, beginning at TR 733 (Doc. 328).

- Kimberly Bell, defendant's former lover. *See* Testimony of Kimberly Bell, beginning at TR 744 (Doc. 328).

- Barry Sample, an employee of Quest Diagnostics ("Quest"), which performed steroid screenings

---

[4] These are examples of testimony provided by defendant in response to questions about injections and injectable items, and the list is by no means exhaustive.

7

of specimens provided by BALCO and by Major League Baseball. *See* Testimony of Barry Sample, beginning at TR 1018 (Doc. 329). Dale Kennedy, a subcontractor for Comprehensive Drug Testing, which assisted Major League Baseball screen players for steroid use. *See* Testimony of Dale Kennedy, beginning at TR 1055 (Doc. 329). Michael Wilson, an IRS Special Agent who executed a search warrant on Quest, and his supervisor, Special Agent Ana Geter. *See* Testimony of Michael Wilson, beginning at TR 1274 (Doc. 330); Testimony of Ana Geter, beginning at TR 1295 (Doc. 330). Brian Bishop, Yvonne Chambers, Stephen Kauffman, Todd McGauley, Borislav Starcevic, Ronald Gonzalez, Szeman Leung, and Dr. Don Catlin, employees of the UCLA Olympic Analytical Laboratory, who received and tested urine samples seized from Quest and analyzed the test results. Testimony of Brian Bishop, beginning at TR 1314 (Doc. 330); Testimony of Yvonne Chambers, beginning at TR 1353 (Doc. 330); Testimony of Stephen Kauffman, beginning at TR 1354 (Doc. 330); Testimony of Todd McGauley, beginning at TR 1412 (Doc. 330); Testimony of Borislav Starcevic, beginning at TR 1421 (Doc. 330); Testimony of Ronald Gonzalez, beginning at TR 1689 (Doc. 363); Testimony of Szeman Leung, beginning at TR 1694 (Doc. 363); Testimony of Don Catlin, beginning at TR 1611 (Doc. 331). On the basis of the above testimony, documents were admitted into evidence that showed that a urine specimen provided by defendant in late May 2003 as part of Major League Baseball's testing program tested positive for THG in 2006.

- Stanley Conte, former director of medical services and head athletic trainer for the San Francisco Giants. *See* Testimony of Stanley Conte, beginning at TR 1098 (Doc. 329).
- Jason Giambi, Jeremy Giambi, Marvin Benard, and Randy Velarde, professional baseball players who received performance enhancing drugs from Anderson. *See* Testimony of Jason Giambi, beginning at TR 1175 (Doc. 329); Testimony of Jeremy Giambi, beginning at TR 1204 (Doc. 329); Testimony of Marvin Benard, beginning at TR 1224 (Doc. 329); Testimony of Randy Velarde, beginning at TR 1264 (Doc. 330).
- Arthur Ting, one of defendant's doctors. *See* Testimony of Arthur Ting, TR 1470 (Doc. 331).
- Kathleen ("Kathy") Hoskins, Steven Hoskins's sister, also a childhood friend of defendant who later worked for defendant. *See* Testimony of Kathleen Hoskins, TR 1548 (Doc. 331).

8

**LEGAL STANDARD**

**I.     Rule 29**

Rule 29 of the Federal Rules of Criminal Procedure requires the Court, on a defendant's motion, to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "A defendant is not required to move for a judgment of acquittal before the court submits the case to the jury as a prerequisite for making such a motion after jury discharge." *Id.* at 29(c)(3). "If the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed. The court must specify the reasons for that determination." *Id.* at 29(d)(1).

The Court's review of the constitutional sufficiency of evidence to support a criminal conviction is governed by *Jackson v. Virginia*, 443 U.S. 307 (1979), which requires a court to determine whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis original); *see also McDaniel v. Brown*, --- U.S. ----, 130 S. Ct. 665, 673 (2010) (reaffirming this standard). *Accord United States v. Nevils*, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (en banc). This rule establishes a two-step inquiry:

> First, a . . . court must consider the evidence presented at trial in the light most favorable to the prosecution. . . . [And s]econd, after viewing the evidence in the light most favorable to the prosecution, the . . . court must determine whether this evidence, so viewed, is adequate to allow "any rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt."

*Nevils*, 598 F.3d at 1164 (quoting *Jackson*, 443 U.S. at 319) (emphasis in *Jackson*, final alteration in *Nevils*).

**II.    Rule 33**

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The Ninth Circuit described the standard for granting a new trial in *United States. v. A. Lanoy Alston, D.M.D., P.C.*, 974 F.2d 1206 (9th Cir. 1992),

9

which it reaffirmed in *United States v. Kellington*, 217 F.3d 1084 (9th Cir. 2000):

> [A] district court's power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal. The court is not obliged to view the evidence in the light most favorable to the verdict, and it is free to weigh the evidence and evaluate for itself the credibility of the witnesses. . . . If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.

*Kellington*, 217 F.3d at 1097 (internal quotation marks and citations omitted).

## DISCUSSION

### I. Motion for acquittal

Section 1503 of Title 18 of the United States Code provides:

> Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States magistrate or other committing magistrate, in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, magistrate judge, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished . . . .

The Supreme Court has described the structure of the statute as follows:

> first it proscribes persons from endeavoring to influence, intimidate, or impede grand or petit jurors or court officers in the discharge of their duties; it then prohibits injuring grand or petit jurors in their person or property because of any verdict or indictment rendered by them; it then prohibits injury of any court officer, commissioner, or similar officer on account of the performance of his official duties; finally, the "Omnibus Clause" serves as a catchall, prohibiting persons from endeavoring to influence, obstruct, or impede the due administration of justice. The latter clause, it can be seen, is far more general in scope than the earlier clauses of the statute.

*United States v. Aguilar*, 515 U.S. 593, 598 (1995).

"[T]he word 'corruptly' as used in the statute means that the act must be done with the purpose of obstructing justice." *United States v. Rasheed*, 663 F.2d 843, 852 (9th Cir. 1981). Because "the obstruction of justice statute was designed to proscribe all manner of corrupt methods of obstructing justice," the proper inquiry for the Court is whether the means used by a defendant "is a corrupt means of influencing, obstructing or impeding the administration of justice." *Id.* As the Seventh Circuit has

10

explained, "it is not the means employed by the defendant that are specifically prohibited by the statute; instead, it is the defendant's corrupt endeavor which motivated the action." *United States v. Cueto*, 151 F.3d 620, 631 (7th Cir. 1998). Thus, "[o]therwise lawful conduct . . . can transgress § 1503 if employed with the corrupt intent to accomplish that which the statute forbids." *Id.*

Although the omnibus clause proscribes both obstruction and the "endeavor" to obstruct, the scope of the clause is not unlimited. It requires not only that "the defendant act[] with an intent to obstruct justice," even if he "is foiled in some way"; but also that the defendant act "in a manner that is likely to obstruct justice." *Id.* at 601–02. "In other words, the endeavor must have the natural and probable effect of interfering with the due administration of justice." *Id.* at 599–600 (internal quotation marks omitted). The Ninth Circuit has explained that "[t]he crime of obstruction of justice under § 1503 is . . . analogous to inchoate offenses like attempt and conspiracy" and "factual impossibility is not a defense." *See United States v. Fleming*, 215 F.3d 930, 936 (9th Cir. 2000) (rejecting narrower reading of the statute under *Aguilar*).

Thus, materiality is an implicit element of section 1503. *See United States v. Thomas*, 612 F.3d 1107, 1128–29 (9th Cir. 2010); *see also United States v. Ryan*, 455 F.2d 728, 734–35 (9th Cir. 1972) (holding that "the acts complained of" as the basis for an obstruction charge under section 1503 "must bear a reasonable relationship to the subject of the grand jury inquiry"). A statement that is material under 18 U.S.C. section 1623(a) is material under 18 U.S.C. section 1503. *See Thomas*, 612 F.3d at 1129 & n.8 (upholding verdict of guilt under 1503, even though the jury was not instructed that the obstructionist statement needed to be material, because, when considering the false statement charge, the jury independently found that the obstructionist statement was material). In order to be material under section 1623(a), a false statement need only be "relevant to any subsidiary issue under consideration." *United States v. McKenna*, 327 F.3d 830, 839 (9th Cir. 2003). "The government need not prove that the perjured testimony actually influenced the relevant decision-making body." *Id.*

Defendant argues that the jury's guilty verdict cannot stand because section 1503 does not

11

proscribe obstructing justice by means of truthful but evasive answers.[5] It is true that the parties have pointed to no reported decisions reviewing such a conviction. However, at least one federal district court has concluded "that literally true but evasive and misleading testimony" would support a conviction for obstruction under section 1503. *See United States v. Remini*, 967 F.2d 754, 755 (2d Cir. 1992) (describing a trial court ruling in *United States v. Gambino (Thomas)*, 89-CR-431 (E.D.N.Y.) (Jack B. Weinstein, J.)). Additionally, with regard to 18 U.S.C. section 1505, which uses nearly identical language to proscribe obstruction of administrative proceedings and legislative inquiries and investigations, the D.C. Circuit has explained that "literal truth may not be a complete defense to obstruction," because "[e]ven a literally true statement may be misleading." *See United States v. Safavian*, 528 F.3d 957, 968 (D.C. Cir. 2008); *see also United States v. Browning*, 630 F.2d 694, 699 (10th Cir. 1980) ("Literal truth is not the test here.").

Moreover, contrary to defendant's assertion, the reasoning behind the original cases holding that a false statement to a grand jury can form the factual basis of an obstruction charge is equally applicable to this situation. For example, in rejecting the appellant's argument that the omnibus clause of section 1503 should be limited "to situations where the defendant interferes with other witnesses or documentary evidence," the Second Circuit said, *inter alia*, that the statute:

> deals with the deliberate frustrations through the use of corrupt or false means of an

---

[5] It is clear that a false statement to a grand jury can, under certain circumstances, form the factual basis of an obstruction charge. *See, e.g., United States v. Gonzalez-Mares*, 752 F.2d 1485, 1491 (9th Cir. 1985). *Cf. United States v. Thomas*, 612 F.3d 1107 (9th Cir. 2010); *United States v. Thoreen*, 653 F.2d 1332, 1341 (9th Cir. 1981) (citing a Fifth Circuit case for the proposition that "[a] witness's sham denial of knowledge . . . obstructs justice by closing off avenues of inquiry and stifling a jury's ability to ascertain the truth").

The government argues that Statement C was false, and that the conviction can be affirmed on that ground. As part of Statement C, defendant said "I just don't get into other people's business" and "[t]hat's what keeps our friendship." The phrase "[t]hat's what keeps our friendship" came immediately after defendant explained that he and Anderson didn't "get into each others' personal lives" or "sit around and talk baseball." The government argues that defendant's explanation as to "what keeps our friendship" was false, because "[t]he basis for the defendant's relationship with Anderson was the overlap in their businesses: Anderson's business was the defendant's business." *See* Gov't Oppo. at 15.

The government has proposed one plausible way to read defendant's testimony. However, there are other ways to understand defendant's testimony, and in particular his use of the phrase "other people's business," which can mean different things, and which in this case does not necessarily refer to the "business" of athletic training or the "business" of distribution and use of performance enhancing drugs. Particularly since the government did not argue this reading to the jury, the Court will not deny defendant's motion based on the government's explanation of how defendant's Statement C might have been false.

12

agency's attempt to gather relevant evidence. The blatantly evasive witness achieves
this effect as surely by erecting a screen of feigned forgetfulness as one who burns files
or induces a potential witness to absent himself.

*See United States v. Cohn*, 452 F.2d 881, 883–84 (2d Cir. 1971). Reaching a similar conclusion, the Fifth Circuit has stated that whether testimony is "described in the indictment as 'evasive' because [a person] deliberately concealed knowledge or 'false' because he blocked the flow of truthful information is immaterial." *United States v. Griffin*, 589 F.2d 200, 204 (5th Cir. 1979). In either event, it can constitute obstruction of justice, as long as the government charges and proves at trial "that the testimony had *the effect* of impeding justice." *Id.* (emphasis added). These cases are in accord with Ninth Circuit law that emphasizes the omnibus clause's prohibition of endeavoring to obstruct through corrupt motive, rather than an enumeration of particular means. *See Rasheed*, 663 F.2d at 852.[6]

Next, defendant argues that the text of section 1503 is ambiguous and the rule of lenity commands a narrow construction of the proscription.[7] Appellate courts have already limited the scope of the omnibus provision of section 1503 by construing the words "endeavor" and "corruptly," and the Supreme Court adopted those limitations in *Aguilar*. After *Aguilar*, the contours of the omnibus provision of section 1503 have been quite clear: The statute criminalizes "conduct . . . where the defendant acts with an intent to obstruct justice, and in a manner that is likely to obstruct justice," even if he "is foiled in some way." *Aguilar*, 515 U.S. at 601–02. Defendant does not point to any word or

---

[6] Cases discussing United States Sentencing Guideline 3C1.1, which provides for an enhancement for obstruction of justice, are not applicable because the commentary instructs that the guideline covers certain instances of "perjury." See U.S.S.G. § 3C1.1 cmt. n. 4 (2010). Thus, courts applying the obstruction enhancement must look to the definition of perjury "that has gained general acceptance and common understanding under the federal criminal perjury statute." *See United States v. Dunnigan*, 507 U.S. 87, 94 (1993); *United States v. Miller*, 527 F.3d 54 (3d Cir. 2008). In a section 1503 case, courts look not to whether the means used to obstruct justice satisfy the elements of a particular crime, but rather to the "corrupt endeavor which motivated the action." *See Cueto*, 151 F.3d at 631 (explaining that "[o]therwise lawful conduct . . . can transgress § 1503 if employed with the corrupt intent to accomplish that which the statute forbids"); *see also Rasheed*, 663 F.2d at 852 (explaining that section 1503 "was designed to proscribe all manner of corrupt methods of obstructing justice").

[7] As the Supreme Court has explained,
[u]nder a long line of our decisions, the tie must go to the defendant. The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them. This venerable rule . . . vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed.
*United States v. Santos*, 553 U.S. 507, 514 (2008) (citations omitted).

13

phrase in the statute that remains unclear.

Even if truthful but evasive answers can form the factual basis of a section 1503 conviction, defendant argues, Statement C does not support the jury's verdict in this case, because it responded to a question that was asked again, and which defendant a short time later answered directly and truthfully by saying that Anderson never gave him anything with which he would be required to inject himself. Thus, defendant argues, the statement was not material and could not have been made with the requisite *mens rea* because he did not, in fact, "evade[]" answering the question of whether he had been given any substance to inject.

Assuming defendant later answered the specific question regarding *self* injection truthfully, that is not dispositive. Viewed in the light most favorable to the government, the record supports a finding, beyond a reasonable doubt, that the question was material to the grand jury's investigation of BALCO and Greg Anderson for unlawfully distributing performance enhancing drugs, and that defendant endeavored to obstruct the grand jury by not answering it when it was first asked. The conviction can be upheld if defendant *endeavored* to obstruct justice, even if he did not succeed. *Aguilar*, 515 U.S. at 602 (explaining that a person can be convicted even if his endeavor "is foiled" in some way). Here, defendant repeatedly provided nonresponsive answers to questions about whether Anderson had ever provided him with injectables, resulting in the prosecuting attorneys asking clarifying question after clarifying question, and even once resulting in one prosecutor interrupting another who was about to move on to a new topic in order to clarify defendant's mixed responses. An evasive answer about an issue material to the grand jury is not necessarily rendered immaterial by the later provision of a direct answer, even if that direct answer is true.

Additionally, while he provided several direct yes or no answers to questions regarding injectables when they were asked for the second or third time, the evidence supports a finding that at least one of those answers—to the question of whether Anderson had ever injected him with any substance—was false.[8] Kathy Hoskins, a childhood friend whom the defendant paid to shop and pack

---

[8] Defendant was also charged with making a false statement for answering "[n]o, no" to the question of whether anyone else other than the team doctor, his personal physician, and those involved in performing surgeries on him, such as "individuals like Mr. Anderson or any associates of

14

clothing for him, testified that between 2001 and 2003, she saw Greg Anderson and defendant go into an office at the defendant's house for one or two minutes, ten or fifteen times, and once she witnessed Anderson use a syringe to give the defendant an injection in the abdominal area. Testimony of Kathy Hoskins, TR 1548, 1551–55, 1557–62 (Doc. 331). After receiving the injection, "Barry said, you know, that's a little some some, when I go on the road, you know, we can't detect it, you can't catch it." *Id.* at TR 1560:20–1560:22.

Defendant makes two arguments about having been charged with obstruction for "the totality" of his grand jury testimony. First, he argues that the government changed its theory of prosecution by the time the count came to trial:

> Prior to trial, when the defendant challenged [the obstruction count], the government responded to the challenge with the statement "that the factual basis in support of [the obstruction count] consists of the *totality* of Bond's intentionally evasive, false and misleading conduct during [his] testimony." (Dkt. 203 [Opp., at 7]; emphasis added.) Given the manner in which Count Five was charged, permitting the obstruction conviction to rest on anything other than the totality of Mr. Bonds testimony would constitute a constructive amendment of the indictment.

Def. Mot. at 13–14 (citing *Stirone v. United States*, 361 U.S. 212 (1960); *United States v. Shipsey*, 190 F.3d 1081, 1086–87 (9th Cir. 1999)).

Defendant is incorrect. Defendant was charged with obstructing or endeavoring to obstruct justice. He was also charged with using particular means to do so: "knowingly giving material Grand Jury testimony that was intentionally evasive, false, and misleading, including but not limited to" the particular statements charged separately as being false. *See* Third Superseding Indictment (Doc. 213). It is clear from the language of the indictment, as well as from the manner in which the government has proceeded prosecuting this case, that defendant was at risk of being convicted of obstruction of justice on the basis of any and all statements that he made to the grand jury that were evasive, false, or

---

his," had "ever injected anything in to [him] or taken anything out." The jury hung on that count and did not return a verdict on it.

Where a defendant is convicted of one crime and acquitted of a second, and those verdicts are inconsistent with each other, the conviction need not be reversed. *See United States v. Powell*, 469 U.S. 57, 60, 63-66 (1984) (explaining that the acquittal may have resulted from the jury's unreviewable power to return verdict of not guilty for impermissible reasons). This is no less true when the jury is unable to reach a verdict on the second count. *See Yeager v. United States*, 129 S. Ct. 2360, 2368 (2009) ("[T]here is no way to decipher what a hung count represents."). The fact that the jury hung on count 2 is not relevant to the resolution of this motion.

15

misleading. As the time for trial approached, the government proposed specific statements that it would identify to the jury. The Court reviewed and then limited the number of statements. The jury was instructed that it could only convict if it agreed beyond a reasonable doubt that defendant obstructed or endeavored to obstruct justice by making a material statement or material statements that were evasive, false, or misleading; and if it could agree beyond a reasonable doubt as to which material statement or statements were evasive, false, or misleading. As the Court said during argument regarding the proposed jury instruction, "the notice that you were given is that there could be anything in the grand jury transcript that would be what they're pointing to as obstructive, which is slightly different from saying that, overall, the whole thing is an obstruction of justice." TR 1867:7–1867:11 (Doc. 364). Although the word "totality" may not have been the best word that the government could have chosen to describe the factual basis of the obstruction charge, at no point did the government commit to or even hint at pursuing a theory that was different from the theory ultimately argued to the jury.

Second, defendant argues that the jury should have been instructed to consider defendant's grand jury testimony in its totality. Thus, as to the third element of the obstruction charge, the jury would have been instructed that it needed to find beyond a reasonable doubt that defendant obstructed justice

> 3. by knowingly giving material testimony that, *when considered in its totality*, was intentionally evasive, false, and misleading.

*See* Defendant's Proposed Instructions at 5 (Doc. 344) (emphasis added). Defendant requested this instruction at trial, along with an instruction (that was given) that the jury needed to agree unanimously as to what specific statement or statements constituted material testimony that was intentionally evasive, false or misleading. After argument, the Court rejected the request to insert this "when considered in its totality" language. *See* Advice to Counsel Re: Instructions (Doc. 355).

The jury instructions proposed by defendant were confusing. Because of the placement of the phrase "when considered in its totality," and the separate unanimity instruction requiring the jury to agree on one or more statements from his testimony, it would not have been clear from the proposed instructions (1) whether the jury was to consider a statement in its totality when determining whether that statement was intentionally evasive, false, or misleading; (2) whether the jury was to consider the grand jury testimony in its totality when determining whether any particular statement was intentionally

16

evasive, false, or misleading; or (3) whether the jury was required to determine *both* that the testimony as a whole was both material and intentionally evasive, false, or misleading *and* that a specific statement was both material and intentionally evasive, false, or misleading.

Not only would the instruction have been confusing, it would either have been unnecessary or legally incorrect. It was clear that the jury needed to consider a statement "in its totality" when determining whether that statement was intentionally evasive, false, or misleading. It was also clear from the instructions that were given that the jury needed to consider defendant's grand jury testimony "in its totality" when determining whether any particular statement was intentionally evasive, false, or misleading. The jury was specifically instructed "to weigh and to evaluate all the evidence received in the case" when deciding the facts. *See* Instructions to Jury at 2 (Doc. 356). Additionally, the jury was instructed that "[a] statement was material if it had a natural tendency to influence, or was capable of influencing, the decision of the grand jury." *Id.* at 10. In order to determine whether a specific statement was material, therefore, the jury had to consider defendant's grand jury testimony "in its totality." And the jury was instructed that "corruptly" means "for the purpose of obstructing justice." *Id.* In order to determine whether defendant made a particular statement for the purpose of obstructing justice, the jury necessarily was required to consider the "totality" of the grand jury testimony, along with the other evidence presented in the case that would be relevant to the question. And there is no indication that the jury was confused on this point. In fact, the jury specifically requested eleven extra copies of defendant's entire grand jury testimony. *See* Jury Notes (Doc. 377 at 3). Finally, neither the statute, nor the indictment, nor the government's actions prosecuting this case, support requiring the jury to determine *both* that the testimony as a whole was both material and intentionally evasive, false, or misleading *and* that a specific statement was both material and intentionally evasive, false, or misleading.

Defendant's final argument for acquittal is that the prosecutor actually encouraged him to continue the answer that was later charged as being evasive, and therefore he should be forgiven his rambling. Defendant argues that a prosecutor has a duty to clarify unresponsive answers, but that rather than doing so in this case, in the middle of defendant's rambling statement the prosecutor said "right," thus encouraging him to continue rather than urging him back on track. Statement C is what defendant

17

said immediately following the "right."

Viewed in the light most favorable to the *defense*, the prosecutor's "right" could perhaps be considered a statement of encouragement. Viewed in the light most favorable to the *government*, as it must be for purposes of this motion, the prosecutor's "right" was the product of defendant's diversionary tactics, of his endeavor to evade providing a direct answering to the prosecutor's material question.

The government explains the verdict on Count 5 as follows:

> A rational juror could reasonably find from all the evidence presented at trial that the defendant gave the testimony underlined in Statement C to intentionally evade the question whether Anderson provided athlete clients with injectable substances [and] to intentionally mislead the grand jury into believing the defendant's testimony that, despite his close association with Anderson, the defendant knew nothing about Anderson's alleged distribution of [performance enhancing drugs].

Gov't Oppo. at 15—16. The Court agrees.

## II.  Motion for a new trial

Defendant argues that the Court should consider all of the above discussed arguments when determining whether to grant him a new trial, as well as two additional factors: (1) what defendant sees as a misleading closing argument with regard to Statement C; and (2) that the jury was instructed in the disjunctive rather than the conjunctive—i.e., that it could convict if Statement C was "evasive, false, *or* misleading," rather than "evasive false *and* misleading."

Defendant objects to portions of the government's closing, such as when the government argued that defendant "sought again and again to avoid answering questions about injections" and that he was "refusing to answer the question because . . . the defendant [could not] tell the truth of being injected." *See* Gov't Closing, TR 1933:10–1933:11; 1980:20–1980:21 (Doc. 365) As explained above, defendant did repeatedly provide what could reasonably be viewed as evasive responses to questions about injections, and the evidence supports a conclusion that he never actually provided a truthful answer as to whether he ever was injected by Anderson. The government's closing argument was not misleading.

Defendant requested a conjunctive instruction at trial. After argument, the Court rejected this request. See Advice to Counsel Re: Instructions (Doc. 355). The words "evasive" "false" and "misleading" do not appear in the obstruction statute, although defendants are often charged in

18

indictments with violating section 1503 by means of evasive, false, and misleading statements. *See, e.g., Thomas*, 612 F.3d at 1112; *United States v. Conley*, 249 F.3d 38, 42 (1st Cir. 2001); *see also United States v. Biaggi*, 853 F.2d 89, 104 (2d Cir. 1988) (encouraging another to make such statements); *United States v. Heldt*, 668 F.2d 1238, 1250 (D.C. Cir. 1981) (conspiracy to obstruct justice). A charge for "evasive, false, and misleading conduct" under section 1503 is like a charge for a disjunctively defined offense. *Cf. United States v. Bettencourt*, 614 F.2d 214, 219 (9th Cir. 1980) ("In the absence of [any] other fatal defect in the indictment, a jury may convict on a finding of any of the elements of a disjunctively defined offense, despite the grand jury's choice of conjunctive language in the indictment."). As discussed above, the focus of the omnibus clause of the obstruction statute is on the defendant's "intent to accomplish what the statute forbids," not the method he chooses, *see Cueto*, 151 F.3d at 631, and the conviction can properly stand even if it is based on an evasive or misleading—but not false—statement. The jury instruction was proper.

Having reconsidered the arguments made in support of defendant's motion for acquittal, and having considered the additional factors that defendant argues support his motion for a new trial, while weighing the evidence presented at trial and evaluating the credibility of the different witnesses, the Court concludes that the evidence does not preponderate against the verdict, and no new trial is required.

### III. Immunity grant

Defendant's final argument is that a prosecution under section 1503 for a truthful but temporarily unresponsive statement is inconsistent with the immunity given defendant before his testimony and with the Fifth Amendment's proscription of compelled self-incrimination.

In *Thomas*, the Ninth Circuit held that obstructing justice under section 1503 can constitute conduct that "otherwise fail[s] to comply" with an immunity order. *See* 612 F.3d at 1125–28. Defendant attempts to distinguish *Thomas* because the appellant in that case had been convicted of obstruction on the basis of a false statement, while defendant Bonds was convicted on the basis of what he argues was a true statement. The holding in *Thomas* was not based on the fact that the appellant's testimony had been false, but on the fact that it "'frustrate[d] the purpose of the grant of immunity.'" *See id.* at 1126 (quoting *United States v. Duran*, 41 F.3d 540, 545 (9th Cir. 1994)). As in *Thomas*,

defendant Bonds was granted immunity pursuant to 18 U.S.C. section 6002, and "[t]he purpose of the immunity order in this case was to compel [defendant] to testify truthfully *and in good faith* before the grand jury to assist it in its investigation into the BALCO case." *See id.* at 1126 (emphasis added). "'A grant of immunity relates to the past, not to future conduct.'" *Id.* at (quoting *United States v. Black*, 776 F.2d 1321, 1327 (6th Cir. 1985)). The prosecution of defendant under section 1503 was constitutionally permissible under the Fifth Amendment and consistent with the immunity order. S*ee id.* (citing *Pillsbury Co. v. Conboy*, 459 U.S. 248 (1983), for the proposition that section 6002 was "intended to provide as little immunity as the Constitution will allow").[9]

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby DENIES defendant's motion for acquittal and DENIES defendant's alternate motion for a new trial. (Doc. 396.)

**IT IS SO ORDERED.**

Dated: August 26, 2011

SUSAN ILLSTON
United States District Judge

---

[9] Defendant appears to argue that his immunity grant was broader than that required by the Fifth Amendment, because of how the government explained the immunity order to him when he testified before the grand jury. The government read the immunity order to defendant and then explained to defendant that he could be prosecuted for "otherwise failing to comply with" the order. *See* Gov't Trial Ex. 37 at 10. This was an accurate explanation that did not serve to expand the terms of the immunity order.

20